**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **AN GLOBAL LLC, *et al.*,**[1] | Case No. 23-11294 (___) |
| **Debtors.** | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION 1L SECURED PARTIES,
(IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL
HEARING, AND (VI) GRANTING RELATED RELIEF**

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") hereby move (the "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105(a), 361, 362, 363, 364, 503(b), 506(c), and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"):  (i) authorizing the Debtors to (a) obtain postpetition financing and (b) utilize cash collateral, (ii) granting senior secured priming liens and superpriority administrative expense claims, (iii) granting adequate protection to the

---

1.  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/AgileThought.  The Debtors' address is 222 W. Las Colinas Boulevard, Suite 1650E, Irving, TX 75039.

Prepetition 1L Secured Parties (as defined herein), (iv) modifying the automatic stay, (v) scheduling a final hearing, and (vi) granting related relief. In support of the Motion, the Debtors submit the *Declaration of James S. Feltman in Support of the Debtors' DIP Financing Motion* (the "DIP Declaration"), filed contemporaneously herewith, and respectfully state as follows:[2]

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek, among other things:

(i)      authorization for Debtor AN Global LLC, in its capacity as borrower (the "Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "Guarantors"), on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $118,637,658 (the "DIP Facility"), which consists of (i) a new money multi-draw term loan facility in an aggregate principal amount of $22,700,000 (the commitments thereunder, the "New Money DIP Commitments" and the Interim Term Loans and Final Term Loans (each as defined herein) advanced thereunder, the "New Money DIP Loans") to be funded by certain Prepetition 1L Lenders (as defined herein), and (ii) upon entry of the Final Order, a deemed term loan "roll-up" postpetition financing of the remaining outstanding Prepetition 1L Obligations in the aggregate equal to $95,937,658 (such rolled-up debt, the "Roll-Up Loans" and together with the New Money DIP Loans, the "DIP Loans");

(ii)     authorization for the Debtors to enter into that certain *Senior Secured Superpriority Priming Debtor-In-Possession Financing Agreement* among AgileThought, Inc. ("Holdings"), the Borrower, the other Guarantors, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Blue Torch Finance LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Documents"), which shall be in substantially the same form attached to the Interim Order as **Exhibit 2**, and to perform their respective obligations thereunder and all such other and

---

2.   Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Interim Order or, to the extent not defined therein, then as defined in the DIP Credit Agreement (as defined herein).

further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(iii)     authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein), and (y) upon entry of the Final Order to effectuate the Roll-Up Loans;

(iv)     the granting of adequate protection to the lenders under that certain Financing Agreement, dated as of May 27, 2022 (as amended, supplemented or otherwise modified, the "Prepetition 1L Credit Agreement" and, together with all security, pledge and guaranty agreements and all "Loan Documents" (as defined in the Prepetition 1L Credit Agreement), each as amended, supplemented or otherwise modified, the "Prepetition 1L Documents"), by and among AN Global LLC, as borrower, the subsidiaries of Holdings party thereto, as guarantors (collectively with AN Global LLC, the "Prepetition 1L Obligors"),[3] the several lenders party thereto (the "Prepetition 1L Lenders"), and Blue Torch Finance LLC, as administrative agent and collateral agent for the Prepetition 1L Lenders (the "Prepetition 1L Agent" and, collectively with the Prepetition 1L Lenders, the "Prepetition 1L Secured Parties") with respect to, among other things, the use of their Cash Collateral and the Prepetition Collateral;

(v)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Closing Fee (as defined herein), the Agency Fee (as defined herein), the Audit and Collateral Monitoring Fees (as defined herein), the Exit Fee (as defined herein), and the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vi)     the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, that was not subject to a valid and perfected

---

3.   The Prepetition 1L Obligors are: AN Global LLC; AgileThought, Inc.; AgileThought, LLC; 4th Source, LLC; IT Global Holdings LLC; 4th Source Holding Corp.; QMX Investment Holdings USA, Inc.; AGS Alpama Global Services USA, LLC; Entrepids Technology Inc.; 4th Source Mexico, LLC; AN USA; AgileThought Digital Solutions S.A.P.I. de C.V.; and AgileThought México, S.A. de C.V.

lien on the Petition Date (such property and assets, the "<u>Unencumbered Assets</u>"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(vii)   the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(viii)   the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition First Liens (as defined in the Interim Order), subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(ix)   the granting of superpriority administrative expense claims against each of the Debtors' estates in favor of the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(x)    the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(xi)    authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(xii)    the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the Interim Order, the Final Order, and the DIP Documents;

(xiii)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on this Motion be held before this Bankruptcy Court to consider entry of the Interim Order;

(xiv)    that this Bankruptcy Court schedule a final hearing (the "Final Hearing") to consider entry of a Final Order authorizing and approving, on a final basis, among other things, the Borrower's borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $22.7 million in New Money DIP Loans, the Roll-Up Loans and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents; and

(xv)    granting related relief.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory and legal predicates for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503(b) and 507(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 4001-2.

## BACKGROUND

4.     On the date hereof (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  No trustee, examiner, or creditors' committee has been appointed in these cases.  The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.     The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of James S. Feltman, Chief Restructuring Officer of the Debtors, in Support of First Day Relief*, filed contemporaneously herewith and incorporated herein by reference.

## FACTS RELEVANT TO THIS MOTION

### I.     Prepetition Facilities

6.     As of the Petition Date, the Debtors have approximately $112 million of secured indebtedness.  The following is a brief summary of the history and present status of the Debtors' prepetition secured debt obligations (collectively, the "Prepetition Facilities").

### A.     The Prepetition 1L Credit Facility

7.     On May 27, 2022, certain of the Debtors[4] entered into the Prepetition 1L Credit Agreement with the Prepetition 1L Secured Parties.  The Prepetition 1L Credit Agreement

---

4.    Debtor AN Global LLC entered the Prepetition 1L Credit Agreement as borrower, while Debtors AgileThought, Inc., AgileThought, LLC, 4th Source, LLC, IT Global Holding LLC, 4th Source Holding Corp., QMX Investment

(Footnote continued on next page)

originally provided for a $3 million revolving credit facility (the "Revolving Credit Facility"), and a $55 million term loan facility (the "Term Loan Facility," and together with the Revolving Credit Facility, the "Prepetition 1L Credit Facility").  The Prepetition 1L Credit Agreement was subsequently amended such that the Revolving Credit Facility was increased to $6 million.  In addition, in the weeks leading up to the Petition Date, the Prepetition 1L Credit Agreement was amended to provide additional term loans in the aggregate principal amount of $4,635,490 and $10,598,775, respectively (together, the "Emergency Bridge").  As of the Petition Date, the total amount due under the Prepetition 1L Credit Facility was approximately $96 million, inclusive of interest and fees.

8.    All obligations under the Prepetition 1L Credit Agreement (the "Prepetition 1L Obligations") are secured by Collateral (as defined in the Prepetition 1L Credit Agreement and related Pledge and Security Agreement) consisting of (i) substantially all of the tangible and intangible assets of Debtor AN Global LLC and the Prepetition 1L Guarantors other than AgileThought Mexico, S.A. de C.V.; (ii) the proceeds therefrom; and (iii) pledges of the Mexican subsidiaries[5] (collectively, the "Prepetition 1L Collateral").

---

Holdings USA, Inc., AGS Alpama Global Services USA, LLC, Entrepids Technology Inc., 4th Source Mexico, LLC, AN USA, and AgileThought Digital Solutions, S.A.P.I. de C.V. (collectively, the "Original 1L Guarantors") entered as guarantors.  On August 10, 2022, Debtor AgileThought Mexico, S.A. de C.V. joined the Prepetition 1L Credit Agreement as an additional guarantor (together with the Original BT Guarantors, the "Prepetition 1L Guarantors").

5.    Including AgileThought Digital Solutions S.A.P.I. de C.V.; AgileThought Mexico, S.A. de C.V.; AN Data Intelligence, S.A. de C.V.; AN Extend S.A. de C.V.; AN UX, S.A. de C.V.; Faktos Inc, S.A.P.I. de C.V.; Facultas Analytics, S.A.P.I. de C.V.; Entrepids Mexico, S.A. de C.V.; AgileThought Servicios Administrativos, S.A. de C.V.; AgileThought Servicios México, S.A. de C.V.; Cuarto Origen, S. de R.L. de C.V.; and AN Evolution, S. de R.L. de C.V.

B.    **The Prepetition 2L Credit Facility**

9.    On November 22, 2021, certain of the Debtors (the "Prepetition 2L Obligors")[6] entered into that certain Credit Agreement (as amended, the "Prepetition 2L Credit Agreement"), with the lenders party thereto (the "Prepetition 2L Lenders"), GLAS Americas LLC as collateral agent (the "Prepetition 2L Collateral Agent"), and GLAS USA LLC, as administrative agent (the "Prepetition 2L Administrative Agent" and, together with the Prepetition 2L Collateral Agent, the "Prepetition 2L Agents" and, together with the Prepetition 2L Lenders, the "Prepetition 2L Secured Parties" and, the Prepetition 2L Secured Parties together with the Prepetition 1L Secured Parties, the "Prepetition Secured Parties"). The Prepetition 2L Credit Agreement provided for a term loan facility in an initial aggregate principal amount of approximately $20.7 million (the "Prepetition 2L Credit Facility").

10.    Under the Prepetition 2L Credit Agreement, each Prepetition 2L Lender has the option to convert all or any portion of its outstanding loans, interest and fees into common stock of Debtor AgileThought, Inc. at any time at the respective conversion prices. On December 27, 2021, Manuel Senderos and Kevin Johnston exercised the conversion options for their respective principal amounts of $4.5 million and $0.2 million, respectively.

11.    Pursuant to an August 10, 2022 amendment to the Prepetition 2L Credit Agreement, the maturity date for the Tranche B loans, held by Nexxus Capital Private Equity Fund VI, L.P. ("Nexxus Capital"), was extended to June 15, 2023. In addition, upon maturity, such Tranche B loans, including interest and fees, became subject to a mandatory conversion into common stock of Debtor AgileThought, Inc. On June 15, 2023, the outstanding principal, interest,

---

6.    The Prepetition 2L Obligors are AgileThought, Inc. (f/k/a AN Global Inc.); AgileThought México, S.A. de C.V.; 4th Source, LLC; IT Global Holdings LLC; AN Global LLC; QMX Investment Holdings USA, Inc.; AgileThought Digital Solutions S.A.P.I. de C.V.; 4th Source Holding Corp.; Entrepids Technology Inc.; AGS Alpama Global Services USA, LLC; AN USA; and AgileThought, LLC.

and fees related to the Nexxus Capital loans, in the approximate amount of $10 million, converted to common stock of AgileThought, Inc.

12.     As of the Petition Date, approximately $13 million remains outstanding under the Prepetition 2L Credit Facility.

13.     All obligations under the Prepetition 2L Credit Agreement (the "Prepetition 2L Obligations," and together with the Prepetition 1L Obligations, the "Prepetition Obligations") are secured by Collateral (as defined in the Prepetition 2L Credit Agreement and the related Guaranty and Collateral Agreement) consisting of (i) substantially all of the tangible and intangible assets of Debtor AgileThought, Inc. and the Prepetition 2L Guarantors other than AgileThought Digital Solutions, S.A.P.I. de C.V. and (ii) the proceeds therefrom (the "Prepetition 2L Collateral," and together with the Prepetition 1L Collateral, the "Prepetition Collateral").  On May 27, 2022, the Prepetition 1L Agent and the Prepetition 2L Agents entered into a Subordination and Intercreditor Agreement regarding the relative priority of their respective liens on the Prepetition Collateral.  Pursuant to such agreement (the "Intercreditor Agreement"), the Prepetition 2L Agents have agreed not to object if any of the Prepetition 1L Secured Parties seeks to provide postpetition financing or consent to use "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral").

C.     **The AGS Subordinated Promissory Note**

14.     On June 24, 2021, Debtor AgileThought, Inc. entered into a Subordinated Promissory Note with AGS Group LLC ("AGS Group"), pursuant to which AgileThought, Inc. incurred indebtedness to AGS Group in an aggregate principal amount equal to $673,000 (as amended and restated, the "AGS Subordinated Promissory Note").  On January 31, 2023, the AGS Subordinated Promissory Note was cancelled in full and restated for a principal amount of $775,931.61, with accrued interest totaling approximately $100,000, due on March 31, 2023.  In

addition, on February 10, 2023, AgileThought, Inc. agreed to issue and pledge 414,367 shares of common stock, valued at approximately $1.8 million (approximately twice the then-current outstanding principal and interest owed under the AGS Subordinated Promissory Note), in favor of AGS Group to serve as collateral for AgileThought, Inc.'s obligations under the AGS Subordinated Promissory Note. However, pursuant to the Prepetition 1L Credit Agreement and the Prepetition 2L Credit Agreement, AgileThought, Inc. could not repay the AGS Subordinated Promissory Note if an event of default had occurred and was continuing under either the Prepetition 1L Credit Facility or the Prepetition 2L Credit Facility. The Debtors have entered into a letter agreement with AGS Group to provide that a failure to pay such indebtedness will not be deemed an event of default.

15. As of the Petition Date, AgileThought, Inc.'s obligations under the AGS Subordinated Promissory Note remain outstanding.

**D.     Exitus Capital Subordinated Note**

16. On July 26, 2021, Debtor AgileThought Digital Solutions, S.A.P.I. de C.V. entered into a Simple Loan Facility Agreement and related promissory note (together, the "Exitus Subordinated Note") with Exitus Capital, S.A.P.I. de C.V. ("Exitus Capital") in an aggregate principal amount equal to $3.7 million. The Exitus Subordinated Note matured on July 27, 2023.

17. On January 31, 2023, Debtor AgileThought, Inc. agreed to issue and pledge 1,207,712 shares of common stock, valued at approximately $5.2 million (approximately twice the then-current outstanding principal and interest owed under the Exitus Subordinated Note), in favor of Exitus to serve as collateral for AgileThought Digital Solutions, S.A.P.I. de C.V.'s obligations under the Exitus Subordinated Note. However, pursuant to the Prepetition 1L Credit Agreement and the Prepetition 2L Credit Agreement, AgileThought Digital Solutions, S.A.P.I. de C.V. could only repay the Exitus Subordinated Note if the Debtors made certain scheduled repayments under

the Prepetition 1L Credit Facility.  The Debtors did not make the required Prepetition 1L Credit Facility payments and were therefore unable to repay the Exitus Subordinated Note on the July 27, 2023 maturity date.

18.    As of the Petition Date, AgileThought Digital Solutions, S.A.P.I. de C.V.'s obligations under the Exitus Subordinated Note remain outstanding in the total amount of approximately $1.6 million.

### E.    The Prior First Lien Facility

19.    On November 12, 2018, certain of the Debtors[7] entered into a credit agreement (the "Prior Credit Agreement"), under which Monroe Capital Management Advisors, LLC ("Monroe Capital") served as administrative agent for the lenders (the "Prior Lenders," and together with Monroe Capital, the "Prior Secured Parties").  The Prior Credit Agreement provided for a $5 million revolving credit facility (the "Prior Revolving Credit Facility"), and a $98 million term loan facility (the "Prior Term Loan Facility," and together with the Prior Revolving Credit Facility, the "Prior Credit Facility").  The principal of the Prior Credit Facility was paid off on May 27, 2022.

20.    On December 29, 2021, Debtor AgileThought, Inc. agreed to issue and pledge 4,439,333 shares of common stock in favor of Monroe Capital to serve as collateral for the Debtors' obligations under the Prior Credit Facility.  Monroe Capital still holds 2,016,129 shares

---

7.    Debtors IT Global Holding LLC and 4th Source, LLC entered the Prior Credit Agreement as borrowers, while Debtors AN Global LLC, AgileThought, Inc. (f/k/a AN Global Inc.), QMX Investment Holdings USA, Inc., AgileThought Digital Solutions, S.A.P.I. de C.V., 4th Source Holding Corp., Facultas Analytics, S.A.P.I. de C.V., Faktos Inc, S.A.P.I. de C.V., Cuarto Origen, S. de R.L. de C.V., 4th Source Mexico, LLC, AGS Alpama Global Services Mexico, S.A. de C.V., Entrepids Technology Inc., Entrepids Mexico, S.A. de C.V., AGS Alpama Global Services USA, LLC, AN UX, S.A. de C.V., AN Data Intelligence, S.A. de C.V., AgileThought Mexico, S.A. de C.V. (f/k/a AN Digitical S.A. de C.V.), Anzen Soluciones, S.A. de C.V., AN Evolution, S. de R.L. de C.V., AgileThought Servicios Administrativos, S.A. de C.V. (f/k/a Nasoft Servicios Administrativos, S.A. de C.V.), AN USA, AgileThought Servicios México, S.A. de C.V., and AgileThought LLC (collectively, the "Prior Guarantors") entered as guarantors.

as collateral for the Debtors' obligation to pay approximately $3.5 million in deferred fees, payable on or before May 25, 2023, which remain unpaid.

## II.   **Events of Default**

21.     The Debtors have been in default under the Prepetition 1L Credit Agreement since December 31, 2022.  These defaults include or have included, without limitation, failure to pay interests when due, failure to comply with certain negative covenants, and failure to comply with various financial covenants.  On April 18, 2023, the Prepetition 1L Agent issued a Notice of Default with respect to these defaults.

22.     The defaults under the Prepetition 1L Credit Agreement triggered cross-defaults under the Prepetition 2L Credit Facility and the Exitus Subordinated Note.

23.     On August 25, 2023, the Prepetition 1L Agent and the Prepetition 1L Lenders under the Prepetition 1L Credit Facility delivered a "Notice of Acceleration and Demand for Immediate Payment" (the "Acceleration Notice") to Debtor AN Global LLC.  The Acceleration Notice noted the existence of numerous events of default under the Prepetition 1L Credit Agreement, and declared the unpaid principal amount of all outstanding Prepetition 1L Obligations under the Prepetition 1L Documents to be immediately due and payable.  The Acceleration Notice provided that such Prepetition 1L Obligations "are not less than $93,640,057.55 and there are certain other amounts owing under the Financing Agreement, including accrued and unpaid interest, the Applicable Premium payable pursuant to Section 2.07(c) of the Financing Agreement and certain fees, costs and expenses (including fees of the Agents, FTI, and counsel for each Agent and each Lender) payable pursuant to Section 12.04 of the Financing Agreement."  The Debtors do not dispute the existence of various events of default or the Prepetition 1L Agent's or Prepetition 1L Lenders' right to accelerate the obligations under the Prepetition 1L Credit Facility.

## THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS

24.    Beginning in March 2023, the Debtors began exploring restructuring alternatives.  In anticipation of their need for debtor-in-possession financing and the use of cash collateral, the Debtors have, in consultation with Teneo, performed a review and analysis of their projected cash needs.  Based upon that review and analysis, the Debtors and their advisors determined that the use of cash collateral alone would be insufficient to operate their businesses, and that additional funding was necessary.  The Debtors are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses, pay their employees and vendors, service their customers, administer their estates during these Chapter 11 Cases, and effectuate an orderly sale process.  (DIP Decl. ¶ 8.)  Teneo undertook a detailed analysis of the Debtors' operations and funding needs, and, from this review and analysis, it became clear that the Debtors would require an infusion of capital to operate during these Chapter 11 Cases as they continue to conduct their marketing for the sale process.  (*Id.*)

25.    Without prompt access to postpetition financing and Cash Collateral, the Debtors will be unable to: (a) ensure payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative expenses to be incurred; (c) provide a positive message to the market that these Chapter 11 Cases are sufficiently funded and that the sale process for the Debtors' assets will be adequately robust, which is critical to ensure confidence in the Debtors from, among others, their customers, employees, and vendors; and (d) make any necessary payments to preserve the Debtors' workforce in the United States and other foreign countries in which the Debtors do business and preserve the value of the foreign subsidiaries.  (*Id.* ¶ 9.)  Immediate access to the DIP Facility and continued access to the Cash Collateral is therefore crucial to the Debtors' efforts to preserve value for their

stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.  (*Id.*)

26.    In furtherance of their cash needs, the Debtors and Teneo prepared an initial budget outlining the funding that would be critical in the initial thirteen (13) weeks post-filing, with such budget to be updated pursuant to the terms of the DIP Credit Agreement and the Interim Order.  (*Id.* ¶ 10.)  Based on information available as of the Petition Date, the Debtors believe that the initial budget, as will be updated with the consent of the DIP Agent, is an accurate reflection of their initial funding requirements and will allow them to meet their obligations in these Chapter 11 Cases.  (*Id.*)  The Debtors also believe, and therefore submit, that the initial budget is fair, reasonable, and appropriate under the circumstances.  (*Id.*)

## ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE ON BETTER TERMS

### I.    The Marketing Process

27.    The Debtors first engaged in a process to solicit new out-of-court financing as well as proposals to acquire the Debtors or their assets.  The Debtors were unable to obtain new out-of-court financing on acceptable terms.  Then, prior to the commencement of these Chapter 11 Cases, on June 28, 2023, the Debtors retained Teneo Securities LLC ("Teneo Securities") to act as the Debtors' investment banker in connection with, among other things, a marketing process for the Debtors' proposed debtor-in-possession financing facility.  (*Id.* ¶ 11.)  The Debtors, through Teneo Securities, contacted twenty-three four (23) potential lenders to seek proposals for debtor-in-possession financing.  (*Id.*)

28.    Obtaining access to third-party postpetition financing was difficult because all or nearly all of the Debtors' assets are encumbered under the existing capital structure, which, along with the Debtors' approximately $112 million of prepetition funded indebtedness and

increasing losses from 2022 through 2023, restricts the availability of, and options for, postpetition financing.  (*Id.* ¶ 12.)  The prepetition sale process did not yield any offers sufficient to clear the debt; therefore, the Debtors believed that there was not an equity cushion available for the Debtors to obtain debtor-in-possession financing priming the Prepetition Secured Parties' liens over their objections.  (*Id.*)  Any dispute with the Prepetition Secured Parties or perceived uncertainty surrounding the Debtors' ability to fund these Chapter 11 Cases could cause significant turmoil within the Debtors' workforce and result in a substantial deterioration of value.

29.    To avoid a protracted and expensive priming fight, which the Debtors could not afford, the Debtors and their advisors believed that their only alternatives were to:  (a) obtain the consent of the Prepetition Secured Parties to the priming of their liens by a third-party lender; (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis; (c) find lenders willing to refinance out the Prepetition Secured Parties and provide incremental liquidity; or (d) find junior financing and a new secured lender.  (*Id.* ¶ 13.)

30.    Notwithstanding these considerations, the Debtors, with the assistance of Teneo Securities, solicited proposals for third-party debtor-in-possession financing.  (*Id.* ¶ 14.) Teneo Securities reached out to twenty-three (23) third-party financing sources to gauge their interest in providing postpetition financing to the Debtors.  (*Id.*)  Of the third-party financing sources that Teneo Securities contacted, only four (4) demonstrated interest in pursuing a potential financing by executing a confidentiality agreement to facilitate an evaluation of funding a debtor-in-possession financing facility.  (*Id.*)  No potential financing parties were willing to provide financing junior to the existing Prepetition Secured Parties due to the amount of existing secured debt relative to the Debtors' financial position and the uncertainty surrounding the sale process. (*Id.*)  In addition, any senior financing that does not include the consent of the Prepetition Secured

Parties would have required non-consensual priming. (*Id.*) For the foregoing reasons, the Debtors, in consultation with Teneo Securities, determined that reaching out to additional third-party financing sources would be fruitless and unlikely to result in any financing proposals. (*Id.*) As a result, under these circumstances, there is no better financing available to the Debtors other than the DIP Facility.

## II.    The DIP Facility Has Been Heavily Negotiated

31.    The Debtors and the DIP Lenders engaged in arm's length negotiations regarding the terms offered by the DIP Lenders. At the conclusion of this process, the Debtors determined that the DIP Lenders offered the most viable and beneficial DIP financing terms available and the parties were able to come to an agreement on the terms of the DIP Facility. Management and the Debtors' legal and financial advisors were actively involved throughout the negotiations with the DIP Lenders for debtor-in-possession financing, which were conducted at arms' length and in good faith. (*Id.* ¶ 15.) The terms of the DIP Facility were negotiated over the course of several weeks leading up to the Petition Date, with the Debtors and their advisors exchanging multiple drafts of the DIP Credit Agreement. (*Id.*) The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Facility available to the Debtors given the Debtors' lack of alternative third-party financing. (*Id.*) Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Documents.

## III.    The Terms, Rates, and Fees of the DIP Facility Are Reasonable

32.    The terms and conditions of the DIP Facility are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure, among other factors. Pursuant to the DIP Documents, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. (*Id.* ¶ 16.) Specifically, the Debtors have agreed to pay interest in kind (a) on the

Roll-Up Loans, at the Reference Rate (as defined in the DIP Credit Agreement) plus a margin of 10.00% per annum (the "Applicable Reference Rate"), which is the rate in effect under the Prepetition 1L Credit Facility, and (b) on the New Money DIP Loans, at either the Applicable Reference Rate or, if agreed by the DIP Lenders in their sole discretion, Adjusted Term SOFR (as defined in the DIP Credit Agreement) plus a margin of 11.00% per annum (the "Applicable SOFR Rate", and together with the Applicable Reference Rate, collectively, the "Applicable Rate"). (*Id.*) Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), interest will accrue the rate of interest otherwise in effect plus 2.00%, payable in cash upon demand. (*Id.*) In addition, the Debtors have agreed to pay to the DIP Lenders: (i) the Closing Fee; (ii) the Agency Fee; (iii) the Audit and Collateral Monitoring Fees; and (iv) the Exit Fee (collectively, the "DIP Fees"). (*Id.*)

33. The Applicable Rate and the DIP Fees provided for in the DIP Facility are reasonable under the circumstances as compared to similar debtor-in-possession financings in the market as well as the attendant interest rates, fees, and premiums in comparable debtor-in-possession financing facilities. (*Id.* ¶ 17.) The Applicable Rate and DIP Fees are customary, usual, and in line with debtor-in-possession financings of this kind. (*Id.*) The Debtors and their advisors considered the Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the best alternative reasonably available to the Debtors. (*Id.*) As a result, the Debtors' payment of the Applicable Rate and DIP Fees in order to obtain the DIP Facility is in the best interests of the estates.

34. The Debtors and the DIP Lenders agree that the terms, covenants, interest rates, and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, which, in turn, is integral to the broader restructuring's success through the sale

process.  (*Id.* ¶ 18.)  Under the Debtors' circumstances, the interest rates, premiums, and fees reflected in the DIP Credit Agreement are reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases and are an integral component of the overall terms of the DIP Facility.  (*Id.*)  The DIP Facility as a whole is crucial to avoid immediate and irreparable harm to the Debtors' estates, employees, customers and creditors.

### IV.  The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable

35.    The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement.  These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility and the Stalking Horse Bid (as defined in the Sale Motion).

36.    The DIP Facility serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they can smoothly enter into chapter 11 and continue to operate in the ordinary course of business while facilitating a robust sale process.  (*Id.* ¶ 20.)  The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility.  (*Id.*)  The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate an orderly sale process pursuant to section 363 of the Bankruptcy Code.  (*Id.*)

## MATERIAL TERMS OF THE DIP CREDIT AGREEMENT

37.     As detailed in the DIP Declaration, the Debtors presently lack sufficient liquidity not only to support their operations but also to pursue a value-maximizing sale process or successfully reorganize.  The Debtors have concluded that they require postpetition financing to meet their ongoing working capital and general business needs during these Chapter 11 Cases as well as the costs of bankruptcy administration.  Accordingly, in consultation with their legal and financial advisors, the Borrower, the Guarantors, the DIP Agent, and the DIP Lenders have negotiated the DIP Facility.  The Guarantors will provide guarantees of all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans made to the Debtors pursuant to the DIP Documents and all other Obligations (as defined in the DIP Credit Agreement) (the "DIP Obligations").  The DIP Obligations are secured by substantially all of the tangible and intangible assets of the Borrower and the Guarantors and the proceeds therefrom (the "DIP Collateral").

38.     The terms of the DIP Facility are memorialized in the DIP Credit Agreement, a substantially final version of which is attached to the proposed Interim Order as **Exhibit 2**.[8]  The DIP Credit Agreement provides for a postpetition loan commitment in an aggregate principal amount not to exceed $118.7 million (the "DIP Commitments"); *provided that*, until the Bankruptcy Court enters the Final Order, no loans under the DIP Credit Agreement shall

---

[8].    This Motion contains summaries of certain terms and conditions set forth in the DIP Credit Agreement and Interim Order.  These summaries are intended solely for informational purposes to provide the Court and interested parties a brief overview of the significant terms thereof and should only be relied upon as such.  For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Documents and the DIP Orders.  To the extent there exists any inconsistency between the summaries contained in this Motion and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control in all respects.

be made other than New Money DIP Loans in an aggregate principal amount not to exceed $11.2 million.

39.    Pursuant to Bankruptcy Rule 4001(b), (c) and (d) and Local Rule 4001-2, the Debtors submit the following concise statement of the material terms of the DIP Credit Agreement and Interim Order:

| Summary of the Material Terms | | Reference |
|---|---|---|
| **Borrower:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Debtor AN Global LLC, as debtor and debtor-in-possession in these Chapter 11 Cases. | DIP Credit Agreement *preamble.* |
| **DIP Guarantors:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Holdings and each of Holdings' subsidiaries as follows: AgileThought, LLC, 4th Source, LLC, IT Global Holding LLC, 4th Source Holding Corp., QMX Investment Holdings USA, Inc., AGS Alpama Global Services USA, LLC, Entrepids Technology Inc., 4th Source Mexico, LLC, AN USA, AgileThought Digital Solutions, S.A.P.I. de C.V., Faktos Inc., S.A.P.I. de C.V., AgileThought México, S.A. de C.V., AgileThought Argentina S.A., AgileThought Brasil-Consultoria Em Tecnologia LTDA, AgileThought Brasil Servicos de Consultoria Em Software LTDA, AgileThought Costa Rica S.A., AgileThought Servicios Administrativos, S.A. de C.V., AgileThought Servicios México, S.A. de C.V., AGS Alpama Global Services México, S.A. de C.V., AN Data Intelligence, S.A. de C.V., AN Extend, S.A. de C.V., AN Evolution, S. de R.L. de C.V., AN UX, S.A. de C.V., Anzen Soluciones, S.A. de C.V., Cuarto Origen, S. de R.L. de C.V., Entrepids México, S.A. de C.V., Facultas Analytics, S.A.P.I. de C.V., AgileThought, S.A.P.I. de C.V., and Tarnow Investment, S.L., each of these guarantors being a debtor-in-possession in these Chapter 11 Cases. | DIP Credit Agreement *preamble*, *signature pages.* |
| **DIP Agent:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Blue Torch Finance LLC | DIP Credit Agreement *preamble.* |
| **DIP Lenders:** | The lenders under the Prepetition 1L Credit Agreement | DIP Credit Agreement *preamble.* |

| Summary of the Material Terms | | Reference |
|---|---|---|
| *Bankruptcy Rule 4001(c)(1)(B)* | | |
| **Loan Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(A), (O), (ii)* | The DIP Facility shall be comprised of superpriority senior secured multiple-draw term loans in an aggregate principal amount equal to $118,637,658, which shall be comprised of:<br><br>(a) $22,700,000 in aggregate principal amount of New Money DIP Loans, of which $11,200,000 shall be available upon entry of the Interim Order (the "<u>Interim Term Loans</u>," and the remainder, the "<u>Final Term Loans</u>"); and<br>(b) $95,937,658 in aggregate principal amount of Roll-Up Loans. | DIP Credit Agreement § 2.01(a); Interim Order *preamble.* |
| **Interest Rates:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (ii)* | The Roll-Up Loans will bear interest at the Reference Rate plus a margin of 10.00% per annum, which shall be payable in kind and capitalized.  The New Money DIP Loans will bear interest at either (a) the Reference Rate plus a margin of 10.00% per annum or (b) if agreed by the DIP Lenders in their sole discretion, Adjusted Term SOFR plus a margin of 11.00% per annum, which, in each case, shall be payable in kind and capitalized. | DIP Credit Agreement § 2.04(a), (b), (d). |
| **Default Interest:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (ii)* | Upon the occurrence and during the continuance of an Event of Default, the DIP Loans will bear interest at the Applicable Rate plus 2.00% per annum, which shall be payable in kind and capitalized. | DIP Credit Agreement § 2.04(c), (d). |
| **Maturity Date:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iii), (c)(1)(B); Local Rule 4001-2(a)(i)(M)* | The outstanding principal of all DIP Loans shall be due and payable on the Final Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of the DIP Credit Agreement.<br><br>The "Final Maturity Date" means the earliest of (a) November 27, 2023 or if such day is not a Business Day, the preceding Business Day, (b) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (c) twenty-three (23) days after the Bankruptcy Court's entry of the Interim Order unless, on or before such day, the Final Order shall have been entered by the Bankruptcy Court, (d) the date the Bankruptcy Court converts any of the | DIP Credit Agreement §§ 2.03(a), 1.01. |

| Summary of the Material Terms | Reference |
|---|---|
| Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (e) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (f) the date of substantial consummation of a sale all or substantially all of the assets (and to the extent applicable, the equity) of the Loan Parties as set forth and pursuant to the Asset Purchase Agreement or another acquisition agreement approved by the Bankruptcy Court in its Sale Order (as defined herein), and (g) such earlier date on which the Obligations shall become due and payable by acceleration or otherwise in accordance with the terms of the DIP Documents | |
| **DIP Fees:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B)* | <u>Closing Fee</u>: 5.00% of the New Money DIP Commitments, payable in kind.<br><u>Agency Fee</u>: $100,000 in cash.<br><u>Audit and Collateral Monitoring Fees</u>: (i) $1,500 per day per examiner plus the examiner's out-of-pocket costs and reasonable expenses; and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations conducted by a third party on behalf of the DIP Agent.<br><u>Exit Fee</u>: 5.00% of the aggregate principal amount of the DIP Loans; *provided* that, to the extent that (i) Second Additional Term Loans (as defined in the Prepetition 1L Credit Agreement) have been converted into Roll-Up Loans and (ii) the Roll-Up Loans include the fee of 4.00% payable on the Second Additional Term Loans (in accordance with the agreement entered into in connection with the Second Additional Term Loans), then only an additional 1.00% Exit Fee shall apply to such amount of Roll-Up Loans. | DIP Credit Agreement §§ 2.07, 1.01. |
| **Use of Proceeds:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(ii), (c)(1)(B)* | Proceeds of the New Money DIP Loans will be used in accordance with the terms of the DIP Budget, subject to Permitted Variances (as defined below): initially to fund the Funding Account and thereafter (x) to pay amounts due to the DIP Lenders and the DIP Agent and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lenders and the DIP Agent, (y) to pay administration costs of the Chapter 11 Cases, fund obligations benefiting from the Carve Out, and pay claims or amounts approved by the | DIP Credit Agreement § 6.01(s). |

| Summary of the Material Terms | Reference |
|---|---|
| | Bankruptcy Court, and (z) for working capital and general corporate purposes of the Loan Parties<br><br>Proceeds of the Roll-Up Loans will be used solely to refinance (through a cashless conversion) the same amount of Prepetition 1L Obligations under the Prepetition 1L Credit Agreement. | |
| **Priority and Security:**<br><br>*Bankruptcy Rules 4001(c)(1)(B)(i), (ii), (iii), (vii), (xi); Local Rule 4001-2(a)(i)(G)* | As security for the DIP Obligations, the Debtors propose to grant to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "<u>DIP Collateral</u>"), subject only to the payment of the Carve Out to the extent specifically provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, the "<u>DIP Liens</u>").<br><br>(a) <u>First Lien on Unencumbered Property</u>. Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, | DIP Credit Agreement § 6.01(z); Interim Order ¶ 10. |

| Summary of the Material Terms | Reference |
|---|---|
| machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (including, upon entry of the Final Order, the proceeds of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions" and any proceeds thereof, the "Avoidance Proceeds")), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.<br><br>(b) Liens Priming the Prepetition First Liens and Prepetition Second Liens.  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, | |

| Summary of the Material Terms | Reference |
|---|---|
| including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition First Liens securing the Prepetition 1L Obligations or the Prepetition Second Liens securing the Prepetition 2L Obligations.<br><br>(c) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) above, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition 1L Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition 1L Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "<u>Permitted Liens</u>"). | |
| **<u>Material Conditions to Closing:</u>**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | (a) <u>Payment of Fees, Etc</u>.  The Borrower shall have paid on or before the effective date of the DIP Credit Agreement (the "<u>Effective Date</u>") all fees, costs, expenses and taxes then due and payable pursuant to Section 2.07 and Section 12.04 of the DIP Credit Agreement. | DIP Credit Agreement § 5.01. |

| Summary of the Material Terms | Reference |
|---|---|
| (b) <u>Representations and Warranties; No Event of Default</u>.  The following statements shall be true and correct:<br>   (i)   The representations and warranties contained in the DIP Documents are true and correct on and as of the Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date); and<br>   (ii)   no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from the DIP Credit Agreement or the other DIP Documents becoming effective in accordance with its or their respective terms.<br>(c) <u>Legality</u>.  The making (or deemed making) of the Interim Term Loans on the Effective Date shall not contravene any law, rule or regulation applicable to any Secured Party.<br>(d) <u>Delivery of Documents</u>.  The DIP Agent shall have received specified DIP Documents, each in form and substance satisfactory to the DIP Agent and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto, on or before the Effective Date.<br>(e) <u>Material Adverse Effect</u>.  The DIP Agent shall have determined, in its sole judgment, that no event or development shall have occurred since December 31, 2022 which could reasonably be expected to have a Material Adverse Effect, other than in connection with the Chapter 11 Cases or as disclosed on any Form 10-K, Form 10-Q, or Form 8-K filed by Holdings with the SEC since December 31, 2022 and prior to the Petition Date.<br>(f) <u>Approvals</u>.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required | |

| Summary of the Material Terms | Reference |
|---|---|
| in connection with the making of the Interim Term Loans on the Effective Date, or the conduct of the Loan Parties' business, or the consummation of any of the underlying transactions (other than, for the avoidance of doubt, the Final Order) shall have been obtained and shall be in full force and effect.<br><br>(g) <u>Proceedings; Receipt of Documents</u>.  All proceedings in connection with the making of the Interim Term Loans and the other transactions contemplated by the DIP Documents, and all documents incidental thereto, shall be satisfactory to the DIP Agent and its counsel, and the DIP Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the DIP Agent or such counsel may reasonably request.<br><br>(h) <u>Security Interests</u>.  The DIP Documents shall create in favor of the DIP Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest in the DIP Collateral secured thereby (subject only to Permitted Liens).<br><br>(i) <u>Litigation</u>.  Except for the Chapter 11 Cases and the matters set forth on Schedule 6.01(j) to the DIP Credit Agreement, there shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation) pending or threatened in any court or before any arbitrator or Governmental Authority which relates to the DIP Loans or which, in the opinion of the DIP Agent, is reasonably likely to be adversely determined, and that, if adversely determined, would reasonably be expected to have a Material Adverse Effect.<br><br>(j) <u>Notice of Borrowing</u>.  The DIP Agent shall have received a Notice of Borrowing pursuant to Section 2.02 of the DIP Credit Agreement.<br><br>(k) <u>Patriot Act Compliance</u>.  The DIP Agent shall have received, at least two (2) Business Days prior to the Effective Date, a duly executed IRS Form W-9 (or other applicable tax form) of Holdings and the Borrower, and all documentation and other information with respect to the Loan Parties | |

| Summary of the Material Terms | Reference |
|---|---|
| required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act, that has been reasonably requested in writing by the Administrative Agent at least three (3) Business Days prior to the Effective Date.<br><br>(l) <u>Bank Accounts</u>. The CRO has been appointed as the duly appointed chief restructuring officer of the Borrower and the other Loan Parties.  All deposit and securities accounts owned by the Domestic Loan Parties [and the Mexican Loan Parties] shall have been updated to provide signing authority for the CRO.<br><br>(m) <u>Chapter 11 Matters</u>.  Each of the following events or conditions shall have occurred or have been completed to the satisfaction of the DIP Agent and Required Lenders:<br><br>   (i)   The DIP Agent and the Lenders shall have received the initial DIP Budget for the 13-week period commencing on the Petition Date and the Projected Daily Cash Flow Schedule for the two-week period commencing on the Petition Date and such forecast and schedule shall be in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole discretion;<br><br>   (ii)   The Chapter 11 Cases shall have been commenced and all of the pleadings related to the requested "first day orders" shall be in form and substance reasonably satisfactory to the Required Lenders;<br><br>   (iii)   On the Petition Date, the Loan Parties shall have filed motions seeking approval (x) of bid procedures in respect of the sale of all or substantially all of the assets of the Loan Parties (the "<u>Bid Procedures Motion</u>"), and (y) for the sale of the assets and equity of the Loan Parties as set forth in and pursuant to the Asset Purchase Agreement (the "<u>Sale Motion</u>"), all of which foregoing motions, and related relief being sought, to be in form and | |

| Summary of the Material Terms | Reference |
|---|---|
| | |

|  |  |  |
|---|---|---|
| | | substance satisfactory to the Required Lenders in their sole discretion; |
| (iv) | | All of the "first day orders" entered by the Bankruptcy Court on or about the Petition Date or the Effective Date (and if any such orders shall have not been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) shall be in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders; |
| (v) | | The amount of the Interim Term Loans to be made on or about the Effective Date shall not exceed the amount authorized by the Interim Order; |
| (vi) | | The Bankruptcy Court shall have entered the Interim Order, and the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated; |
| (vii) | | The Chapter 11 Cases of any of the Loan Parties shall not have been dismissed or converted to cases under chapter 7 of the Bankruptcy Code; |
| (viii) | | All orders entered by the Bankruptcy Court pertaining to any payment of the Loan Parties' vendors, shippers, or other trade counterparties and all motions and other documents filed, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders; and |
| (ix) | | No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Loan Party shall have applied for, consented to or acquiesced in any such appointment. |

| Summary of the Material Terms | Reference |
|---|---|
| **Material Conditions to Final Term Loans:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | (a) <u>Payment of Fees, Etc</u>. The Borrower shall have paid all fees, costs, expenses and material taxes then payable by the Borrower pursuant to the DIP Documents.<br>(b) <u>Representations and Warranties; No Event of Default</u>. The following statements shall be true and correct on the date of such Final Term Loans:<br>   (i)    The representations and warranties contained in the DIP Documents are true and correct on and as of the date of the Final Term Loan as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date);<br>   (ii)   at the time of and after giving effect to the making of such Final Term Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Final Term Loan to be made, on such date; and<br>   (iii)   the conditions set forth in Section 5.02 of the DIP Credit Agreement have been satisfied as of the date of such date.<br>(c) <u>Legality</u>. The making of the Final Term Loans shall not contravene any law, rule or regulation applicable to any Secured Party.<br>(d) <u>Notices</u>. The DIP Agent shall have received a Notice of Borrowing pursuant to Section 2.02 of the DIP Credit Agreement.<br>(e) <u>Proceedings; Receipt of Documents</u>. All proceedings in connection with the making of such Final Term Loan and the other transactions contemplated by the DIP Documents, and all documents incidental thereto, shall be satisfactory to the DIP Agent and its counsel, and the DIP Agent and such counsel shall have received all such other agreements, instruments, approvals, opinions and other documents, each in form and substance satisfactory to the DIP Agent, as the DIP Agent may reasonably request. | DIP Credit Agreement § 5.02. |

| Summary of the Material Terms | Reference |
|---|---|
| (f) <u>Entry of Final Order</u>.  Within twenty-three (23) days of the Bankruptcy Court's entry of the Interim Order, the Bankruptcy Court shall have entered the Final Order, and the DIP Agent and the DIP Lenders shall have received a true and complete copy of the Final Order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.<br>(g) <u>Compliance with Orders</u>. The Loan Parties shall be in compliance in all material respects with the Bankruptcy Court DIP Orders.<br>(h) <u>Compliance with Asset Purchase Agreement</u>. The Loan Parties shall be in compliance in all material respects with the Asset Purchase Agreement.<br>(i) <u>Bid Procedures Order</u>.  Within twenty-six (26) days of the Petition Date, the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion, which order shall be in form and substance acceptable to the Required Lenders in their sole discretion (the "<u>Bid Procedures Order</u>"). | |
| **<u>Events of Default</u>:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(M)* | (a) the Borrower shall fail to pay, when due, (i) any interest on any DIP Loan, or any fee, indemnity or other amount payable under the DIP Credit Agreement or any other DIP Document, and such failure continues for a period of three (3) Business Days or (ii) all or any portion of the principal of the DIP Loans;<br>(b) any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any DIP Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any DIP Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;<br>(c) any Loan Party shall fail to perform or comply with any covenant or agreement contained in (i) Section 7.01(a) - (d), (f), (h), (k) - (m), (o), (r), (s), or (u) - (y), Section 7.02, Section 7.03 or Article | DIP Credit Agreement § 9.01. |

| Summary of the Material Terms | Reference |
|---|---|
| VIII of the DIP Credit Agreement, or (ii) any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party or any Mortgage to which it is a party and such failure shall remain unremedied for two (2) Business Days;<br><br>(d) any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any DIP Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) above, such failure, if capable of being remedied, shall remain unremedied for fifteen (15) days after the earlier of the date a senior officer of any Loan Party has knowledge of such failure and the date written notice of such default shall have been given by the DIP Agent to such Loan Party;<br><br>(e) Holdings or any of its Subsidiaries shall fail to pay when due any principal, interest or other amount payable in respect of Indebtedness, which Indebtedness is in an aggregate amount at least $100,000, and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid, redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;<br><br>(f) except the Chapter 11 Cases, any of Holdings' Foreign Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or | |

| Summary of the Material Terms | Reference |
|---|---|
| composition of it or its debts under any non-United States debtor relief laws, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall make a general assignment for the benefit of creditors, or (iii) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);<br>(g) except the Chapter 11 Cases, any proceeding shall be instituted against any of Holdings' Foreign Subsidiaries seeking to adjudicate it under non-United States debtor relief laws a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of fifteen (15) days or any of the actions sought in such proceeding shall occur;<br>(h) any material provision of any DIP Document shall at any time for any reason cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any Loan Party that is party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;<br>(i) the Bankruptcy Court DIP Orders, any Security Agreement, any Mortgage or any other Collateral Document, after entry or delivery thereof, shall for any reason, on and after the entry of the Interim Order, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, senior-most Lien in favor of the DIP Agent for the benefit of the DIP Lenders on | |

| Summary of the Material Terms | Reference |
|---|---|
| any DIP Collateral purported to be covered thereby;<br><br>(j) one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $100,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against Holdings or any of its Subsidiaries and remain unsatisfied (unless such judgment, order, or award is subject to the automatic stay under Section 362 of the Bankruptcy Code and only for so long such stay remains in effect) and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of ten (10) consecutive days (or, in the case of a Foreign Subsidiary, a period of ten (10) consecutive Business Days) after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;<br><br>(k) Holdings or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for more than ten (10) days;<br><br>(l) any material damage to, or loss, theft or destruction of, any DIP Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than ten (10) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;<br><br>(m) the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by Holdings or any of its Subsidiaries, if | |

| Summary of the Material Terms | Reference |
|---|---|
| such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;<br><br>(n) the indictment, or the threatened indictment of Holdings or any of its Subsidiaries or any senior officer thereof under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against Holdings or any of its Subsidiaries or any senior officer thereof, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of Holdings or any such Subsidiary or any property that such senior officer holds in his or her capacity as an officer;<br><br>(o) (i) there shall occur one or more ERISA Events that individually or in the aggregate results in, or could reasonably be expected to result in liability of any Loan Party or any of its ERISA Affiliates in excess of $500,000, or (ii) there exists any fact or circumstance that could reasonably be expected to result in the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA upon the property or rights to property of any Loan Party or any of its ERISA Affiliates;<br><br>(p) any Variance shall exceed the Permitted Variance;<br><br>(q) any Loan Party shall file a motion in the Chapter 11 Cases to obtain additional financing from a party other than the Lenders under Section 364(c) or (d) of the Bankruptcy Code that (i) is not permitted under Section 7.02(b) of the DIP Credit Agreement and (ii) does not commit to provide for the payment of the DIP Obligations and the Prepetition 1L Obligations in full and in cash upon the incurrence of such additional financing;<br><br>(r) any Loan Party shall file a motion seeking an order (i) approving payment of any claim that arose prior to the Petition Date other than (x) as provided for in the "first day" or "second day" orders approved by the Required Lenders, (y) as contemplated by the DIP Budget (including Permitted Variances) as then in effect, or (z) to the | |

| Summary of the Material Terms | Reference |
|---|---|
| extent otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets, or (iii) except with respect to the Prepetition 1L Obligations as provided in the Bankruptcy Court DIP Orders, approving any settlement or other stipulation not approved by the Required Lenders and not included in the DIP Budget as then in effect with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor;<br><br>(s) an order is entered in any of the Chapter 11 Cases appointing, or any Loan Party, or any Subsidiary of a Loan Party, shall file an application for an order seeking the appointment of, (i) a trustee under section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;<br><br>(t) an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the DIP Commitments, and payment in full in cash of all Obligations (other than contingent indemnification obligations as to which no claim has been asserted) of the Loan Parties hereunder and under the other DIP Documents upon entry thereof;<br><br>(u) an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases (i) to revoke, reverse, stay, modify, supplement or amend the Bankruptcy Court DIP Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever), in each case other than the Carve Out, to have administrative priority as to the Loan Parties equal or superior to the priority of the DIP Superpriority Claim shall be entered by the | |

| Summary of the Material Terms | Reference |
|---|---|
| Bankruptcy Court, or (iii) dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all DIP Commitments, and payment in cash in full of all Obligations (other than contingent indemnification obligations as to which no claim has been asserted) of the Loan Parties hereunder and under the other DIP Documents upon entry thereof;<br><br>(v) any Loan Party violates any term, provision or condition in the Bankruptcy Court DIP Orders;<br><br>(w) the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;<br><br>(x) an application for any of the orders described in Sections 8.01(s) - (w) of the DIP Credit Agreement shall be made by a Person (including, for the avoidance of doubt, the Loan Parties) and such application is not contested by the Loan Parties in good faith or such Person actually obtains entry of an order of the Bankruptcy Court;<br><br>(y) any Loan Party shall pay any claim that arose prior to the Petition Date other than (i) as permitted by any "first day" or "second day" order entered by the Bankruptcy Court on or prior to the Effective Date or (ii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Required Lenders, in each case consistent with the DIP Budget;<br><br>(z) the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);<br><br>(aa)   (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests relating to the Prepetition 1L Obligations | |

| Summary of the Material Terms | Reference |
|---|---|
| or of the DIP Agent and/or the DIP Lenders, or the claims or rights against such Person or to subject any DIP Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code, or (ii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the DIP Agent and/or the DIP Lenders created by any of the Bankruptcy Court DIP Orders, the DIP Credit Agreement, or any Collateral Document, or created in connection with the Prepetition 1L Obligations;<br>(bb)    any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, (i) disallow in whole or in part, the Agents' and Lenders' claim in respect of the Obligations or contest any material provision of any Loan Document, or (ii) disallow in whole or in part, any claims in respect of the Prepetition 1L Obligations or contest any material provision of any "Loan Documents" (as defined in the Prepetition 1L Credit Agreement);<br>(cc)    the failure of the Borrower to timely satisfy any of the Milestones (as defined herein);<br>(dd)    any Loan Party or any of its Subsidiaries seeks entry of an order approving or attempts to consummate a sale of substantially all of its assets, or a material portion thereof, via a Plan of Reorganization or section 363 sale without the prior written consent of the Required Lenders (which may be given or withheld in such Lenders' sole discretion);<br>(ee)    there shall be any Plan of Reorganization confirmed in the Chapter 11 Cases that does not provide for the repayment of the Prepetition 1L Obligations and the Obligations in full and in cash on the effective date of such Plan of Reorganization;<br>(ff) any Loan Party, or any Person claiming by or through the Loan Parties or any of their Subsidiaries, shall (x) obtain court authorization | |

| Summary of the Material Terms | Reference |
|---|---|
| to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the DIP Agent or any DIP Lender (in any of their respective capacities as such) relating to the DIP Loans or the DIP Documents, unless such suit or other proceeding is in connection with the enforcement of the DIP Documents against such DIP Agent or such DIP Lender, in their capacities as such or (y) file, assist or otherwise participate in any pleading that, if the relief requested therein were granted, would result in an Event of Default;<br>(gg)    the Bankruptcy Court shall enter any order to materially limit, restrict, curtail, reduce, suspend, stay or enjoin the right of the Buyer (as defined in the Asset Purchase Agreement) to credit bid the DIP Obligations or Prepetition 1L Obligations;<br>(hh)    the DIP Lenders or Prepetition 1L Lenders are not permitted to credit bid at any auction in the Chapter 11 Cases;<br>(ii) any of the Loan Parties shall (i) fail to comply with the Asset Purchase Agreement in any material respect or (ii) amend the Asset Purchase Agreement in a manner that is adverse to the interests of the Lenders without prior written consent of the DIP Agent;<br>(jj) the Roll-Up Loans shall not be approved upon entry of the Final Order;<br>(kk)    any Mexican Governmental Authority shall file a Lien against any Mexican Loan Party or any of its property or assets; or<br>(ll) any termination of the Asset Purchase Agreement (unless such termination results from the approval by the Bankruptcy Court in its Sale Order of an asset purchase agreement or other acquisition agreement with a winning bidder other than the Buyer (as defined in the Asset Purchase Agreement)). | |
| **Case Milestones:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v), (vi); Local Rule 4001-2(a)(i)(H)* | (i)    The Petition Date shall occur no later than August 28, 2023.<br><br>(ii)    The Bankruptcy Court shall enter the Interim Order approving the DIP Credit Agreement on an interim basis in form and substance satisfactory to the DIP Agent and the Required | DIP Credit Agreement § 7.01(x), Schedule 7.01(x). |

| Summary of the Material Terms | | Reference |
|---|---|---|
| | Lenders in their sole and absolute discretion no later than three (3) days after the Petition Date. | |
| (iii) | The Loan Parties shall have filed motions seeking approval for the retention of the Financial Advisor and the Investment Banker no later than five (5) days after the Petition Date. | |
| (iv) | The Bankruptcy Court shall enter the Bid Procedures Order in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole and absolute discretion no later than twenty-six (26) days after the Petition Date (subject to Bankruptcy Court availability). | |
| (v) | The Bankruptcy Court shall enter the Final Order approving the DIP Credit Agreement in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole and absolute discretion no later than twenty-three (23) days after the Bankruptcy Court's entry of the Interim Order (subject to Bankruptcy Court availability). | |
| (vi) | The deadline for submitting qualified bids pursuant to the Bid Procedures Order will be no later than fifty-eight (58) days after the Petition Date. | |
| (vii) | If applicable, an auction to select a winning bid pursuant to the Bid Procedures Order will conclude no later than sixty-one (61) days after the Petition Date. | |
| (viii) | The Bankruptcy Court shall hold a hearing to approve the winning bid and will enter an order approving the sale (a "Sale Order") in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole and absolute discretion no later than sixty-five (65) days after the Petition Date. | |
| (ix) | If a Sale Order is entered, the sale will close no later than ninety (90) days after the Petition Date (or, if such day is not a Business Day, the | |

| Summary of the Material Terms | Reference |
|---|---|
| | next succeeding Business Day). | |
| **Reporting Information:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Each Loan Party will furnish to the DIP Agent and each DIP Lender: (i) (A) (I) a 13-week cash flow forecast of Holdings and its Subsidiaries (each, a "DIP Budget"), prepared by the Loan Parties' Financial Advisor, setting forth in reasonable detail all sources and uses of the Loan Parties' cash for the succeeding 13-week period and (II) a listing of all accounts payable balances of the Loan Parties as of one (1) Business Day immediately prior to the applicable reporting date, which shall include the amount and age of each such account payable and the name and mailing address of each account creditor; (B) (I) a projected daily cash flow schedule of Holdings and its Subsidiaries (each, a "Projected Daily Cash Flow Schedule"), prepared by the Loan Parties' Financial Advisor, setting forth in reasonable detail all sources and uses of the Loan Parties' cash for the succeeding two-week period and (II) a calculation of the Qualified Cash of Holdings and its Subsidiaries as of the date of such Projected Daily Cash Flow Schedule; and (C) such other information as the DIP Agent may reasonably request; and (ii) commencing with the Testing Period that ends on the last day of the third (3rd) Weekly Period after the Petition Date and weekly thereafter, a report (each, a "Variance Report") describing in reasonable detail the Loan Parties' actual aggregate cash receipts and actual aggregate cash disbursements during such Testing Period as compared to the projected aggregate cash receipts and projected aggregate cash disbursements set forth in the DIP Budget as then applicable for such Testing Period (such comparison, the "Variance"). | DIP Credit Agreement § 7.01(a)(xix), Interim Order ¶ 7. |
| **Variance Covenant:**<br><br>*Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E)* | So long as any principal of or interest on any DIP Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any DIP Lender shall have any DIP Commitment under the DIP Credit Agreement, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing, permit a Variance during any Testing Period (i) in respect of the total aggregate amount of Operating Disbursements to be more than [10]% in excess of the amount of Operating Disbursements forecasted in the DIP Budget applicable | DIP Credit Agreement § 7.03. |

| Summary of the Material Terms | Reference |
|---|---|
| during such Testing Period or (ii) in respect of the aggregate cash receipts to be less than [90]% of the aggregate cash receipts forecasted in the DIP Budget applicable during such Testing Period. Any Variance that does not exceed the Variance permitted pursuant to the foregoing clauses (i) and (ii) shall be referred to herein as a "<u>Permitted Variance</u>." | |
| **<u>Indemnification</u>:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix); Local Rule 4001-2(a)(i)(J)* | In addition to each Loan Party's other Obligations under the DIP Credit Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Related Parties (collectively called the "<u>Indemnitees</u>") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of any DIP Document, of any Environmental Claim or any other document executed in connection with the transactions contemplated by the DIP Credit Agreement, (ii) the DIP Agent's or any DIP Lender's furnishing of funds to the Borrower under the DIP Credit Agreement or the other DIP Documents, including, without limitation, the management of any such DIP Loans or the Borrower's use of the proceeds thereof, (iii) the DIP Agent and the DIP Lenders relying on any instructions of the Borrower or the handling of the Loan Account and DIP Collateral of the Borrower as herein provided, (iv) any matter relating to the financing transactions contemplated by the DIP Credit Agreement or the other DIP Documents or by any document executed in connection with the transactions contemplated by the DIP Credit Agreement or the other DIP Documents, or (v) any claim, including any Environmental litigation, investigation or proceeding relating to or arising out of any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "<u>Indemnified Matters</u>"); *provided, however*, that the Loan Parties shall not have any obligation to any Indemnitee under | DIP Credit Agreement § 12.16(a); Interim Order ¶ 26. |

| Summary of the Material Terms | Reference |
|---|---|
| | this subsection for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction. | |
| **Parties with an Interest in Cash Collateral:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | The Prepetition 1L Secured Parties. | Interim Order ¶ 4(c). |
| **Adequate Protection:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv), (c)(1)(B)(ii); Local Rule 4001-2(a)(i)(P)* | Subject only to the Carve Out and the terms of the Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition 1L Agent, for the benefit of themselves and the Prepetition 1L Lenders, will be granted the following (collectively, the "Adequate Protection Obligations"):<br><br>(a) First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral.  Subject to the terms of the Interim Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, | Interim Order ¶ 16. |

| Summary of the Material Terms | Reference |
|---|---|
| (B) the DIP Liens, and (C) the Permitted Liens (if any).  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition First Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).<br><br>(b) <u>First Lien Adequate Protection Superpriority Claim</u>.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and the DIP Superpriority Claims (the "<u>First Lien Adequate Protection Superpriority Claim</u>").  The First Lien Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the First Lien Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition 1L Secured Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations | |

| Summary of the Material Terms | Reference |
|---|---|
| have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.<br><br>(c) <u>Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized and directed to pay, without further Bankruptcy Court order, reasonable and documented fees and expenses (the "<u>First Lien Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition 1L Agent and Prepetition 1L Lenders, including, without limitation, the reasonable and documented fees and expenses of Ropes & Gray, LLP and Chipman Brown Cicero & Cole, LLP counsel to the Prepetition 1L Agent. The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.  The applicable professional shall serve copies of the invoices supporting the First Lien Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any First Lien Adequate Protection Fees shall be subject to prior ten day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee shall file with this Bankruptcy Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Bankruptcy Court.  If no objection is filed within such ten-day review period, such invoice shall be paid without further order of the Bankruptcy Court within five days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement.  For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney- client privilege or any benefits of the attorney work product doctrine.<br><br>(d) <u>First Lien Accrued Adequate Protection Payments</u>.  As further adequate protection, the | |

| Summary of the Material Terms | Reference |
|---|---|
| Prepetition 1L Agent, on behalf of the Prepetition 1L Lenders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "First Lien Accrued Adequate Protection Payments") payable in-kind on the thirtieth day of each month equal to the interest at the Applicable Rate plus the Default Rate (as such terms are defined in the Prepetition 1L Credit Agreement) that would otherwise be owed to the Prepetition 1L Lenders under the Prepetition 1L Credit Agreement during such monthly period in respect of the Prepetition 1L Obligations, until such time as the full Prepetition 1L Obligations Amount is indefeasibly and irrevocably (x) paid in full, in cash; or (y) fully converted into DIP Obligations. | |
| **Carve Out:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F)* | The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order, or otherwise, and, with respect to the amounts in clause (x) below, to the extent provided for in the DIP Budget, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and an official committee of unsecured creditors (the "Creditors' Committee"), if any, pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (x) at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (but not to exceed the amount of Allowed Professional Fees specified in the applicable | Interim Order ¶ 11(a). |

| Summary of the Material Terms | Reference |
|---|---|
| DIP Budget for the period from the Petition Date to the date of the Carve Out Trigger Notice, the "<u>Pre-Carve Out Trigger Amount</u>"), plus (y) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $[200,000] incurred after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, plus (z) up to $[___] on account of amounts required to be paid to Guggenheim Securities, LLC on account of any Transaction Fee under and as defined in that certain engagement letter between Guggenheim Securities, LLC and the Debtors, effective as of August 11, 2023, incurred at any time, before or after delivery of a Carve-Out Trigger Notice, and payable under sections 328, 330, and/or 331 of the Bankruptcy Code, and allowed by order of this Court at any time (the amounts set forth in clauses (y) and (z) being the "<u>Post-Carve Out Trigger Notice Cap</u>" and the amounts set forth in clauses (x), (y) and (z), net of any unused retainers held by or on behalf of such Professional Persons, collectively, the "<u>Carve-Out Amount</u>").  For the avoidance of doubt, the maximum aggregate Pre-Carve Out Trigger Amount shall not exceed the cumulative amount set forth in the applicable DIP Budget for the Professional Persons incurred from the Petition Date to the date of the Carve Out Trigger Notice.  Within three business days of the receipt of a Carve-Out Trigger Notice, each Professional Person shall provide its reasonable, good-faith estimate of the amount of its fees and expenses to be included in the Pre-Carve Out Trigger Amount.  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee (if appointed) providing that a Termination Event (as defined in the Interim Order) has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked. | |

| Summary of the Material Terms | | Reference |
|---|---|---|
| **Disparate Treatment of Professionals Under Carve Out:**<br><br>*Local Rule 4001–2(a)(i)(F)* | The Interim Order contains no provision for disparate treatment for professionals retained by a Creditors' Committee, if any, with respect to the Carve Out. | Interim Order ¶ 11. |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt:**<br><br>*Local Rule 4001–2(a)(i)(E)* | The Interim Order provides for provisions deeming prepetition debt to be converted to postpetition debt. Specifically, the proceeds from the DIP Facility refinance $95,937,658 of the Prepetition 1L Obligations under the Prepetition 1L Credit Facility. | Interim Order ¶ 6(c). |
| **Cross-Collateralization:**<br><br>*Local Rule 4001–2(a)(i)(N)* | See "Priority and Security" above. | Interim Order ¶ 10. |
| **Debtors' Stipulations:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii); Local Rule 4001–2(a)(i)(Q)* | Pursuant to the Interim Order, the Debtors for themselves, their estates and all representatives of such estates, make the stipulations set forth in Paragraph 4 of the Interim Order. | Interim Order ¶ 4. |
| **Liens on Avoidance Actions:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001–2(a)(i)(U)* | Pursuant to Bankruptcy Code § 364(c)(2), the DIP Agent is granted valid, perfected, enforceable and non-avoidable liens on, and security interests in, all now owned or hereafter acquired assets and property of the Debtors, including, without limitation, proceeds of Avoidance Actions upon entry of the Final Order. | Interim Order ¶ 10(a). |
| **Non-Consensual Priming Liens:**<br><br>*Local Rule 4001–2(a)(i)(G)* | The Interim Order does not provide for non-consensual priming of any existing secured lien. See "Priority and Security" above. | Interim Order ¶ 10. |
| **Release, Waiver or Limitation on** | Subject to the rights and limitations set forth in the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their | Interim Order ¶ 29. |

| Summary of the Material Terms | | Reference |
|---|---|---|
| **any Claim or Cause of Action:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition 1L Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition 1L Obligations or the Prepetition First Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties. | |
| **Waiver or Modification of Automatic Stay:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv);* | Upon the occurrence of a Termination Event and following the giving of not less than three (3) business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), the | Interim Order ¶ 22. |

| Summary of the Material Terms | | Reference |
|---|---|---|
| *Local Rule 4001-2(a)(i)(S)* | automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties, without further notice or order of the Bankruptcy Court, unless the DIP Agent, the DIP Lenders, the Prepetition 1L Agent, and the Prepetition 1L Lenders elect otherwise in a written notice to the Debtors, which may be by email. | |
| **Limitation on Remedies Hearings:**<br><br>*Local Rule 4001-2(a)(i)(T)* | The only permissible basis for the Debtors, the Creditors' Committee (if any), or any other party to contest, challenge or object to an Enforcement Notice shall be solely with respect to the validity of the Termination Event(s) giving rise to such Enforcement Notice (*i.e.*, whether such Termination Event validly occurred and has not been cured or waived in accordance with this Interim Order). | Interim Order ¶ 22. |
| **Section 506(c) Waiver:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x);* *Local Rule 4001–2(a)(i)(C), (V)* | Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties. | Interim Order ¶ 12. |
| **Section 552(b)(1) Waiver:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii);* *Local Rule 4001–2(a)(i)(W)* | Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable. | Interim Order ¶ 14. |

## BASIS FOR RELIEF REQUESTED

I.    **Approval of the DIP Facility Is Essential to the Debtors' Ability to Successfully Effectuate a Restructuring Transaction**

40.     It is essential to the success of the Chapter 11 Cases that the Debtors immediately obtain access to sufficient postpetition financing.  The Debtors' continuing viability, the avoidance of business interruption, the preservation of estate assets and the Debtors' ability to successfully effectuate a restructuring transaction all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

41.     For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for approval of the DIP Facility.

II.    **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents**

42.     The Bankruptcy Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or super-priority financing under certain circumstances discussed in detail below.

A.    **Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment**

43.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and

receivables facility "reflect[ed] sound and prudent business judgement"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

44.     In determining whether debtors have exercised sound business judgment in selecting a particular DIP financing proposal, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

45.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the totality of the circumstances. *Farmland Indus., Inc.*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its

reorganization).  The Bankruptcy Court may also appropriately take into consideration non-economic benefits to the debtors offered by a proposed postpetition facility.  For example, in *In re Ion Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

46.     Here, the Debtors' determination to secure the DIP Facility is an exercise of sound business judgment.  As further discussed in the DIP Declaration, the DIP Facility was a product of an arms'-length negotiation and a careful evaluation of alternatives, as well as evaluation of the Debtors financial needs.  (DIP Decl. ¶ 15.)  Specifically, the Debtors, with the advice and counsel of their advisors, determined that the Debtors will require immediate liquidity to fund the administrative costs of these Chapter 11 Cases and the ongoing needs of the Debtors' business.  Indeed, without immediate additional liquidity, the Debtors would be unable to preserve their business nor maximize value, to the detriment of the Debtors' customers, creditors, employees, vendors, and other parties in interest.  The Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that the DIP Facility: (a) allows the Debtors to avoid a value-destructive priming fight; (b) provides a path forward in chapter 11 by allowing the Debtors to facilitate a sale process; and (c) allows the Debtors to operate in the ordinary course of business postpetition and fund the administration of the Chapter 11 Cases for the benefit of the estates and all of the Debtors' stakeholders.  (*Id.* ¶ 9.)  The Debtors and their

advisors therefore determined that entry into the DIP Facility was the best path available and they

have obtained the best terms currently achievable under the circumstances.  (*See id.* ¶ 24.)

**B.  The Debtors Satisfy the Requirements for Entering in the DIP Facility Under Section 364(c) of the Bankruptcy Code**

47.    The Debtors propose to obtain postpetition financing under the terms and

conditions of the DIP Facility by providing security interests and other liens, as described herein

and provided for in the DIP Documents, pursuant to sections 364(c) and 364(d) of the Bankruptcy

Code.  More specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve

Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly

perfected postpetition security interests in and liens on the DIP Collateral, which include

substantially all of the Debtors' assets, and, specifically, (a) a priming security interest and lien on

the Prepetition Collateral to the extent such Prepetition Collateral is subject to prepetition liens

that secure the prepetition facilities of the Prepetition Secured Lenders (as defined in the DIP

Documents), (b) a junior security interest and lien to all property of the Debtors that is subject to

Prepetition Permitted Liens, (c) a first lien priority senior security interest in all property of the

Debtors that is not subject to a valid, perfected and non-avoidable lien, subject to and as further

provided for in the DIP Documents and the Interim Order.

48.    The statutory requirement for obtaining postpetition credit under section

364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured

credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).

Furthermore, section 364(c) financing is appropriate when the debtor-in-possession is unable to

obtain unsecured credit allowable as an ordinary administrative claim.  *See In re Crouse Grp., Inc.*,

71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of

the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section

364(b) of the Bankruptcy Code); *Ames Dep't Stores*, 115 B.R. at 37-39 (holding that debtor must

show it made reasonable effort to seek other sources of financing under section 364(a) and (b) of

the Bankruptcy Code).

49.     Bankruptcy courts have articulated a three-part test to determine whether a

debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts

look to whether:

(a)     [The debtor is] unable to obtain unsecured credit under section
        364(b), *i.e.,* by allowing a lender only an administrative claim per
        11 U.S.C. § 503(b)(1)(A);

(b)     The credit transaction is necessary to preserve the assets of the
        estate; and

(c)     The terms of the transaction are fair, reasonable, and adequate, given
        the circumstances of the debtor-borrower and the proposed lender.

*L.A. Dodgers*, 457 B.R. at 312 (citing *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa.

1988)); *see also Crouse Grp.*, 71 B.R. at 549; *Ames Dep't Stores,* 115 B.R. at 37-39.  The elements

of this test are satisfied here.

50.     As described in the DIP Declaration, the Debtors recognized that it would

be particularly difficult to secure financing because all of the Debtors' cash and material assets are

encumbered by existing liens under their prepetition debt and the Prepetition 1L Lenders indicated

that they would not consent to a "priming" DIP financing provided by a third party.  (DIP Decl.

¶ 12.)  In light of this, the Debtors understood that any third-party DIP financing would require

engaging in a protracted and costly priming fight or valuation dispute with the Prepetition 1L

Lenders at the very outset of these Chapter 11 Cases.  (*Id.*)  Regardless of the prospects of success,

the expense and disruption associated with complex litigation at the beginning of the case would

seriously jeopardize the Debtors' restructuring efforts, as already strained liquidity would be

required to fund such a fight. Such litigation would also have had a disastrous effect on the Debtors' effort to conduct a value-maximizing sale process.

51.     Without adequate postpetition financing, the Debtors will be unable to administer these Chapter 11 Cases, which would significantly impair their ability to complete a sale of their assets while preserving the value of their enterprise. The DIP Facility ensures that the Debtors have the liquidity to fund these cases. Additionally, as set forth below, the terms of the DIP Facility are fair, reasonable and adequate given the facts and circumstances.

## C.  The Debtors Should Be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis.

52.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

53.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that

such credit is unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

54.      As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

55.      Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facility to the extent such DIP Collateral is subject to prepetition liens that secure the Prepetition Obligations. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either

(a) their Prepetition Secured Lenders have consented or (b) the Prepetition Secured Lenders' interests in collateral are adequately protected.

56. Here, the Prepetition 1L Secured Parties have affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility. Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide an adequate protection package to protect the interests of the Prepetition 1L Secured Lenders. The Prepetition 2L Agents have not presently indicated that they affirmatively consent to the relief sought by this Motion. However, as discussed above, pursuant to the Intercreditor Agreement, the Prepetition 2L Agents have agreed not to object if any of the Prepetition 1L Secured Parties seeks to provide postpetition financing or consent to use cash collateral.[9] Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

**D. No Adequate Alternative to the DIP Facilities Is Currently Available**

57. To obtain a postpetition financing facility, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. *See YL West 87th Holdings I LLC,*

---

9. Section 6.2(a) of the Intercreditor Agreement provides: "If any First Lien Borrower or any other Credit Party shall be subject to any Insolvency Proceeding at any time prior to the Discharge of First Lien Obligations, and the First Lien Agent or the First Lien Lenders shall seek to provide any First Lien Borrower or any other Credit Party with, or consent to a third party providing, any financing under Section 364 of the Bankruptcy Code or consent to any order for the use of cash collateral under Section 363 of the Bankruptcy Code or any similar provision of any foreign Insolvency Proceeding or under a court order in respect of measures granted with similar effect under any Insolvency Proceeding (each, a "First Lien DIP Financing") constituting Collateral with such First Lien DIP Financing to be secured by all or any portion of the Collateral (including assets that, but for the application of Section 552 of the Bankruptcy Code or any similar provision of any foreign Insolvency Proceeding would be Collateral), then the Second Lien Agents, on their own behalf and on behalf of the Second Lien Creditors, agree that they will raise no objection and will not support any objection to such First Lien DIP Financing or use of cash collateral or to the Liens securing the same on the grounds of a failure to provide 'adequate protection' for the Liens of the Second Lien Agents and Second Lien Creditors securing the Second Lien Obligations or on any other grounds (and without the consent of the First Lien Agent will not request any adequate protection solely as a result of such First Lien DIP Financing or use of cash collateral that is Collateral) except that if the First Lien Agent is granted Liens on additional collateral as adequate protection with respect to Collateral, the Second Lien Agents may request second priority Liens to those of the First Lien Agent on the same additional collateral as adequate protection of its interests in the Collateral."

423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (stating that debtor has an obligation only to make "reasonable efforts, under the circumstances . . . to obtain [unsecured financing], in the ordinary course of business or otherwise"; *In re Harborwalk, LP*, No. 10-80043-G3-11 (LZP) (Bankr. S.D. Tex. Jan. 29, 2010) [Docket No. 28] ("Section 364(d)(1) does not require that a debtor seek credit from every possible source, but a debtor must show that it made a reasonable effort to obtain postpetition financing from other potential lenders on less onerous terms and that such financing was unavailable.") (internal citations omitted).

58.     Given the amount of the Prepetition Obligations, procuring the necessary postpetition financing as unsecured debt or as debt secured by liens junior to the liens of the Prepetition Secured Parties was not a viable alternative.   Moreover, the Debtors did not believe they would be able to secure third-party postpetition financing on a non-priming basis and/or on better terms than those provided by the DIP Lenders without protracted litigation regarding the priming of the Prepetition Secured Parties' liens.  Accordingly, the Debtors have determined that, under the circumstances, the DIP Facilities are the best postpetition financing option available to them and their estates.

59.     As a result, the Debtors have shown, in satisfaction of the requirements of sections 364(c) and (d) of the Bankruptcy Code, that alternative credit on more favorable terms was unavailable to them.

**E.  The Debtors Should Be Authorized to Use the Cash Collateral**

60.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash

collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lenders and the Prepetition Secured Lenders consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

61.      Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

62.     As set forth above, the Prepetition Secured Parties have or are deemed to have consented to the use of Cash Collateral.  The Debtors propose providing the Prepetition 1L Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects against the diminution in value of their interest in the Prepetition Collateral.  Specifically, as detailed in the Interim Order, the Debtors are proposing the following adequate protection (collectively, the "Adequate Protection Obligations"):

(a) payment of all reasonable out-of-pocket fees, costs and expenses of the Prepetition 1L Secured Parties;

(b) additional and replacement liens to the extent of any postpetition diminution in value of the Prepetition 1L Secured Parties' interest in the Prepetition Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay, which liens will be junior to the Carve Out and the DIP Liens (the "First Lien Adequate Protection Liens");

(c) superpriority administrative expense claims to the extent of any postpetition diminution in value of the Prepetition 1L Secured Parties' interest in the Prepetition Collateral resulting from the use, sale or lease by the Debtors of such Prepetition Collateral and/or the imposition of the automatic stay, which claims will be junior to the Carve Out and the DIP Obligations and be payable from and have recourse to all assets and property of the Debtors (the "First Lien Adequate Protection Superpriority Claim"); and

(d) monthly adequate protection payments to the Prepetition 1L Lenders payable in-kind on the thirtieth day of each month equal to the interest at the Applicable Rate plus the Default Rate (as such terms are defined in the Prepetition 1L Credit Agreement) that would otherwise be owed to the Prepetition 1L Lenders under the Prepetition 1L Credit Agreement during such monthly period in respect of the Prepetition 1L Obligations, until such time as the full Prepetition 1L Obligations Amount is paid in full, in cash.

63.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition 1L Secured Lenders from any potential diminution in value to the Prepetition Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Secured Lenders agree or are deemed to agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition 1L Secured Lenders are appropriate.  Thus, the

Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

F.    **The Roll-Up Loans Are Appropriate**

64.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).   The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

65.    Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re TPC Group Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. June 3, 2022) (authorizing an approximately $323 million DIP facility, including a $238 million roll-up of prepetition secured notes, of which approximately $59 million rolled up on an interim basis); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS)

(Bankr. D. Del. Jul. 20, 2020) (authorizing an approximately $50 million DIP facility including a $22 million roll-up); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing DIP facilities in the aggregate amount of $240 million, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re True Religion Apparel, Inc.*, No. 20-10941 (CSS) (Bankr. D. Del. Aug. 1, 2017) (approving roll up with a ratio of 5.79:1 on term loan facility).[10]

66.     As set forth above, the DIP Credit Agreement provides that the DIP Facility will be used to roll up, subject to entry of the Final Order, approximately $96 million of the Debtors' prepetition debt under their capital structure. This repayment is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility. Without continued access to the additional liquidity provided under the DIP Facility, the Debtors will be unable to fund the administration of these Chapter 11 Cases and the sale process.

67.     As discussed in the DIP Declaration, the Roll-Up Loans were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facility and was required by the DIP Lenders as

---

10. Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

considerations for the extension of postpetition financing.  (DIP Decl. ¶ 15.)  Additionally, the

Roll-Up Loans were a necessary condition for the DIP Lenders to agree to provide the Emergency

Bridge on a prepetition basis.  The Emergency Bridge was required for the Debtors to continue

funding their operations pending the filing of these Chapter 11 Cases and obtaining access to the

DIP Facility.  Further, the Debtors believe the Prepetition 1L Obligations are secured by perfected,

first priority liens, and the portion being converted to Roll-Up Loans are fully secured such that

the roll-up of the obligations merely accelerates the satisfaction of the obligations without affecting

the recovery of other creditors.  For these reasons and because no other party has put forward an

actionable financing proposal, the granting of the Roll-Up Loans is reasonable, appropriate, a

sound exercise of the Debtors' business judgment, and ultimately in the best interests of all

stakeholders given the alternatives.

III.    **The Debtors Should Be Authorized to Pay the Fees Required Under the DIP Documents**

68.    As described in the DIP Declaration, the Debtors have agreed, subject to

Bankruptcy Court approval, to pay certain fees to the DIP Lenders (collectively, the "DIP Fees")

in exchange for providing the DIP Facility.  The DIP Fees include (i) a closing fee, payable in

kind, in an amount equal to 5.00% of the New Money DIP Commitments (the "Closing Fee"),

(ii) an agency fee in cash in an amount equal to $100,000 (the "Agency Fee"), and (iii) an exit fee

in cash in an amount equal to 5.00% of the DIP Loans, other than if the Second Additional Term

Loans have been converted into Roll-Up Loans, in which case the fee is an incremental 1% to fees

already payable on the Second Additional Term Loans (the "Exit Fee").  The Closing Fee shall be

payable in kind and the Agency Fee shall be payable in cash, and both shall be fully earned and

due and nonrefundable once paid.  The Exit Fee is due on repayment of any DIP Loan.

69.    The DIP Fees, together with the other provisions of the DIP Documents, represent the most favorable terms the DIP Lenders or any other potential investor would agree to make the DIP Facility available to the Debtors.  The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient postpetition financing necessary to continue their operations and fund the Chapter 11 Cases.  Paying the DIP Fees—which were negotiated at arms'-length among the parties—in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.  Accordingly, the Bankruptcy Court should authorize the Debtors to pay the DIP Fees.

## IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e)

70.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id.*

71.    Here, the Debtors believe the DIP Documents embody the most favorable terms on which the Debtors could obtain DIP Financing.  As discussed in the Feltman Declaration, all negotiations regarding the provisions of the DIP Facility were conducted in good faith and on an arm's length basis.  The terms and conditions of the DIP Facility are fair and reasonable, and

the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Facility other than as disclosed herein. Accordingly, the Bankruptcy Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    The Scope of the Carve Out Is Appropriate

72.    The DIP Superpriority Claims, the DIP Liens, the First Lien Adequate Protection Liens, and the First Lien Adequate Protection Superpriority Claim are subject to the Carve Out. The Carve Out ensures that assets will be available for the payment of fees of the U.S. Trustee and professional fees of the Debtors and an unsecured creditors' committee, if one is appointed. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Accordingly, the Carve Out is necessary and appropriate, and should be approved.

## VI.    The Automatic Stay Should Be Modified on a Limited Basis

73.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens. Specifically, the DIP Facility contemplates modifying the automatic stay so as to (i) permit the creation and perfection of the DIP Liens, and (ii) provide for the automatic vacation of such stay to permit the DIP Agent to enforce its rights

with respect to the DIP Collateral in the event of an Event of Default under the DIP Facility, subject to three (3) business days' written notice to counsel to the Debtors, and the U.S. Trustee.

74.     Stay modifications of this kind are ordinary and standard features for postpetition financings, and in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g.*, *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re Town Sports Int'l, LLC*, No. 12-12168 (CTG) (Bankr. D. Del. Oct. 2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15, 2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).[11]

## SATISFACTION OF BANKRUPTCY RULE 6003

75.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm." As described herein, the Debtors will suffer immediate and irreparable harm without the Court's authorization to withdraw and borrow funds under the DIP Facility. If the relief is not granted, the Debtors' ability to continue to operate and pay their administrative expenses will be significantly disrupted, which will have a disastrous effect on the Debtors' operations.

---

11. Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

76.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and that the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## INTERIM APPROVAL IS APPROPRIATE

77.     Bankruptcy Rules 4001(b) and 4001(c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *See* Fed. R. Bankr. P. 4001(c)(2).

78.     The Debtors request that the Bankruptcy Court authorize them, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an amount up to $11.2 million.  As discussed above, this relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  Absent interim approval of this interim borrowing under the DIP Facility, the Debtors' businesses would suffer immediate and irreparable harm.

## REQUEST FOR FINAL HEARING

79.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Bankruptcy Court set a date for the Final Hearing that is as soon as practicable, and in no event after twenty-five (25) days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY**

80.    Pursuant to Bankruptcy Rules 6003(b) and 6004(h), the Debtors seek (a) immediate entry of an order granting the relief sought herein and (b) a waiver of any stay of the effectiveness of such an order.  Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following . . . a motion to pay all or part of a claim that arose before the filing of the petition."  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  From this, courts have ruled that, where the failure to grant any such requested relief would result in immediate and irreparable harm to a debtor's estate, a court may allow a debtor to pay all or part of a claim that arose prepetition immediately.

81.    As set forth above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, the Debtors submit that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## **RESERVATION OF RIGHTS**

82.    Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (a) an admission as to the validity of any claim against a Debtor entity or the existence of any lien against the Debtors' property; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the

Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

## NOTICE

83.     Notice of the hearing of this Motion shall be provided to:  (i) the U.S. Trustee for the District of Delaware; (ii)  the holders of the twenty (20) largest unsecured claims against the Debtors on a consolidated basis; (iii) counsel for Blue Torch Finance LLC, as the administrative agent for the Prepetition 1L Lenders and the DIP Lenders; (iv) counsel for GLAS Americas LLC, as the administrative agent for the 2L Lenders; (v) Exitus Capital, S.A.P.I. de C.V.; (vi) Monroe Capital Management Advisors, LLC, as administrative agent for the Prior 1L Lenders; (vii) AGS Group LLC ; and (viii) all parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  As this Motion is seeking "first day" relief, within two (2) business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

84.     No prior request for the relief sought in this Motion has been made to this Bankruptcy Court or any other court.

WHEREFORE, the Debtors respectfully request that this Court:   (i) consider the Motion on an expedited basis; (ii) grant the Interim Order, substantially in the form attached as **Exhibit A** hereto, authorizing the Debtors to obtain the postpetition financing described herein on an interim basis and setting the Motion for a final hearing; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated: August 28, 2023
Wilmington, Delaware

Respectfully submitted,

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (No. 4057)
Gregory J. Flasser (No. 6154)
R/ Stephen McNeill (No. 5210)
**POTTER ANDERSON & CORROON LLP**
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
E-mail:  jryan@potteranderson.com
   gflasser@potteranderson.com
   rmcneill@potteranderson.com

and

Kathryn A. Coleman
Christopher Gartman
Jeffrey S. Margolin
Elizabeth A. Beitler
**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, NY  10004-1482
Telephone: (212) 837-6000
Facsimile:  (212) 422-4726
Email:  katie.coleman@hugheshubbard.com
chris.gartman@hugheshubbard.com
jeff.margolin@hugheshubbard.com
elizabeth.beitler@hugheshubbard.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*