**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **AN GLOBAL LLC, *et al.*,**[1] | Case No. 23-_____ (___) |
| **Debtors.** | (Joint Administration Requested) |

**DECLARATION OF JAMES S. FELTMAN, CHIEF RESTRUCTURING OFFICER OF
THE DEBTORS, IN SUPPORT OF FIRST DAY RELIEF**

Pursuant to 28 U.S.C. § 1746, I, James S. Feltman, hereby declare:

1.      I am the Chief Restructuring Officer ("CRO") of AN Global LLC ("AN Global")
and its affiliates that are debtors and debtors-in-possession in the above captioned chapter 11 cases
(collectively, the "Debtors" or the "Company").  I am a Senior Managing Director of Teneo Capital
LLC ("Teneo"), based in New York, New York.  On March 31, 2023, the Debtors engaged Teneo
to provide turnaround management services and designated me as Chief Responsible Officer.
Substantially contemporaneous with the commencement of the chapter 11 cases (the "Chapter 11
Cases"), I was appointed the Chief Restructuring Officer of the Debtors.

2.      My experience in the restructuring industry spans over 30 years and encompasses
a broad range of corporate recovery services, including engagements involving business workouts
and turnarounds, operational restructuring, and fiduciary and related matters.  Before joining
Teneo in March 2023, I served as a Managing Director of Duff & Phelps LLC (now known as
Kroll LLC).  In addition to this service, I have over two decades of experience with Big 4
accounting firms and I was previously a partner at Arthur Andersen LLP and KPMG LLP.  I am a

---

1.    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
and noticing agent at http://www.kccllc.net/AgileThought.  The Debtors' address is 222 W. Las Colinas
Boulevard, Suite 1650E, Irving, TX 75039.

fellow of the American College of Bankruptcy, a member of the American Institute of Certified

Public Accountants and Florida Institute of Certified Public Accountants, and a Certified Public

Accountant in the State of Florida.  From 2002-2008, I was a member of the board of directors of

the American Bankruptcy Institute.

3.      I submit this declaration ("Declaration") in support of the Debtors' chapter 11

petitions and contemporaneously filed requests for relief in the form of motions and applications

(such motions and applications, the "First Day Motions").  I have reviewed the First Day Motions

or have otherwise had their contents explained to me, and it is my belief that the relief sought

therein is essential to the uninterrupted operation of the Debtors' business and to the success of the

Chapter 11 Cases.  I am over the age of 18 and am authorized to submit this Declaration on behalf

of the Debtors.

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my review of relevant documents, information provided to me by

employees working under my supervision at Teneo, my discussions with the Debtors' senior

management team, or my opinion based upon experience, knowledge and information concerning

the operations of the Debtors.  If called upon to testify, I would testify competently to the facts set

forth in this Declaration.  Unless otherwise indicated, the financial information contained herein

is unaudited and provided on a consolidated basis.

### Commencement of the Chapter 11 Cases

5.      On the date hereof (the "Petition Date"), the Debtors each commenced with this

Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code").  The Debtors intend to continue in the possession of their respective properties and the

management of their respective businesses as debtors in possession.  The Debtors, including parent

company AgileThought, Inc., a public company, commenced the Chapter 11 Cases because of

2

liquidity issues to effectuate an orderly and value-maximizing sale transaction for the benefit of its stakeholders that addresses tax assessments in excess of $200 million against certain of its Mexican affiliates who are Debtors in these Chapter 11 Cases, which tax assessments the Debtors maintain are significantly overstated and without a factual foundation.  These issues are discussed in further detail below.

6.      The Debtors' prepetition first lien secured lenders, led by agent Blue Torch Finance LLC ("Blue Torch"), have agreed to provide the debtor-in-possession ("DIP") financing needed to fund an orderly and value-maximizing sale process in these Chapter 11 Cases.  Blue Torch has also agreed to serve as the stalking horse bidder in connection with that process by means of a credit bid of the entire outstanding amount of their prepetition and DIP loan claims.  Blue Torch's DIP financing and stalking horse bid will provide significant benefits to the Debtors and allow for the preservation of the Debtors' business as a going concern to ensure continuity of services to the Debtors' customers.

7.      The Debtors commenced the Chapter 11 Cases in the venue of this Court due to, as further described herein and in the First Day Motions, the fact that AN Global LLC, is a Delaware limited liability company.  While the Debtors maintain operations in the U.S., Mexico, Argentina, Brazil, Costa Rica and Spain, the Debtors' worldwide headquarters are located in Irving, Texas.  Most of the Debtors maintain property in bank accounts in the United States.  Moreover, the debt documents for certain of the Debtors' funded indebtedness are governed by New York law, and the Debtors regularly transact business in the ordinary course throughout the United States.

8.      Part I of this Declaration describes the Debtors' corporate history and business operations; Part II provides the Debtors' corporate and prepetition capital structure; Part III details the circumstances leading to the filing of these Chapter 11 Cases and the Debtors' path forward;

Part IV outlines the Debtors' proposed debtor-in-possession financing, use of cash collateral, and sale process; and Part V describes the First Day Motions.

**I.     THE DEBTOR'S BUSINESS**

9.      This section provides context for the circumstances surrounding the Chapter 11 Cases and covers three topics:  the Debtors' history and corporate structure, operations, and employee population.

**A.     History and Corporate Structure**

10.     In 2000, Manuel Senderos and Mauricio Garduno founded NASoft, a variable stock corporation organized under the laws of Mexico.  Over the next twenty years, Mr. Senderos, the current Chief Executive Officer and Chairman of the Board of AgileThought, Inc., and Mr. Garduno, the current President of the Mexican Debtors, executed ten strategic acquisitions, which ultimately formed the AgileThought corporate family.

11.     Notable transactions and partnerships over the last two decades include, among others:  (i) acquiring AGS Alpama Global Services USA, LLC, and AGS Alpama Global Services México, S.A. de C.V. in 2014; (ii) partnering with Nexxus, to complete five acquisitions and establishing capabilities in digital transformation, cloud solutions, advanced analytics and digital marketing in 2015-2016; (iii) acquiring Anzen Soluciones, S.A. de C.V. in 2015; (iv) acquiring Qlikmex and Extend Solutions in 2016; (v) partnering with Credit Suisse to complete three acquisitions and establishing capabilities in e-commerce in 2017; (vi) acquiring 4th Source, which expanded the U.S. footprint and enhanced presence with clients from the healthcare industry, in 2018; and (vii) acquiring AgileThought, LLC, which further expanded the Company's U.S. footprint, and enhanced delivery capabilities, and maintaining relationships with large clients within the professional services industry in 2019.  In 2019, the Company also relocated its global headquarters to Texas, and changed its name to "AgileThought."

12.     On August 23, 2021 ("Closing Date"), LIV Capital Acquisition Corp. ("LIVK"), a special purpose acquisition company, and the former Company parent (in its pre-merger capacity, "Legacy AgileThought") consummated the transactions contemplated by the definitive agreement and plan of merger ("Merger Agreement"), dated May 9, 2021. Pursuant to the terms, Legacy AgileThought merged with and into LIVK, whereupon the separate corporate existence of Legacy AgileThought ceased, with LIVK surviving such merger (the "Surviving Company").  On the Closing Date, the Surviving Company became the corporate parent under which the Company operates today, AgileThought, Inc.

13.     Currently, AgileThought, Inc. is a public company whose stock is presently traded on the NASDAQ under the symbol AGIL.  As set forth on the structure annexed hereto as **Exhibit A**, Debtor AgileThought, Inc. directly or indirectly owns 30 subsidiaries, all of which are Debtors in these Chapter 11 Cases.

### B.     Business Operations

14.     The Company is a leading global provider of agile-first, end-to-end digital transformation services in the North American market using on-shore and near-shore delivery. The Company helps its clients transform by building, improving and running new solutions at scale.  The Company's services enable its clients to leverage technology more effectively to focus on better business outcomes.

15.     The Company has a stable revenue stream, with many longstanding customers. Customers include many companies that are established names in their respective industries.  Over 100 current customers, including Fortune 1000 companies, trust the Company to solve their digital challenges and optimize mission-critical systems to drive business value.  The Company's solution architects, developers, data scientists, engineers, transformation consultants, automation specialists, and other experts located across the United States and across Latin America deliver

next-generation software solutions that accelerate the transition to digital platforms across business processes.

16.     The Company operates its business through ten "Guilds," which act as agencies within the Company.  The Guilds are designed to help extend market leadership, drive significant value for all clients, and provide high-growth career paths for our employees.

17.     The Guilds are distinct groups with domain experience embedded in their areas of expertise, working cross-functionally in fast-moving teams called "Agile Squads" to drive innovation and establish new offerings and solutions for our clients.

i)      The Agility Guild utilizes innovative approaches like Agile, DevOps, Design Thinking, and Project Management, including Agile Coaching, Agile Delivery Management, Agile Transformation, and IT Program Management.

ii)     The Design & Product Guild provides services related to product management, design strategy & interface design, business analysis, and branding.

iii)    The Data & Analytics Guild leverages state-of-the-art tools and methodologies to extract actionable insights from complex datasets, including data engineering, data science & causality, data visualization, and machine learning.

iv)     The Enterprise Solutions Guild provides the best-added value to customer through excellence in the timely delivery of business apps and related services.

v)      The Front-End Engineering Guild provides support for web development, conversational interfaces, mobile development, and Metaverse & Web3.0.

vi)     The Backend Engineering Guild creates exceptional backend platforms and leverages cloud technology to provide scalable platforms and complex architecture, cloud rationalization, microservices, and digital commerce services.

vii)    The Cloud-Ops & Security Guild provide cybersecurity assessments, and cloud transformation, cloud operation, and governance and compliance services.

viii) The Quality Guild focuses on developing and implementing testing best practices within the software development lifecycle, including quality assessments and playbooks, performance testing, automation testing, and AI test data generations.

ix) The Gaming Guild provides gamification techniques to various business areas, game testing services, player support teams and customer service, and visually stunning 2D and 3D assets concept art and VFX.

x) The Applied AI Guild is comprised of experts who are able to fine-tune generative AI models, provide infrastructure to support generative AI models at scale, transform raw data into a format for machine learning, all with AI transparency and explainability.

**C.    Employees**

18.    As of the Petition Date, the Company had 2,131 employees. The majority of the Debtors' employees are located in Mexico. As of the Petition Date, the Debtors had 427 employees located outside of Mexico, including 145 in the United States.

19.    The compensation offered to the Company employees provides a variety of additional benefits depending on employee classification, including health insurance, dental insurance, holiday bonuses, productivity bonuses, group life insurance, disability insurance, retirement plans, food vouchers, remote work stipends, and other benefits.

## II.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

20.    As of the Petition Date, the Debtors have an overall cash position of approximately $2.87 million, and a total of approximately $110 million in financial debt obligations. Principal long-term loans and borrowings are described below.[2]

---

2.    The descriptions of these financings in this Declaration or any of the First Day Motions are provided for informational purposes only and the Debtors reserve all rights relating to the long-term loans and borrowings described herein. Capitalized terms used but not defined herein have the meanings ascribed to them in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition 1L Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion").

21.     <u>Prepetition 1L Credit Facility</u>.  On May 27, 2022, certain of the Debtors entered into a financing agreement ("<u>Prepetition 1L Credit Facility</u>") by and among AN Global, certain subsidiaries of the Company, as guarantors (the "<u>Prepetition 1L Guarantors</u>" and together with AN Global, the "<u>Prepetition 1L Obligors</u>"), the financial institutions party thereto as lenders (the "<u>Prepetition 1L Lenders</u>"), and Blue Torch, as the administrative agent and collateral agent.  The Prepetition 1L Obligors include AN Global and the following Debtors: AgileThought, Inc.; AgileThought, LLC; 4th Source, LLC; IT Global Holding LLC; 4th Source Holding Corp.; QMX Investment Holdings USA, Inc.; AGS Alpama Global Services USA, LLC; Entrepids Technology Inc.; 4th Source Mexico, LLC; AN USA; AgileThought Digital Solutions S.A.P.I. de C.V.; and AgileThought Mexico, S.A. de C.V.

22.     The Prepetition 1L Credit Facility is secured by (i) substantially all of the tangible and intangible assets of the Prepetition 1L Obligors other than AgileThought Mexico, S.A. de C.V.; (ii) the proceeds therefrom; and (iii) pledges of the Mexican subsidiaries[3] and initially provided for a term loan of $55 million and revolving credit facility with an aggregate principal limit not to exceed $3 million at any time outstanding.  On May 27, 2022, AN Global borrowed the full $55 million under the term loan facility.  On June 28, 2022, AN Global borrowed $3 million under the revolving credit facility. The Prepetition 1L Obligors recognized $5 million in debt issuance costs.

23.     On August 10, 2022, the Prepetition 1L Obligors entered into a waiver and amendment to the Prepetition 1L Credit Facility to provide for an extension of the period of time

---

3.    Including AgileThought Digital Solutions, S.A.P.I. de C.V.; AgileThought Mexico, S.A. de C.V.; AN Data Intelligence, S.A. de C.V.; AN Extend, S.A. de C.V., AN UX, S.A. de C.V.; Faktos Inc, S.A.P.I. de C.V.; Facultas Analytics, S.A.P.I. de C.V.; Entrepids México, S.A. de C.V.; AgileThought Servicios Administrativos, S.A. de C.V.; AgileThought Servicios México, S.A. de C.V.; Cuarto Origen, S. de R.L. de C.V.; and AN Evolution, S. de R.L. de C.V.

which AN Global has to satisfy certain reporting and post-closing obligations under the Prepetition 1L Credit Facility. The Prepetition 1L Obligors recognized approximately $600,000 in debt issuance costs related to the wavier and amendment.  On November 1, 2022, the Prepetition 1L Obligors entered into an amendment to further extend the period of time which AN Global has to satisfy certain reporting and post-closing obligations.

24.     As of December 31, 2022, AN Global was in default under the permitted factoring disposition and leverage ratio covenants of the Prepetition 1L Credit Facility.  Subsequent to December 31, 2022, AN Global was also in default under the leverage ratio, liquidity, aged accounts payables, permitted payments and other covenants under the Prepetition 1L Credit Facility.  As a result of such defaults, the Company entered into a waiver and amendment with Blue Torch on March 7, 2023 ("Amendment No. 4") to revise significant terms of the Prepetition 1L Credit Facility as set forth below.

25.     Pursuant to Amendment No. 4, AN Global agreed to pay approximately $34 million of the Company's total indebtedness and related obligations in 2023, including principal payments of approximately $15 million by April 15, 2023, approximately $20 million by June 15, 2023 (inclusive of the approximately $15 million by April 15, 2023 if not paid by then) and approximately $25 million by September 15, 2023 (inclusive of the approximately $20 million by June 15, 2023 if not paid by then) to Blue Torch. Thereafter, AN Global agreed to make quarterly payments on the term loan of approximately $687,500 starting December 31, 2023. The amendment also revised the maturity date of the Prepetition 1L Credit Facility from May 27, 2026 to January 1, 2025 and revised the interest provisions to remove the step-down in interest rate based on the Company's total leverage ratio. Interest is paid monthly for both loans and is calculated based on either (i) the Adjusted Term SOFR (the three-month Secured Overnight

Financing Rate as determined by the Federal Reserve Bank of New York, plus 0.26161%) plus a margin of 9.0% per annum. Under default, AN Global is required to pay interest monthly at a Reference Rate (essentially the "prime rate" as published by the Wall Street Journal and as further defined in the Prepetition 1L Credit Facility), plus a margin of 8% per annum, plus an additional 2% per annum post-default margin. Interest on each loan is payable on the last day of the then effective interest period applicable to such loan and at maturity. In connection with Amendment No. 4, AN Global agreed to pay the administrative agent a waiver and amendment fee equal to $5.5 million, which was paid in kind by adding such amount to the outstanding principal of the term loan. In addition, if AN Global failed to repay the respective aggregate principal amounts on or prior to April 15, 2023, June 15, 2023 and September 15, 2023, a failed payment fee equal to approximately $4 million, $2 million and $3 million, respectively, would be paid in kind by adding such fee to the outstanding principal of the term loan.  If AN Global meets these payments when due, which have not been met for April 15, 2023, and June 15, 2023, as noted below, then no fee would be added to the outstanding principal.  Amendment No. 4 also required the Company to engage both a financial advisor to support the Company's capital raising needs and an operational advisor to conduct a formal assessment of the Company's financial performance, in both cases on terms reasonably acceptable to Blue Torch. Lastly, Amendment No. 4 granted a waiver for certain financial covenants as of December 31, 2022 and reset the covenant requirements for future periods. This amendment was determined to substantially alter the Prepetition 1L Credit Facility such that extinguishment accounting was applied. The Company recognized an approximately $700,000 debt discount and a loss on debt extinguishment of approximately $10.2 million for the three months ended March 31, 2023. The Company recognized approximately $1.1 million in debt issuance costs with the amendment.

26.     AN Global defaulted in making the March 31, 2023 interest payment and was not in compliance with the liquidity and aged accounts payable aging covenants, which constituted an event of default under the Prepetition 1L Credit Facility.  On April 15, 2023, AN Global did not pay the approximately $15 million principal payment due by April 15, 2023, and thus approximately $4 million in fees was added to the outstanding principal balance. On April 18, 2023, the Prepetition 1L Obligors entered into forbearance agreements regarding the Prepetition 1L Credit Facility and the Prepetition 2L Credit Facility (as defined below). Pursuant to the forbearance terms, the Prepetition Secured Parties (as defined in the DIP Motion) agreed to forbear from accelerating their respective obligations and otherwise exercising any rights and remedies (other than certain limited remedies, such as continuing to accrue applicable default interest) under the loans until May 10, 2023 (which was subsequently extended to May 19, 2023, and then further extended to May 26, 2023), or earlier in the event of non-compliance with certain representations, covenants and other requirements, all subject to the terms and conditions thereof. Such forbearance has not been subsequently extended.

27.     Furthermore, as contemplated in the forbearance agreements, on April 20, 2023, the Prepetition 1L Obligors entered into Amendment No. 5 to the Prepetition 1L Credit Facility that increased the revolver capacity thereunder by $3.0 million.  The Prepetition 1L Obligors also incurred an additional $1.5 million in lender fees associated with the forbearance and revolver amendments, of which approximately $1 million is refundable if the revolver is paid in full by an agreed upon future date. In addition, the Company capitalized approximately $900,000 of interest payments not paid by March 31, 2023.

28.     On June 15, 2023, AN Global did not pay the approximately $20 million principal payment due by June 15, 2023 under the Prepetition 1L Credit Facility and thus approximately $2

million in fees was added to the outstanding principal balance under the Prepetition 1L Credit Facility.

29.    On July 17, 2023, the Prepetition 1L Obligors entered into an additional amendment to the Prepetition 1L Credit Facility ("Amendment No. 6") pursuant to which the Prepetition 1L Lenders agreed to provide an additional term loan in the amount of $4,635,490. Among other amendments to the Prepetition 1L Credit Facility, Amendment No. 6 eliminated AN Global's ability to select an interest rate based on Term SOFR to apply to the loans thereunder, such that the interest rate applicable to all loans under the Prepetition 1L Credit Facility thereafter would be determined as follows: the greatest of the following reference rates (a) 2.0% per annum (b) the Federal Funds rate plus 0.5% per annum (c) Adjusted Term SOFR plus 1.0% per annum or (d) the last prime rate quoted by the Wall Street Journal (which was 8.25% per annum as of the date of Amendment No. 6), plus an applicable margin (which is 8.0% per annum for reference rate loans), plus a 2.0% per annum post-default margin. AN Global paid an amendment fee of $2.5 million in connection with Amendment No. 6, which was paid in kind by capitalizing such fee and adding the amount to the outstanding principal amount under the Prepetition 1L Credit Facility.

30.    On August 18, 2023, the Prepetition 1L Obligors entered into an additional amendment to the Prepetition 1L Credit Facility ("Amendment No. 7") pursuant to which the Prepetition 1L Lenders agreed to provide an additional term loan in the amount of $10,598,775. AN Global paid an amendment fee of $529,938.75 in connection with Amendment No. 7, which was paid-in-kind by capitalizing such fee and adding the amount to the outstanding principal amount under the Prepetition 1L Credit Facility, and agreed to a $423,951 exit fee (the "Exit Fee") due and payable upon certain triggering events, including commencement of Chapter 11 Cases. Among other amendments to the Prepetition 1L Credit Facility, Amendment No. 7 added such

Exit Fee to the prepayment premium payable upon certain triggering events under the Prepetition 1L Credit Facility

31.     On August 25, 2023, the Prepetition 1L Agent and the Prepetition 1L Lenders under the Prepetition 1L Credit Facility delivered a "Notice of Acceleration and Demand for Immediate Payment" to AN Global (the "Acceleration Notice").  The Acceleration Notice noted the existence of numerous events of default under the Prepetition 1L Credit Facility, and declared the unpaid principal amount of all outstanding Prepetition 1L Obligations under the Prepetition 1L Documents to be immediately due and payable.  The Acceleration Notice provided that such Prepetition 1L Obligations "are not less than $93,640,057.55 and there are certain other amounts owing under the Financing Agreement, including accrued and unpaid interest, the Applicable Premium payable pursuant to Section 2.07(c) of the Financing Agreement and certain fees, costs and expenses (including fees of the Agents, FTI, and counsel for each Agent and each Lender) payable pursuant to Section 12.04 of the Financing Agreement."  The Debtors do not dispute the existence of various events of default or the Prepetition 1L Agent's or Prepetition 1L Lenders' right to accelerate the obligations under the Prepetition 1L Credit Facility.

32.     Prepetition 2L Credit Facility.  On November 22, 2021, the Company entered into a new second lien credit facility (the "Prepetition 2L Credit Facility") with Nexxus Capital and Credit Suisse (both of which are existing shareholders of AgileThought, Inc. and have representation on AgileThought, Inc.'s Board of Directors), Manuel Senderos, Chief Executive Officer and Chairman of the Board of Directors, and Mauricio Garduno Gonzalez Elizonda, the current President of the Mexican Debtors, and Kevin Johnston, the Debtors' former Chief Operating Officer, joining as an additional lender on December 9, 2021 pursuant to Amendment No. 1 to the Prepetition 2L Credit Facility.  The Prepetition 2L Credit Facility provides for a term

loan facility in an initial aggregate principal amount of approximately $20.7 million, accruing interest at a rate per annum equal to 11.00% for the US dollar-denominated loan and 17.41% for the Mexican peso-denominated loan.  The Prepetition 2L Credit Facility had an original maturity date of March 15, 2023.  The Company recognized approximately $900,000 million in debt issuance costs with the issuance.

33.     On August 10, 2022, the Company entered into an amendment to the Prepetition 2L Credit Facility to extend the maturity date of the Tranche A (Credit Suisse), Tranche C (Senderos), and Tranche E (Johnston) loans to September 15, 2026, and provide for potential increases, that step up over time from one percent to five percent, in the interest rate applicable to the Tranche A loans.  The amendment also extended the maturity date of the Tranche B (Nexxus Capital) loans thereunder to June 15, 2023 and provided for a mandatory conversion of the Tranche B loans thereunder, including interest and fees, into equity securities of the Company upon the maturity of said loans at a conversion price equal to $4.64 per share, subject to regulatory approval. The amendment also provided for the covenants and certain other provisions of the Prepetition 2L Credit Facility to be made consistent with those in the Prepetition 1L Credit Facility (and in certain cases for those covenants to be made less restrictive than those in the Prepetition 1L Credit Facility).  This amendment was determined to substantially alter the debt agreement such that extinguishment accounting was applied.  The Company recognized a loss on debt extinguishment of $11.7 million for the three months ended September 30, 2022.  As part of the reassessment of the debt instrument, the Company bifurcated the conversion option on the Mexican peso-dominated loans and recognized an embedded derivative liability of $9.0 million as of the amendment date.

34.     On November 18, 2022, the Company entered into a letter agreement with the Tranche A (Credit Suisse) lenders.  The letter agreement changed the conversion price at which the Credit Suisse lenders may convert their outstanding loans, interest, and fees into the Company's common stock from a fixed conversion price of $4.64 per share to the closing price of one share of the Company's common stock on the trading day immediately prior to the conversion date, subject to a floor price of $4.64 per share.  This amendment was determined to substantially alter the Credit Suisse portion of the debt agreement such that extinguishment accounting was applied.  The Company recognized a gain on debt extinguishment of $8.8 million for the three months ended December 31, 2022.  The total loss on debt extinguishment related to the Prepetition 2L Credit Facility was $2.9 million for the twelve months ended December 31, 2022.

35.     Each lender (each, a "Prepetition 2L Lender" and collectively, the "Prepetition 2L Lenders") under that certain Credit Agreement, dated as of November 22, 2021 (as (i) amended by that certain Amendment No. 1 to the Credit Agreement dated as of December 9, 2021, (ii) amended by that certain Amendment No. 2 to the Credit Agreement dated as of March 30, 2022, (iii) amended by that certain Amendment No. 3 to the Credit Agreement dated as of the date of this Agreement, (iv) amended by that certain Amendment No. 4 to the Credit Agreement dated as of August 10, 2022, (v) amended by that certain Amendment No. 5 to the Credit Agreement dated as of November 22, 2022, (vi) amended by that certain Amendment No. 6 to the Credit Agreement dated as of March 7, 2023 and that certain Waiver to Credit Agreement dated as of March 7, 2023, and (vii) modified by that certain Forbearance Agreement dated as of April 18, 2023, the "Prepetition 2L Credit Agreement") has the option to convert all or any portion of its outstanding loans, interest and fees into common stock of the Company at any time at the respective conversion prices.  On December 27, 2021, Manuel Senderos and Kevin Johnston exercised the conversion

options for their respective principal amounts of approximately $4.5 million and $200,000, respectively, at the original conversion price of $10.19 per share.

36.     On March 7, 2023, in connection with Amendment No. 4 to the Prepetition 1L Credit Facility, the Company entered into a sixth amendment to the Prepetition 2L Credit Facility ("Amendment No. 6").  Amendment No. 6 revised the maturity date of the Credit Suisse loans from September 15, 2026 to July 1, 2025.  Amendment No. 6 also provided for the covenants and certain other provisions of the Prepetition 2L Credit Facility to be consistent with those in the Prepetition 1L Credit Facility, as amended by Amendment No. 4, except as set forth in the Financial Covenants.

37.     As described above, the Company defaulted in making the March 31, 2023 interest payment under the Prepetition 1L Credit Facility and was not in compliance with its liquidity and its accounts payable aging covenants thereunder, which constituted an event of default under the Prepetition 1L Credit Facility and triggered a cross-default under the Prepetition 2L Credit Facility. On April 18, 2023, the Company entered into a forbearance agreement regarding the Prepetition 2L Credit Facility.  Pursuant to the forbearance terms, the Prepetition 2L Lenders agreed to forbear from accelerating their respective obligations and otherwise exercising any rights and remedies under their loans until May 10, 2023 (and are otherwise not permitted to accelerate the debt until the Prepetition 1L Credit Facility is paid in full).

38.     On June 15, 2023, the outstanding principal, interest, and fees related to the Nexxus Capital loans automatically converted into 2,163,412 shares of common stock of the Company at a conversion price equal to $4.64 per share.

39.     AGS Subordinated Promissory Note.  On June 24, 2021, the Company entered into a subordinated promissory note with AGS Group LLC ("AGS Group") for a principal amount of

$673,000 (the "AGS Subordinated Promissory Note").  The principal amount outstanding under the AGS Subordinated Promissory Note matured on December 20, 2021 (the "Original Maturity Date") and was extended until May 19, 2022.  On August 4, 2022, the Company entered into another amendment to further extend the maturity date of the AGS Subordinated Promissory Note to January 31, 2023 (the "January 2023 Maturity Date").  Interest is due and payable in arrears on the Original Maturity Date at a 14.0% per annum until and including December 20, 2021 and at 20.0% per annum from the Original Maturity Date to the January 2023 Maturity Date calculated on the actual number of days elapsed.

40.     On January 31, 2023, the AGS Subordinated Promissory Note was cancelled in full and restated for a principal amount of $775,931.61, with accrued interest totaling approximately $100,000.  The outstanding principal and interest matured on March 31, 2023 (the "Extended Maturity Date").  In addition, the Company also agreed to the issuance of common stock of the Company with a value of approximately $1.8 million, equal to approximately two times the then-outstanding principal and interest under the AGS Subordinated Promissory Note.  On February 10, 2023, the Company issued 414,367 shares of common stock to AGS Group to serve as collateral. Upon the earlier of the Extended Maturity Date or the occurrence of an event of default, AGS Group may sell those shares and apply 100% of the net proceeds therefrom to repay the AGS Subordinated Promissory Note.  If the net proceeds from sales of the shares exceed the indebtedness owed by the Company, AGS Group shall remit such excess cash proceeds to the Company.  Upon payment in full of the AGS Subordinated Promissory Note in cash by the Company or through sales of the shares by AGS Group, AGS Group shall return any of the unsold shares to the Company.

41.    Under the terms of the Prepetition 1L Credit Facility and the Prepetition 2L Credit Facility, the Company may only repay the AGS Subordinated Promissory Note with the proceeds of an equity issuance, and then only if the total leverage ratio is 2.50 to 1.00 or less and the Company is in compliance with all financial covenants and no event of default has occurred and is continuing under the Prepetition 1L Credit Facility and the Prepetition 2L Credit Facility.  The Company has entered into a letter agreement with AGS Group to provide that a failure to pay such indebtedness will not be deemed an event of default.  As of the Petition Date, the Company has not yet paid the AGS Promissory Note due to existing contractual restrictions in the Company's secured credit facilities.

42.    Exitus Capital Subordinated Debt.  On July 26, 2021, AgileThought Digital Solutions, S.A.P.I. de C.V.'s ("AT Digital Solutions") agreed with existing lenders and Exitus Capital, S.A.P.I. de C.V. ("Exitus Capital") to enter into a zero-coupon subordinated loan agreement with Exitus Capital in an aggregate principal amount equal to $3.7 million (the "Exitus Capital Subordinated Debt").  Net loan proceeds totaled $3.2 million, net of approximately $500,000 in debt discount.  No periodic interest payments were required and the loan was due on January 26, 2022, with an option to extend for up to two additional six month terms.  On January 25, 2022, and July 26, 2022, AT Digital Solutions exercised its option to extend the loan an additional six months, recognizing an additional approximately $500,000 debt issuance costs related to each loan extension

43.    On January 26, 2023, AT Digital Solutions entered into an amendment to extend the maturity date of the Exitus Capital Subordinated Debt from January 26, 2023, to July 27, 2023. In addition, AT Digital Solutions paid approximately $1.1 million of the principal amount of the Exitus Capital Subordinated Debt on January 27, 2023, plus a fee of approximately $400,000. On

February 27, 2023, AT Digital Solutions paid an additional $1 million of the principal.  I understand that Blue Torch contends these payments on account of the Exitus Capital Subordinated Debt were not permitted under the Prepetition 1L Credit Facility.  The remaining principal of approximately $1.6 million was due and payable on the new maturity date of July 27, 2023.  In addition, on January 31, 2023, the Company agreed to the issuance of common stock of the Company with a value of approximately $5.2 million, equal to approximately two times the then-current outstanding principal amount of the Exitus Capital Subordinated Debt.  On February 10, 2023, the Company issued 1,207,712 shares of common stock to serve as collateral.  The Company is obligated to issue additional shares to Exitus Capital from time to time if the value of the shares held by them is less than two times the outstanding principal amount of the loan.

44.    As of July 27, 2023, the remaining balance of the Exitus Capital Subordinated Debt was not repaid to Exitus Capital due to existing contractual restrictions in the Company's secured credit facilities and a related subordination agreement that prohibit payments by the Company and its subsidiaries in respect of subordinated debt, which failure to pay resulted in an event of default (under the cross-default provision) under the Prepetition 1L Credit Facility and the Prepetition 2L Credit Facility.  As a result, Exitus Capital may be able to sell those shares and apply up to 100% of the net proceeds therefrom to repay the Exitus Capital Subordinated Debt.  As of the Petition Date, AT Digital Solutions' obligations under the Exitus Subordinated Note remain outstanding in the total amount of approximately $1,580,000.

45.    Although a failure to pay Exitus Capital is a cross-default under both the Prepetition 1L Credit Facility and Prepetition 2L Credit Facility, it does not allow either of the Prepetition 1L Lenders or Prepetition 2L Lenders to accelerate indebtedness due under their respective loans unless Exitus Capital accelerates the amounts due to it.

46.     The Company's default status on the Prepetition 1L Credit Facility also triggered a cross-default on the Exitus Capital Subordinated Debt.

47.     <u>Paycheck Protection Program Loans</u>.    On April 30, 2020, and May 1, 2020, respectively, the Company received Paycheck Protection Program ("<u>PPP</u>") loans through four of its subsidiaries for a total amount of $9.3 million.  The PPP loans bear a fixed interest rate of 1% over a two-year term, are guaranteed by the United States federal government, and do not require collateral. The loans may be forgiven, in part or whole, if the proceeds are used to retain and pay employees  and  for  other  qualifying  expenditures.  The  Company  submitted  its  forgiveness applications to the Small Business Administration between November 2020 and January 2021. The monthly repayment terms were established in the notification letters with the amount of loan forgiveness.   On December 25, 2020, approximately $100,000 of an approximately $200,000 million PPP loan was forgiven.  On March 9, 2021, approximately $100,000 of an approximately $300,000  PPP  loan  was  forgiven.    On  June  13,  2021,  approximately  $1.2  million  of  an approximately  $1.2  million  PPP  loan  was  forgiven.    On  January  19,  2022,  approximately $7,300,000 of an approximate $7.6 million PPP loan was forgiven resulting in a remaining PPP Loan balance of approximately $300,000 of which approximately $100,000 is due within the next year. The remaining payments are due quarterly until May 2, 2025, if not forgiven.  As of the Petition Date, the total PPP Loan balance was approximately $172,000.

48.     <u>Prior Term Loan Facility</u>.  In 2018, the Company entered into a revolving credit agreement with Monroe Capital Management Advisors LLC that permitted the Company to borrow up to $1.5 million through November 10, 2023.  In 2019, the agreement was amended to increase the borrowing limit to $5 million. Also in 2018, the Company entered into a term loan credit agreement with Monroe Capital Management Advisors LLC that permitted the Company to

borrow up to $75 million through November 10, 2023. In 2019, the agreement was amended to increase the borrowing amount to $98 million. Interest on the revolving credit agreement and term loan agreement (the "<u>Prior Term Loan Facility</u>") were paid monthly and calculated as LIBOR plus a margin of 8.0% to 9.0%, based on the Total Leverage Ratio as calculated in the most recent Compliance Certificate. An additional 2.0% interest were incurred during periods of loan covenant default.

49.    On March 22, 2021, the Company used $20 million from proceeds of issuance of preferred stock to partially pay the Prior Term Loan Facility.

50.    On June 24, 2021, an amendment was signed to modify the debt covenants for the periods June 30, 2021 and thereafter. In addition to the covenant modifications, the amendment also established the deferral of the monthly $1 million principal payments previously due in April and May, along with the $1 million payments due in June and July to September 30, 2021. As a result, the regular quarterly principal installments resumed, and the Prior Term Loan Facility lenders charged an approximately $4 million fee paid upon the end of the term loan in exchange for the amended terms. The amendment resulted in a debt modification, thus the fees payable to the Prior Term Loan Facility lenders were capitalized and were amortized over the remaining life of the Prior Term Loan Facility. From September 30, 2021, to October 29, 2021, the Company entered into various amendments to extend the due date of the $4 million in principal payments previously due September 30, 2021 to November 19, 2021.

51.    On November 29, 2021, the Company made a $20 million principal prepayment, which included the $4 million principal payment that was originally due September 30, 2021. The Company paid with proceeds from the Prepetition 2L Credit Facility. Furthermore, on December 29, 2021, the Company issued 4,439,333 shares of common stock to the administrative agent for

the Prior Term Loan Facility (the "Prior Term Loan Shares"), which, subject to certain terms and regulatory restrictions, may sell the Prior Term Loan Shares upon the earlier of August 29, 2022 and an event of default and apply the proceeds to the outstanding balance of the loan. In addition, the Company agreed to issue warrants to the administrative agent to purchase $7 million worth of the Company's common stock for nominal consideration. The warrants will be issued on the earlier of full repayment of outstanding deferred fees or August 29, 2023. In addition, the Company may be required to pay the Prior Term Loan Facility lenders cash to the extent that the Company cannot issue some or all of the warrants due to regulatory restrictions. The Prior Term Loan Facility lenders charged an additional $2.9 million fee paid upon the end of the term loan in exchange for the amended terms.

52.     On November 22, 2021, the Company entered into an amendment that requires sixty percent (60%) of proceeds from future equity issuances be used to repay the outstanding balance on the Prior Term Loan Facility. On December 27, 2021, the Company closed a follow-on stock offering resulting in $21.8 million of net proceeds, of which $13.7 million was used as payment of the outstanding principal and interest balances for the Prior Term Loan Facility.

53.     On March 30, 2022, the Company entered into an amendment with the Prior Term Loan Facility and Prepetition 2L Lenders to waive the Fixed Charge Coverage Ratio for March 31, 2022. In addition, the Total Leverage Ratio covenant for the quarterly period ending March 31, 2022 was reset. As consideration for entering into this amendment, the Company agreed to pay the Prior Term Loan Facility's administrative agent a fee equal to approximately $500,000. The fee would be fully earned as of March 30, 2022, and due and payable upon the end of the term loan. However, the agreement provided that the fee shall be waived in its entirety if final payment in full occurred prior to or on May 30, 2022. The modification triggered by this new amendment

was determined to be substantially different from the old instrument, therefore the modification was accounted for as an extinguishment and the debt instrument was adjusted to fair value as of March 31, 2022.

54.     On May 27, 2022, the Company paid approximately $40.2 million to settle the outstanding principal, interest, and a portion of the $6.9 million deferred fees related to amendments to the Prior Term Loan Facility.   The prior term loan lenders waived the approximately $500,000 fee related to the March 30, 2022 amendment and returned 2,423,204 Prior Term Loan Shares as part of the deferred fees settlement.  Since August 29, 2022, the prior term loan lenders may sell the remaining Prior Term Loan Shares and apply 100% of the net proceeds to the outstanding deferred fees obligation.  The prior term loan lenders shall return any of the remaining unsold Prior Term Loan Shares upon full payment of the remaining deferred fees.

### III.     CIRCUMSTANCES LEADING TO CHAPTER 11 FILING

### A.     The Debtors Lack Sufficient Liquidity to Service their Debt Obligations.

55.     The Company has a substantial amount of indebtedness and related obligations and does not currently have sufficient available cash flows to service payment commitments.  As of the Petition Date, total funded indebtedness and related obligations were approximately $110 million, consisting of at least approximately $94.7 million under the Prepetition 1L Credit Facility; approximately $12.8 million under the Prepetition 2L Credit Facility; approximately $1,580,000 under the Exitus Subordinated Note; approximately $775,000 under the AGS Subordinated Promissory Note; and approximately $172,000 in PPP loans.  The Debtors also estimate that unsecured trade claims may total approximately $20 million; the disputed Mexican Tax Assessment (as defined below) may total approximately $203 million; the Monroe Capital claim may total $3.5 million, litigation claims may total at least $2.5 million; and other unsecured claims

may total at least several million dollars.[4]   Accordingly, the Debtors estimate that their total consolidated debt exceeds $340 million, inclusive of the disputed Mexican Tax Assessment and other disputed claims.  The Company does not have sufficient cash flows to service its ongoing payment obligations, or assets to repay such debt and related obligations in full when due.

56.    As described above, numerous events of default have occurred under the Prepetition 1L Credit Facility.  All prior forbearance agreements regarding the Prepetition 1L Credit Facility and Prepetition 2L Credit Facility have expired and Blue Torch may at any time accelerate the Company's obligations and otherwise exercise any rights and remedies under its loan agreements, particularly as Blue Torch advised the Company that it will not continue to finance the Company's operations absent a firm commitment to refinance the Prepetition 1L Credit Facility in full or a firm commitment by a purchaser to acquire the Company with proceeds sufficient to, at least, repay the Prepetition 1L Credit Facility in full.  Since the Company does not have sufficient cash flows from operating activities to fund their debt obligations, was unable to raise additional capital or refinance its debt, or effectuate a sale having proceeds sufficient to repay the Prepetition 1L Credit Facility in full, the Debtors were required to commence these Chapter 11 Cases in order to raise additional liquidity and continue their operations to maximize the value for all stakeholders.

**B.    The Disputed Mexican Tax Assessment Thwarted Prepetition Sale Efforts.**

57.    On August 2, 2021, the Mexican Tax Administration Service (Servicio de Administración Tributaria) (the "Mexican Tax Authority") issued a tax assessment against Debtors AT Digital Solutions, formerly known as North American Software, S.A.P.I. de C.V., and Anzen

---

4.   The Debtors provide these estimated claims amounts for informational purposes only and without any admission of liability, and reserve all rights, claims and defenses with respect thereto.

Soluciones, S.A. de C.V. ("Anzen" and together with AT Digital Solutions, the "Mexican Tax Entities") for income tax, VAT tax, and employees profit sharing payables, totaling an aggregate amount of $3,373,018,857 Mexican pesos (the "Mexican Tax Assessment"). Using an end of July 2023 conversion rate of 16.7338, the Mexican Tax Assessment totaled approximately $203,333,138.09 in U.S. dollars as of June 30, 2023, broken down as follows: an assessment for 2018 against AT Digital Solutions consisting of tax totaling $108,311,640.72, interest totaling $49,467,453.94, and penalties totaling $43,790,115.99; an assessment for 2019 against AT Digital Solutions consisting of tax totaling $859,672.91, interest totaling $241,688.59, and penalties totaling $443,711.98; and an assessment for 2019 against Anzen consisting of tax totaling $122,804.24, interest totaling $32,494, and penalties totaling $63,555.73. Thus, the approximately US $203 million Mexican Tax Assessment includes interest and penalties totaling approximately $94 million, nearly half of its total amount.

58.     The Debtors strongly contest the Mexican Tax Assessment and have taken steps to challenge it. On April 8, 2022, an administrative appeal ("*recurso de revocación*") challenging the Mexican Tax Assessment was filed before the Mexican Tax Authority, which was registered under file number RRL2022005645 (the "Administrative Appeal") and assigned to the "*Administración Desconcentrada Jurídica 2*" for its processing and resolution. As of the Petition Date, no definitive ruling has been issued to the Administrative Appeal.

59.     I understand that Blue Torch contends the Mexican Tax Assessment was not disclosed to Blue Torch prior to the Company's entry into the Prepetition 1L Credit Facility.

60.     Notwithstanding the pendency of the Administrative Appeal and the Debtors view that the tax liability was greatly overstated, potential buyers were unwilling to purchase the Debtors in a non-bankruptcy sale due to concerns about the Mexican Tax Assessment.

Additionally, as result of the Mexican Tax Assessment and the Mexican Tax Entities' inability to timely and effectively raise their challenges to the asserted amount of the Mexican Tax Liability in either Mexico or this Court, which amount the Debtors believe is grossly overstated, the Mexican Tax Entities commenced chapter 11 cases to commence an orderly liquidation of those businesses, which they believe is the only avenue to maximize the value of the Mexican Tax Entities.

**C.      The Debtors were Unable to Raise Additional Capital or Effectuate a Sale Outside of Bankruptcy.**

61.      In an effort to alleviate the foregoing conditions, the Company pursued several strategies with two nationally recognized financial advisors.  On March 22, 2023, the Debtors engaged Cantor Fitzgerald to help them seek financing, additional equity investment, and restructuring of debt.  Cantor Fitzgerald ran an extensive, multi-month process to seek such alternative financing or investment.  However, these efforts proved unfruitful.

62.      In addition, on May 3, 2023, the Debtors engaged J.P. Morgan Securities LLC ("JPM") to solicit bids for a sale of the Debtors.  JPM's marketing efforts yielded several rounds of bidding for the Debtors.  However, despite this interest from multiple bidders, as a result of the Mexican Tax Assessment and the other factors described above, the interested bidders ultimately declined to proceed with a purchase of the Debtors.

63.      Based on the foregoing, the Debtors concluded that a chapter 11 process is necessary in order to sell the Company's assets free and clear of all liens, claims, and encumbrances, in order to maximize value for their stakeholders.  Accordingly, the Debtors determined that it was in their best interests and the best interests of their stakeholders to seek bankruptcy relief in order to sustain their business operations and maximize value for stakeholders.

## IV.    RESTRUCTURING ACTIONS

### A.    Need for DIP Financing

64.    I am submitting a separate declaration (the "DIP Declaration") in support of the Debtors' proposed debtor-in-possession financing (such financing, the "DIP Facility"), which I incorporate by reference herein.  This section provides a brief summary of the DIP Facility.

65.    In order to meet its liquidity needs during these Chapter 11 Cases, AN Global seeks to enter into a Senior Secured Superpriority Priming Debtor-In-Possession Financing Agreement, dated on or about the date hereof (the "DIP Credit Agreement"; capitalized terms used but not otherwise defined herein have the meaning assigned to such terms in the DIP Credit Agreement), among AN Global, as Borrower, AgileThought, Inc., and each other subsidiary of AgileThought, Inc., party thereto, as Guarantors, the Lenders from time to time party thereto (the "DIP Lenders"), and Blue Torch, as Administrative Agent and Collateral Agent.

66.    Pursuant to the DIP Credit Agreement, the DIP Lenders have agreed to make available to AN Global a term loan facility in an aggregate principal amount $118,637,658.01, of which $22,700,000.00 million shall be new Term Loans and, upon entry of a Final Order, $95,937,658.01 shall be Roll-Up Loans converted from the Prepetition 1L Credit Agreement. The Loans shall accrue interest at either (x) the Reference Rate plus 10% per annum or (y) Adjusted Term SOFR plus 11% per annum. These rates are identical to those in effect under the Prepetition 1L Credit Facility in effect immediately prior to the Petition Date.

67.    The DIP Fees include (i) a closing fee in cash in an amount equal to 5.00% of the New Money DIP Commitments (as defined in the DIP Order)[5] (the "Closing Fee"), (ii) an agency

---

5.    For clarity, the New Money DIP Commitments do not include the Roll-Up Loans and, accordingly, the Closing Fee is not applicable to such loans.

fee in cash in an amount equal to $100,000 (the "Agency Fee"), and (iii) an exit fee in cash in an amount equal to 5.00% of the total amount of the Term Loans (as defined in the DIP Order)[6] (the "Exit Fee").  The Closing Fee and the Agency Fee shall be fully earned and due and payable in cash on the Effective Date (as defined in the DIP Credit Agreement) and shall be nonrefundable once paid. The Exit Fee shall be fully earned on the Effective Date and is payable on repayment of any DIP Loan.

68.     The DIP Credit Agreement will be secured by a substantially all-assets lien against AN Global and each other Debtor, and the Obligations of AN Global shall be jointly and severally guaranteed by each of the Guarantors.

69.     The Debtors presently lack sufficient liquidity not only to support their operations, including payroll obligations, but also to pursue a value-maximizing sale process.  The DIP Facility thus serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they can smoothly land into chapter 11 and continue to operate in the ordinary course of business while facilitating a robust sale process.  The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the ordinary course, and enable the Debtors to facilitate an orderly sale process pursuant to section 363 of the Bankruptcy Code.

---

6.   For clarity, a portion of the Roll-Up Loans are subject to a 5% exit fee under the Prepetition 1L Credit Facility. To the extent that such fee is paid on such loans, the amount paid would reduce the total amount of the Exit Fee on payable on the Roll-Up Loans under the DIP Facility.

70.     The Debtors have concluded that they require postpetition financing to meet their ongoing working capital and general business needs during these Chapter 11 Cases as well as the costs of bankruptcy administration.

71.     Blue Torch has also agreed, pursuant to the terms of the proposed Interim DIP Order, to allow the Debtors to use their "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral").  Absent the ability to use Cash Collateral, the Debtors will not be able to fund their operations and pay present operating expenses, including wages and trade vendors.  Consequently, without access to Cash Collateral, the Debtors will not be able to maintain their business operations and would likely be forced to cease operations immediately and liquidate their assets.  This would likely result in a loss of going concern value that would result in lower recoveries for the Debtors' stakeholders and cause the Debtors' estates to be immediately and irreparably harmed.  In addition, the Debtors need to be able to use Cash Collateral to pay their employees and, in turn, be able to provide customers with the real-time services that they rely upon the Debtors' ability to provide.

72.     All obligations under the Prepetition 2L Credit Agreement (the "Prepetition 2L Obligations," and together with the Prepetition 1L Obligations, the "Prepetition Obligations") are secured by Collateral (as defined in the Prepetition 2L Credit Agreement and the related Guaranty and Collateral Agreement) consisting of (i) substantially all of the tangible and intangible assets of Debtor AgileThought, Inc., and the Prepetition 2L Guarantors other than AT Digital Solutions and (ii) the proceeds therefrom (the "2L Collateral," and together with the Prepetition 1L Collateral, the "Prepetition Collateral").  On May 27, 2022, the Prepetition 1L Agent and the Prepetition 2L Agents (collectively, the "Prepetition Agents") entered into a Subordination and Intercreditor Agreement regarding the relative priority of their respective liens on the Prepetition

Collateral.  Pursuant to such agreement (the "Intercreditor Agreement"), the Prepetition 2L Agents have agreed not to object if any of the Prepetition 1L Secured Parties seeks to provide postpetition financing or consent to use Cash Collateral.

73.     The terms of the DIP Credit Agreement, including the fees to be charged thereunder, represent the most favorable postpetition financing terms that were available to the Debtors.  Based on my experience, I believe that the terms and conditions of the DIP Facility and use of Cash Collateral are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure, among other factors.

**B.      Value Maximizing Sale**

74.     In May 2023, the Debtors retained JPM, an experienced investment banker with significant experience in the technology industry, to market and solicit interest in the Debtors' assets.  JPM's efforts did not lead to any parties willing to proceed with an asset purchase or equity transaction of the Company on a reasonable timetable.  On August 11, 2023, the Company retained Guggenheim Securities, LLC ("Guggenheim Securities") to assist the Company in its exploration and solicitation of offers for the Company's assets in these Chapter 11 Cases. Additional details regarding the Debtors' prepetition marketing process are contained in the DIP Declaration.

75.     Prior to the Petition Date, the Company pursued several strategies with three nationally recognized investment banks.  On March 22, 2023, the Debtors engaged Cantor Fitzgerald & Co. ("Cantor") to help them seek financing, additional equity investment, and restructuring of debt.  Cantor ran an extensive, multi-month process to obtain such alternative financing or investment for the Company.  As a result of this process, the Company received seven (7) indications of interest for financing or investment.  However, these efforts ultimately proved unfruitful.  Subsequently, on May 3, 2023, the Debtors engaged J.P. Morgan Securities LLC ("JPM") to solicit bids to purchase the Debtors.  JPM contacted fifty-nine (59) parties, thirty-four

(34) of whom signed non-disclosure agreements.  JPM's marketing efforts yielded several rounds of bidding, including eleven (11) non-binding indications of interests and three (3) bids.  However, despite interest from multiple bidders, the participating bidders ultimately declined to proceed with a purchase of the Debtors in an out-of-court transaction upon learning of the Mexican Tax Assessment and the other factors described herein.  As of August 11, 2023, the Debtors also engaged Guggenheim Securities, LLC ("Guggenheim Securities") to solicit bids to purchase the Debtors.  Guggenheim Securities has contacted an additional five (5) new potential bidders, three (3) of whom have signed non-disclosure agreements.

76.    At this juncture, while the Debtors, with the assistance of Guggenheim Securities, continue their postpetition marketing efforts, the Debtors expect to enter into a stalking horse asset purchase agreement  (the "Stalking Horse APA") with an entity organized and controlled by Blue Torch, in its capacity as administrative agent and collateral agent for the Prepetition 1L Lenders and the DIP Lenders,  which will serve as the stalking horse (the "Stalking Horse Bidder"). Pursuant to the Stalking Horse APA, which the Debtors anticipate finalizing over the next few days, that contemplates the Stalking Horse Bidder credit bidding the entire outstanding amount of its secured debt, assuming certain liabilities, and providing additional consideration for the estates. The Stalking Horse Bidder's credit bid is also subject to higher and better offers.  The Debtors seek the relief requested in the Sale Motion to ensure that a timely and thorough 90-day sale process is implemented, and alternative purchasers understand the metrics and terms of the stalking horse arrangement when framing competitive offers for the subject assets.   The proposed procedures outlined therein are reasonable, value-maximizing, and in the best interest of the estates and all interested parties.

77.     The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement.  These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility and the Stalking Horse APA.

78.     The DIP Facility and Stalking Horse APA contain the following milestones, among others, for a sale process for substantially all the assets of the Debtors under section 363 of the Bankruptcy Code (the "Milestones"):

- The Petition Date shall occur no later than August 28, 2023,

- The Bankruptcy Court shall enter the Interim Order approving the DIP Credit Agreement on an interim basis no later than three days after the Petition Date.

- The Bankruptcy Court shall enter an order approving bidding procedures (the "Bid Procedures Order") for the Sale no later than 26 days after the Petition Date.

- The Bankruptcy Court shall enter the Final Order approving the DIP Credit Agreement no later than 23 days after the Bankruptcy Court's entry of the Interim Order.

- The deadline for submitting qualified bids pursuant to the Bid Procedures Order will be no later than 58 days after the Petition Date.

- If applicable, an auction to select a winning bid pursuant to the Bid Procedures Order will conclude no later than 61 days after the Petition Date.

- The Bankruptcy Court shall hold a hearing to approve the winning bid and will enter an order approving the Sale (a "Sale Order") no later than 65 days after the Petition Date.

- If a Sale Order is entered, the Sale will close no later than 90 days after the Petition Date.

79.     Pursuant to this sale process, the Debtors intend to contemporaneously herewith seek court approval of a sale of assets free and clear of all claims, interests, and encumbrances.

Time is of the essence in consummating the sale.  The Debtors' businesses are rapidly burning cash and cannot afford an extended stay in chapter 11. The Debtors therefore believe the Milestones are reasonable under the circumstances, including the extensive prepetition marketing and diligence process conducted leading up to these Chapter 11 Cases.  The Debtors believe that the Milestones will allow the Debtors, with the assistance of their advisors, to conclude the extensive prepetition sale process in a value-maximizing sale.  Further, the Debtors vigorously negotiated the DIP Facility and believe the DIP Facility offers the funds and time needed to complete the sale process for the benefit of all stakeholders.  for the largest postpetition financing commitment and longest maturity possible to afford enough time to market their assets, but ultimately were unable to obtain a larger committed amount, longer maturity, or longer milestones than those contained in the DIP Facility.  Absent consummation of a sale on the timeline contemplated by the DIP Facility, I believe the Debtors' businesses would be at significant risk of liquidating, which would cost jobs, erode recoveries for creditors, and prevent customers from receiving vital services.

80.     Against this backdrop, the Debtors ultimately commenced these Chapter 11 Cases to fully and fairly resolve their liabilities in an effective, efficient, expeditious, and centralized forum under the Bankruptcy Code.  The Debtors are singularly focused on preserving value for stakeholders enterprise-wide, preserving jobs, and maintaining the ability to deliver best-in-class technology services to enable their customers to maximize their businesses.  The Debtors believe that advancing a sale process as expeditiously as possible and allowing potential purchasers, including the stalking horse bidder, to implement a refreshed strategy for a new business utilizing the tools of the Bankruptcy Code will maximize the value of the Debtors' estates.

## V.    EVIDENCE IN SUPPORT OF FIRST DAY MOTIONS

81.    The Debtors filed the First Day Motions contemporaneously with the filing of their chapter 11 petitions.  I am familiar with the information contained in each First Day Motion and believe that the relief sought in each motion (a) is necessary to enable the Debtors to undertake certain postpetition activities in connection with their restructuring efforts, including effectuating one or more asset sales in order to maximize value for the benefit of all stakeholders, (b) constitutes a critical element for the Debtors to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtors' estates and creditors' interests.  In my opinion, the granting of each First Day Motion constitutes a critical element in achieving a successful and smooth transition to chapter 11.

82.    The First Day Motions seek relief aimed at, among other things: (i) maintaining employee morale; (ii) preserving customer relationships; (iii) obtaining access to use of cash collateral and debtor-in-possession financing; (iv) ensuring the continuation of the Debtors' cash management systems and other business operations without interruption; and (v) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process.  Overall, this relief is intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  On the Petition Date, the Debtors filed the following First Day Motions:

- **Joint Administration Motion.**  Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a), Fed. R. Bankr. P. 1015(b) and Local Rule 1015-1 Directing Joint Administration of the Debtors' Related Chapter 11 Cases.

- **DIP Motion.**  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition 1L Secured Parties,

(IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.

- **Cash Management Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Existing Cash Management System, Bank Accounts, and Business Forms, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Continue to Perform Ordinary Course Intercompany Transactions, (II) Granting Administrative Expense Status to Ordinary Course Postpetition Intercompany Claims and (III) Granting Related Relief.

- **Employee Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay (I) Prepetition Employee Obligations, (II) Prepetition Withholding Obligations, and (III) Postpetition Employee Obligations in the Ordinary Course, and (B) Authorizing Banks to Honor Related Transfers.

- **Critical Vendor Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Domestic Critical Vendors; (B) Lienholders, and (C) Foreign Vendors, (II) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (III) Granting Related Relief.

- **Utilities Motion.** Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment.

- **Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes in the Ordinary Course of Business and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto.

- **Insurance Motion.** Debtors' Motion for an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Programs and (B) Pay Certain Obligations in Respect Thereof and (II) Authorizing the Debtors' Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations.

- **NOL Motion.** Debtors' Motion Pursuant to 11 U.S.C. §§ 362 & 105(a) for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures and Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates.

- **PII Motion.** Debtors' Motion for an Order Authorizing the Debtors to Redact Individual Stakeholders' Personally Identifiable Information.

- **Claims Agent Application.** Debtors' Application for Entry of an Order Appointing Kurtzman Carson Consultants LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f).

83.     The First Day Motions request authority to pay certain prepetition claims.  I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

This Declaration illustrates the factors that warrant the relief requested in the First Day Motions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2023.

/s/ James S/ Feltman
James S. Feltman
Chief Restructuring Officer