**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| **AN GLOBAL LLC,** *et al.*,[1] | Case No. 23-11294 (___) |
| **Debtors.** | (Joint Administration Requested) |

**DECLARATION OF JAMES S. FELTMAN IN SUPPORT
OF THE DEBTORS' DIP FINANCING MOTION**

Pursuant to 28 U.S.C. § 1746, I, James S. Feltman, hereby declare:

1. I am the Chief Restructuring Officer ("CRO") of AN Global LLC and its affiliates that are debtors and debtors-in-possession in these proceedings (collectively, the "Debtors" or the "Company"). I am a Senior Managing Director of Teneo Capital LLC ("Teneo"), based in New York, New York. On March 31, 2023, the Debtors engaged Teneo to provide turnaround management services, and designated me as Chief Responsible Officer (now CRO) of the Debtors.

2. My experience in the restructuring industry spans over 30 years and encompasses a broad range of corporate recovery services, including engagements involving business workouts and turnarounds, operational restructuring, and fiduciary and related matters. Before joining Teneo in March 2023, I served as a Managing Director of Duff & Phelps LLC (now known as Kroll LLC). In addition to this service, I have over two decades of experience with Big 4 accounting firms and I was previously a partner at Arthur Andersen LLP and KPMG LLP. I am a fellow of the American College of Bankruptcy, a member of the American Institute of Certified

---

1. A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://www.kccllc.net/AgileThought. The Debtors' address is 222 W. Las Colinas Boulevard, Suite 1650E, Irving, TX 75039.

Public Accountants and Florida Institute of Certified Public Accountants, and a Certified Public Accountant in the State of Florida. From 2002-2008, I was a member of the board of directors of the American Bankruptcy Institute.

3. I submit this declaration ("Declaration") in support of the Debtors' *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to the Prepetition 1L Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Financing Motion").[2] I have reviewed the DIP Financing Motion, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Debtors' business and to the success of the Chapter 11 Cases (as defined herein). I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.

4. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision at Teneo, my discussions with the Debtors' senior management team, or my opinion based upon experience, knowledge and information concerning the operations of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this Declaration. Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis.

---

2. Capitalized terms not defined herein shall have the meanings given to them in the DIP Financing Motion.

2

**BACKGROUND**

5.  As discussed above, the Debtors retained Teneo on March 31, 2023 to provide turnaround management services, including advising the Debtors with respect to restructuring and finance matters. Since then, and as described herein, Teneo professionals have worked with the Debtors' management, financial staff and other professionals in the Debtors' restructuring efforts; become acquainted with the Debtors' businesses, operations, properties and finances; analyzed the Debtors' liquidity and projected cash flows; advised the Debtors in their evaluations of financing alternatives; assisted the Debtors in obtaining $15.2 million of bridge financing from its lenders under its prepetition first lien credit facility; and assisted the Debtors in connection with preparations for commencement of these cases, including assistance in the Debtors' efforts to procure debtor-in-possession financing.

6.  Along with the Debtors' other professionals, Teneo, under my supervision, has worked cooperatively with the Prepetition 1L Agent and its professionals to exchange information related to the Company's need for additional liquidity, negotiate two emergency bridge loans, and negotiate the proposed DIP Facility.

7.  As described in the DIP Financing Motion, the Debtors' secured debt obligations arise from borrowings under the Prepetition Facilities. In the aggregate, obligations under the Prepetition Facilities total approximately $112 million and comprise the main credit obligations of the Debtors.

**THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS**

8.  Beginning in March 2023, the Debtors began exploring restructuring alternatives. In anticipation of their need for debtor-in-possession financing and the use of cash collateral, the Debtors have, in consultation with Teneo, performed a review and analysis of their projected cash needs. Based upon that review and analysis, the Debtors and their advisors

3

determined that the use of cash collateral alone would be insufficient to operate their businesses, and that additional funding was necessary. The Debtors are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses, pay their employees and vendors, service their customers, administer their estates during these Chapter 11 Cases, and effectuate an orderly sale process. Teneo undertook a detailed analysis of the Debtors' operations and funding needs, and, from this review and analysis, it became clear that the Debtors would require an infusion of capital to operate during these Chapter 11 Cases as they continue to conduct their marketing for the sale process.

9. Without prompt access to postpetition financing and Cash Collateral, the Debtors will be unable to: (a) ensure payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative expenses to be incurred; (c) provide a positive message to the market that these Chapter 11 Cases are sufficiently funded and that the sale process for the Debtors' assets will be adequately robust, which is critical to ensure confidence in the Debtors from, among others, their customers, employees, and vendors; and (d) make any necessary payments to preserve the Debtors' workforce in the United States and other foreign countries in which the Debtors do business and preserve the value of the foreign subsidiaries. Immediate access to the DIP Facility and continued access to the Cash Collateral is therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.

10. In furtherance of their cash needs, the Debtors and Teneo prepared an initial budget outlining the funding that would be critical in the initial thirteen (13) weeks post-filing,

with such budget to be updated pursuant to the terms of the DIP Credit Agreement and the Interim Order. Based on information available as of the Petition Date, the Debtors believe that the initial budget, as will be updated with the consent of the DIP Agent, is an accurate reflection of their initial funding requirements and will allow them to meet their obligations in these Chapter 11 Cases. The Debtors also believe, and therefore submit, that the initial budget is fair, reasonable, and appropriate under the circumstances.

## ALTERNATIVE SOURCES OF FINANCING ARE NOT AVAILABLE ON BETTER TERMS

### I. The Marketing Process

11. The Debtors first engaged in a process to solicit new out-of-court financing as well as proposals to acquire the Debtors or their assets. The Debtors were unable to obtain new out-of-court financing on acceptable terms. Then, prior to the commencement of these Chapter 11 Cases, on June 28, 2023, the Debtors retained Teneo Securities LLC ("Teneo Securities") to act as the Debtors' investment banker in connection with, among other things, a marketing process for the Debtors' proposed debtor-in-possession financing facility. The Debtors, through Teneo Securities, contacted twenty-three (23) potential lenders to seek proposals for debtor-in-possession financing.

12. Obtaining access to third-party postpetition financing was difficult because all or nearly all of the Debtors' assets are encumbered under the existing capital structure, which, along with the Debtors' approximately $112 million of prepetition funded indebtedness and increasing losses from 2022 through 2023, restricts the availability of, and options for, postpetition financing. The prepetition sale process did not yield any offers sufficient to clear the debt; therefore, the Debtors believed that there was not an equity cushion available for the Debtors to obtain debtor-in-possession financing priming the Prepetition Secured Parties' liens over their

5

objections. Any dispute with the Prepetition Secured Parties or perceived uncertainty surrounding the Debtors' ability to fund these Chapter 11 Cases could cause significant turmoil within the Debtors' workforce and result in a substantial deterioration of value.

13. To avoid a protracted and expensive priming fight, which the Debtors could not afford, the Debtors and their advisors believed that their only alternatives were to: (a) obtain the consent of the Prepetition Secured Parties to the priming of their liens by a third-party lender; (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis; (c) find lenders willing to refinance out the Prepetition Secured Parties and provide incremental liquidity; or (d) find junior financing and a new secured lender.

14. Notwithstanding these considerations, the Debtors, with the assistance of Teneo Securities, solicited proposals for third-party debtor-in-possession financing. Teneo Securities reached out to twenty-three (23) third-party financing sources to gauge their interest in providing postpetition financing to the Debtors. Of the third-party financing sources that Teneo Securities contacted, only four (4) demonstrated interest in pursuing a potential financing by executing a confidentiality agreement to facilitate an evaluation of funding a debtor-in-possession financing facility. No potential financing parties were willing to provide financing junior to the existing Prepetition Secured Parties due to the amount of existing secured debt relative to the Debtors' financial position and the uncertainty surrounding the sale process. In addition, any senior financing that does not include the consent of the Prepetition Secured Parties would have required non-consensual priming. For the foregoing reasons, the Debtors, in consultation with Teneo Securities, determined that reaching out to additional third-party financing sources would be fruitless and unlikely to result in any financing proposals. As a result, under these circumstances, there is no better financing available to the Debtors other than the DIP Facility.

## II. The DIP Facility Has Been Heavily Negotiated

15. The Debtors and the DIP Lenders engaged in arm's length negotiations regarding the terms offered by the DIP Lenders. At the conclusion of this process, the Debtors determined that the DIP Lenders offered the most viable and beneficial DIP financing terms available and the parties were able to come to an agreement on the terms of the DIP Facility. Management and the Debtors' legal and financial advisors were actively involved throughout the negotiations with the DIP Lenders for debtor-in-possession financing, which were conducted at arms' length and in good faith. The terms of the DIP Facility were negotiated over the course of several weeks leading up to the Petition Date, with the Debtors and their advisors exchanging multiple drafts of the DIP Credit Agreement. The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Facility available to the Debtors given the Debtors' lack of alternative third-party financing. Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Documents.

## III. The Terms, Rates, and Fees of the DIP Facility Are Reasonable

16. The terms and conditions of the DIP Facility are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure, among other factors. Pursuant to the DIP Documents, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. Specifically, the Debtors have agreed to pay interest in kind (a) on the Roll-Up Loans, at the Reference Rate (as defined in the DIP Credit Agreement) plus a margin of 10.00% per annum (the "Applicable Reference Rate"), which is the same rate payable by the Prepetition 1L Obligors under the Prepetition 1L Credit Facility, and (b) on the New Money DIP Loans, at either the Applicable Reference Rate or, if agreed by the DIP Lenders in their sole discretion, Adjusted Term SOFR (as defined in the DIP Credit Agreement) plus a margin of 11.00% per

annum (the "Applicable SOFR Rate", and together with the Applicable Reference Rate, collectively, the "Applicable Rate").  Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), interest will accrue the rate of interest otherwise in effect plus 2.00%, payable in cash upon demand.  In addition, the Debtors have agreed to pay to the DIP Lenders: (i) the Closing Fee; (ii) the Agency Fee; (iii) the Audit and Collateral Monitoring Fees; and (iv) the Exit Fee (collectively, the "DIP Fees").  The Debtors have also agreed to roll up a total of approximately $96 million of the Prepetition 1L Obligations (the "Roll-Up Loans").  The DIP Lenders were only willing to provide the $22.7 million of New Money DIP Loans if the DIP Facility also included the roll-up of the Roll-Up Loans.

17.    Based on my experience and knowledge of similar debtor-in-possession financings in the market and my analysis of interest rates and fees in comparable debtor-in-possession financing facilities, I believe that the Applicable Rate and the DIP Fees provided for in the DIP Facility are reasonable under the circumstances.  The Applicable Rate and DIP Fees are customary, usual, and in line with debtor-in-possession financings of this kind.  The Debtors and their advisors considered the Roll-Up Loans, the Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the best alternative reasonably available to the Debtors.  As a result, the Debtors' roll-up of the Roll-Up Loans, payment of the Applicable Rate and DIP Fees in order to obtain the DIP Facility is in the best interests of the estates.

18.    The Debtors and the DIP Lenders agree that the terms, including the roll-up of the Roll-Up Loans, covenants, interest rates, and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, which, in turn, is integral to the broader restructuring's success through the sale process.  Under the Debtors' circumstances, the terms, interest rates, premiums, and fees reflected in the DIP Credit Agreement are reasonable because

such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases and are an integral component of the overall terms of the DIP Facility. The DIP Facility as a whole is crucial to avoid immediate and irreparable harm to the Debtors' estates, employees, customers and creditors.

### IV. The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable

19. The DIP Facility contemplates, as a product of negotiation with and as required by the DIP Lenders as a condition to providing the DIP Facility, certain milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an event of default under the DIP Credit Agreement. These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility and the Stalking Horse Bid. I believe the milestones are reasonable under the circumstances, including the extensive prepetition marketing and sale process for the Debtors' assets as well as the Debtors' pressing liquidity and business needs, making it likely the Debtors cannot afford a longer bankruptcy process.

20. The DIP Facility serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they can smoothly enter into chapter 11 and continue to operate in the ordinary course of business while facilitating a robust sale process. The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, satisfy working capital needs in the

ordinary course, and enable the Debtors to facilitate an orderly sale process pursuant to section 363 of the Bankruptcy Code.

### APPROVAL OF THE DIP FINANCING MOTION IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM TO THE DEBTORS' ESTATES

21. As described above, due to, among other things, the Debtors' financial condition and prepetition capital structure, the Debtors have been unable to obtain alternative sources of postpetition cash or credit in the form of unsecured credit allowable under the Bankruptcy Code. The ability to obtain sufficient working capital and liquidity through the DIP Facility is therefore vital to the preservation and maximization of the value of the Debtors' estates.

22. In evaluating the proposals, my team and I analyzed a series of debtor-in-possession credit facilities in other recent cases of a similar size. Based upon this analysis, I believe that, taken as a whole, the terms of the DIP Facility fall within the range of reasonableness given present credit markets and the circumstances of these particular Chapter 11 Cases.

23. I believe that financing on a postpetition basis would not otherwise be available in the absence of the Debtors' granting claims having priority over any and all other administrative expenses. As of the date hereof, no third-party lender has agreed to extend post-petition financing without receiving senior liens on and security interests in substantially all the Debtors' prepetition assets. Taken as a whole, the terms and conditions of the DIP Credit Agreement are the best available under the circumstances of these Chapter 11 Cases, and were negotiated in good faith at arm's length with all parties represented by experienced counsel.

24. In my judgment, the terms of the DIP Credit Agreement are fair and within the range of reasonableness under the circumstances of these cases and the current credit markets and reflect the exercise of prudent business judgment by the Debtors. I believe obtaining postpetition financing, as provided under the DIP Credit Agreement, will minimize disruption of

the businesses and operations of the Debtors and permit the Debtors to meet payroll and other operating expenses, while they move forward expeditiously in their efforts to consummate a sale of their assets. Without financing, I believe the Debtors' operations would be compromised, which in turn would severely hamper the ability to preserve and maximize the value of the Debtors' businesses for the benefit of stakeholders.

This Declaration illustrates the factors that warrant the relief requested in the DIP Financing Motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2023.

                                                */s/ James S. Feltman*
                                                James S. Feltman
                                                Chief Restructuring Officer