# **EXHIBIT A**

# **(Proposed Final Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re* | Chapter 11 |
| **AN GLOBAL LLC, *et al.*,**[1] | Case No. 23-11294 (JKS) |
| **Debtors.** | (Jointly Administered) |
|  | **Re: Docket No. 12 & 65** |

### FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION 1L SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

Upon the motion, dated August 28, 2023 (the "Motion"),[2] of AgileThought, Inc. ("Holdings") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") commenced on August 28, 2023 (the "Petition Date") for entry of the Interim Order[3] and final order (this "Final Order") under

---

1. The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number or registration number in the applicable jurisdiction, are: AN Global LLC (5504); AgileThought, Inc. (2509); 4th Source Holding Corp. (9629); 4th Source Mexico, LLC (7552); 4th Source, LLC (7626); AgileThought Brasil-Consultoria, Em Tecnologia LTDA (01-42); AgileThought Brasil Servicos de Consultoria Em Software (01-20); AgileThought Costa Rica S.A. (6822); AgileThought Digital Solutions, S.A.P.I. de C.V. (3KR0); AgileThought México S.A. de C.V. (7E46); AgileThought, LLC (7076); AgileThought Servicios Administrativos, S.A. de C.V. (4AG1); AgileThought Servicios México S.A. de C.V. (8MY5); AgileThought, S.A.P.I. de C.V. (No Tax ID); AGS Alpama Global Services USA, LLC (0487); AN Data Intelligence, S.A. de C.V. (8I73); AN Extend, S.A. de C.V. (1D80); AN Evolution, S. de R.L. de C.V. (7973); AN USA (5502); AN UX, S.A. de C.V. (7A42); Cuarto Origen, S. de R.L. de C.V. (0IQ9); Entrepids México, S.A. de C.V. (OCYA); Entrepids Technology Inc. (No Tax ID); Facultas Analytics, S.A.P.I. de C.V. (6G37); Faktos Inc., S.A.P.I. de C.V. (3LLA); IT Global Holding LLC (8776); and QMX Investment Holdings USA, Inc. (9707). The Debtors' headquarters are located at 222 W. Las Colinas Boulevard, Suite 1650E, Irving, Texas 75039.

2. Unless otherwise indicated herein, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

3. "Interim Order" shall mean the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Senior Secured Priming Liens and Superpriority Administrative*

sections 105(a), 361, 362, 363, 364, 503(b), 506(c) and 507(a) of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (as amended, the "<u>Bankruptcy Code</u>"), Rules 2002, 4001, 6003, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"),

and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of

Delaware (this "<u>Bankruptcy Court</u>") seeking, among other things,

(a)    authorization for Debtor AN Global LLC, in its capacity as borrower (the "<u>Borrower</u>"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (the "<u>Guarantors</u>"), on a joint and several basis, the Borrower's obligations in connection with a debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of not less than $119,882,093.79 (the "<u>DIP Facility</u>"), which consists of (i) a new money multi-draw term loan facility in an aggregate principal amount of $22,700,000.00 (the commitments thereunder, the "<u>New Money DIP Commitments</u>" and the Term Loans (as defined below) advanced thereunder, the "<u>New Money DIP Loans</u>" comprising (i) $11,200,000.00 in Initial Term Loans (as defined in the Interim Order), and (ii) $11,500,000.00 in New Money DIP Loans to be funded following entry of this Final Order (the "<u>Final Term Loans</u>")) to be funded by certain Prepetition 1L Lenders (as defined herein), and (ii) a deemed term loan "roll-up" post-petition financing of the full amount of the Prepetition 1L Obligations (such rolled-up debt, the "<u>Roll-Up Loans</u>" and, the Roll-Up Loans together with the New Money DIP Loans, the "<u>Term Loans</u>");

(a)    authorization for the Debtors to enter into that certain *Senior Secured Superpriority Priming Debtor-In-Possession Financing Agreement* among Holdings, the Borrower, the other Guarantors, the lenders from time to time party thereto (collectively, the "<u>DIP Lenders</u>"), and Blue Torch Finance LLC, as administrative agent and collateral agent (in such capacities, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Parties</u>") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>," together with all agreements, documents, and instruments delivered or executed in connection therewith, the "<u>DIP Documents</u>"), which shall be in substantially the same form attached hereto as <u>Exhibit 2</u>, and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(b)    authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to pay fees and interest under

---

*Expense Claims, (III) Granting Adequate Protection to the Prepetition 1l Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 65].

the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein), and (y) to effectuate the Roll-Up Loans;

(c)    the granting of adequate protection to the lenders under that certain Financing Agreement, dated as of May 27, 2022 (as amended, supplemented or otherwise modified, the "Prepetition 1L Credit Agreement" and, all security, pledge and guaranty agreements and all "Loan Documents" (as defined in the Prepetition 1L Credit Agreement, each as amended, supplemented or otherwise modified, the "Prepetition 1L Documents")), by and among AN Global LLC, as borrower, the subsidiaries of Holdings party thereto, as guarantors (collectively with AN Global LLC, the "Prepetition 1L Obligors"),[4] the several lenders party thereto (the "Prepetition 1L Lenders"), and Blue Torch Finance LLC, as administrative agent and collateral agent for the Prepetition 1L Lenders (the "Prepetition 1L Agent" and, collectively with the Prepetition 1L Lenders, the "Prepetition 1L Secured Parties"), with respect to, among other things, the use of their Cash Collateral and the Prepetition Collateral;

(d)    authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Closing Fee (as defined herein), the Agency Fee (as defined herein), the Audit and Collateral Monitoring Fees (as defined herein), the Exit Fee (as defined herein), and the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(e)    the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, that was not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

---

[4]    The Prepetition 1L Obligors are: AN Global LLC; AgileThought, Inc.; AgileThought, LLC; 4th Source, LLC; IT Global Holdings LLC; 4th Source Holding Corp.; QMX Investment Holdings USA, Inc.; AGS Alpama Global Services USA, LLC; Entrepids Technology Inc.; 4th Source Mexico, LLC; AN USA; AgileThought Digital Solutions S.A.P.I. de C.V.; and AgileThought Mexico, S.A. de C.V.

(f)    the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of Section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(g)    the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition First Liens (as defined below), subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(h)    the granting of superpriority administrative expense claims against each of the Debtors' estates in favor of the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(i)    the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c)effective as of the Petition Date;

(j)    authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(k)    the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Final Order;

(l)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Bankruptcy Court to consider entry of the Interim Order; and

(m)    that this Bankruptcy Court schedule a final hearing (the "<u>Final Hearing</u>") to consider entry of this Final Order.

The Bankruptcy Court having considered the Motion, the Feltman Declaration,[5] the evidence submitted or proffered and the arguments of counsel made at Interim Hearing and the Final Hearing; the Interim Order having been entered by this Bankruptcy Court on August 30, 2023; and proper notice of the Motion, the Interim Hearing, and the Final Hearing having been given and in compliance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and the Local Rules; and the Interim Hearing and the Final Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Final Order having been withdrawn, resolved, or overruled by the Bankruptcy Court; and it appearing to the Bankruptcy Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[6]

1.    *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Final Order.  Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction*.  This Bankruptcy Court has core jurisdiction over the Chapter 11 Cases commenced on Petition Date, the Motion, and the parties and property affected hereby

---

[5]    *Declaration of James S. Feltman in Support of Debtors' DIP Financing Motion* (the "<u>Feltman Declaration</u>").

[6]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice*.  Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Final Hearing constitutes proper notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014, and no further notice of the relief sought at the Final Hearing and the relief granted herein is necessary or required.

4.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 27 and 28 of this Final Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)      Prepetition 1L Obligations.  As of the Petition Date, the Prepetition 1L Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition 1L Secured Parties under the Prepetition 1L Documents in the aggregate amount of not less than $97,182,093.79, which consists of (x) not less than approximately $95,937,658.01 in principal amounts of term loans advanced under the Prepetition 1L Credit Agreement along with fees and premiums, plus (y) no less than approximately $1,244,435.78 on account of accrued and unpaid interest thereon prior to the Petition Date ((x) and (y) together, the "Prepetition 1L Obligations Amount"), plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined on the Prepetition 1L Credit Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition 1L Documents (collectively, including the Prepetition 1L Obligations Amount, the "Prepetition 1L Obligations").  The Prepetition 1L Obligations constitute legal, valid,

binding and non-avoidable obligations against each of the Prepetition 1L Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition 1L Agent or Prepetition 1L Secured Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Petition 1L Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(b)    Prepetition First Liens.  Pursuant to the Prepetition 1L Documents, the Prepetition 1L Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "Prepetition First Liens") the "Collateral" (as defined in the Prepetition 1L Documents) (the "Prepetition Collateral"), subject only to certain Permitted Liens as permitted under the Prepetition 1L Documents.  The Prepetition First Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject or subordinate only to certain Permitted Liens (if any) as permitted by the terms of the Prepetition 1L Documents and (iv) constitute the legal, valid, and binding obligation of the Loan Parties (as defined in the Prepetition 1L Documents), enforceable in accordance with the terms of the applicable Prepetition 1L Documents.

(c)     <u>Cash Collateral</u>.   Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition 1L Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "<u>Cash Collateral</u>").

(d)     <u>Intercreditor Agreement</u>.   Prior to the commencement of the Chapter 11 Cases, the Prepetition 1L Agent and GLAS Americas LLC as collateral agent (the "<u>Prepetition 2L Collateral Agent</u>") under that certain Credit Agreement, dated as of November 22, 2021 (as (i) amended by that certain Amendment No. 1 to the Credit Agreement dated as of December 9, 2021, (ii) amended by that certain Amendment No. 2 to the Credit Agreement dated as of March 30, 2022, (iii) amended by that certain Amendment No. 3 to the Credit Agreement dated as of the date of this Agreement, (iv) amended by that certain Amendment No. 4 to the Credit Agreement dated as of August 10, 2022, (v) amended by that certain Amendment No. 5 to the Credit Agreement dated as of November 22, 2022, (vi) amended by that certain Amendment No. 6 to the Credit Agreement dated as of March 7, 2023 and that certain Waiver to Credit Agreement dated as of March 7, 2023, and (vii) modified by that certain Forbearance Agreement dated as of April 18, 2023) (the "<u>Prepetition 2L Credit Agreement</u>") by and among the Loan Parties party thereto (the "<u>Prepetition 2L Obligors</u>"),[7] the lenders thereto (the "<u>Prepetition 2L Lenders</u>"), the Prepetition 2L Collateral Agent, and GLAS USA LLC, as administrative agent (the "<u>Prepetition 2L Administrative Agent</u>"

---

[7]   The Prepetition 2L Obligors are AgileThought, Inc. (f/k/a AN Global Inc.); AgileThought Mexico, S.A. de C.V.; 4th Source, LLC; IT Global Holdings LLC; AN Global LLC; QMX Investment Holdings USA, Inc.; AgileThought Digital Solutions S.A.P.I. de C.V.; 4th Source Holding Corp.; Entrepids Technology Inc.; AGS Alpama Global Services USA, LLC; AN USA; and AgileThought, LLC.

and, together with the Prepetition 2L Collateral Agent, the "Prepetition 2L Agents" and, together with the Prepetition 2L Lenders, the "Prepetition 2L Secured Parties" and, the Prepetition 2L Secured Parties together with the Prepetition 1L Secured Parties, the "Prepetition Secured Parties"), the Borrower and certain of the Guarantors entered into that certain Subordination and Intercreditor Agreement dated as of May 27, 2022 (as amended, supplemented or modified from time to time prior to the Petition Date, the "Intercreditor Agreement"), which sets forth the respective rights, obligations and priorities of the liens and security interests of Prepetition 1L Agent and the Prepetition 1L Lenders on the one hand, and the Prepetition 2L Collateral Agent and Prepetition 2L Lenders, on the other hand, with respect to the Collateral (as defined in the Intercreditor Agreement) and the obligations of Borrower and Guarantors party thereto due to the Prepetition 1L Agent and the Prepetition 1L Lenders, on the one hand, and the Prepetition 2L Collateral Agent and Prepetition 2L Lenders, on the other hand.

(e)     The Term Loans are not First Lien Obligations as defined in the Intercreditor Agreement.

(f)     Nothing in this Final Order shall modify the terms of the Intercreditor Agreement, and the rights, priorities and obligations set forth thereunder.

5.     *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a)     Good cause has been shown for the entry of this Final Order.

(b)     As set forth in the Feltman Declaration, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral in each case on an interim basis, in order to, among other things: (i) permit the orderly continuation of their respective businesses; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll and honor other obligations to employees; (iv) make capital expenditures; (v) make adequate

protection payments; and (vi) pay the costs of the administration of the Chapter 11 Cases and satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facility and authorized use of Cash Collateral.

(c)      As set forth in the Feltman Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  Notwithstanding the existence of Unencumbered Assets, the Debtors are unable to secure adquate funding, the Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent, for the benefit of itself and the DIP Lenders, subject to the Carve Out as provided for herein and the Permitted Liens (if any), the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Final Order and the DIP Documents.  For the avoidance of doubt, the DIP Liens include liens on and security interests in the Unencumbered Assets pursuant to Bankruptcy Code section 364(c)(2).

(d)      The extensions of credit under the DIP Facility, the DIP Documents, and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment

-10-

consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans (including the Roll-Up Loans) made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other Obligations (as defined in the DIP Credit Agreement) (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e) and the terms of this Final Order.  The DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise and any liens or claims granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)     The Roll-Up Loans, as provided for under the DIP Facility are appropriate and the DIP Lenders would not be willing to provide the New Money DIP Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

(g)     The DIP Lenders would not agree to lend New Money DIP Loans, including the Final Term Loans, without the DIP Liens, including, without limitation, without the first lien on unencumbered property provided for in paragraph 10(a) of this Final Order and the first priority

senior priming security interest in and lien on all collateral subject to the Prepetition Second Liens securing the Prepetition 2L Obligations as provided for in paragraph 10(b) of this Final Order. For the avoidance of doubt, the DIP Lenders would not agree to lend New Money DIP Loans, including the Final Term Loans, if the DIP Liens were *pari passu* or junior to the Prepetition Second Liens securing the Prepetition 2L Obligations.

(h)     Pursuant to the Intercreditor Agreement, the Prepetition 2L Agents, on their own behalf and on behalf of the Prepetition 2L Lenders, may not raise or support any objection to the DIP Facility or the provisions of this Final Order and the DIP Documents including, without limitation, the Roll-Up Loans and the Carve Out.

(i)      The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules.  For the reasons set forth in the Motion, the declarations filed in support of the Motion, and the record presented to the Bankruptcy Court at the Final Hearing, absent granting the relief sought by this Final Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Final Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6.      *Authorization of the DIP Facility and the DIP Documents*.

(a)     The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement, which is hereby approved and incorporated herein by reference.

(b)     Upon entry of this Final Order, the Borrower is hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount

of $22,700,000 in New Money DIP Loans (plus an amount equal to the Closing Fee and Agency

Fee, plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP

Credit Agreement) subject to and in accordance with this Final Order and the DIP Documents.

(c)    Proceeds of the DIP Loans and Cash Collateral shall be used solely for the purposes

permitted under the DIP Credit Agreement, this Final Order and in accordance with the applicable

DIP Budget, the DIP Documents, and this Final Order.

(d)    In furtherance of the foregoing and without further approval of this Bankruptcy

Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362

is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and

deliver all instruments and documents (including, without limitation, the DIP Credit Agreement

and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities,

and other amounts contemplated thereby or that may be reasonably required or necessary for the

Debtors' performance of their obligations under the DIP Facility including, without limitation:

 (i)    the execution, delivery, and performance of the DIP Documents, including, without

   limitation, the DIP Credit Agreement and any collateral documents contemplated

   thereby;

 (ii)    the execution, delivery and performance of one or more amendments, waivers,

   consents or other modifications to and under the DIP Documents (in each case in

   accordance with the terms of the DIP Documents and in such form as the Debtors,

   the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement)

   may agree), it being understood that no further approval of the Bankruptcy Court

   shall be required for any amendments, waivers, consents or other modifications to

   and under the DIP Documents or the DIP Budget, except that any modifications or

amendments to the DIP Documents that shorten the maturity thereof or increase the aggregate commitments thereunder or the rate of interest payable with respect thereto shall be on notice and subject to a hearing and Bankruptcy Court approval, as necessary;

(iii)    the non-refundable and irrevocable payment to each of the DIP Lenders or the DIP Agent, as applicable, of the fees referred to in the DIP Documents (which fees, in each case, were, and were be deemed to have been, approved upon entry of the Interim Order, and which fees shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents, including:

- a closing fee of 5.0% of the aggregate principal amount of the New Money DIP Commitments (the "Closing Fee"), which shall be paid in immediately available funds on the Effective Date (as defined in the DIP Credit Agreement);

- An agency fee of $100,000 per annum to the DIP Agent on account of managing agency and administrative costs (the "Agency Fee"), which shall be paid in immediately available funds on the Effective Date (as defined in the DIP Credit Agreement);

- Audit and collateral monitoring fees on account of visits to any or all of the Loan Parties and inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties conducted by representatives of the DIP Agent from time to time, including (i) $1,500 per day per examiner plus the examiner's out-of-pocket costs and reasonable expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations

conducted by a third party on behalf of the DIP Agent (the "<u>Audit and Collateral Monitoring Fees</u>"); and

- an exit fee (the "<u>Exit Fee</u>") equal to 5.00% of the aggregate principal amount of the New Money DIP Commitments and an Exit Fee equal to 5.00% of the aggregate principal amount of the Roll-Up Loans, which Exit Fee shall be payable at the times specified in the DIP Credit Agreement (but in no event later than the date of repayment in full of all other DIP Obligations thereunder, or, if sooner, the date of a deemed payment or reduction of the DIP Obligations in connection with any credit bit by the DIP Agent or DIP Lenders) provided that, to the extent that (i) Second Additional Term Loans (as defined in the Prepetition 1L Credit Agreement) have been converted into Roll-Up Loans and (ii) the Roll-Up Loans include the fee of 4.00% payable on the Second Additional Term Loans (in accordance with the agreement entered into in connection with the Second Additional Term Loans and Section 2.01(a)(iv) of the DIP Credit Agreement), then only an additional 1.00% Exit Fee shall apply to such amount of Roll-Up Loans (which amount, for the avoidance of doubt, shall include the aggregate amount of Roll-Up Loans under clauses (i) and (ii) above).

(iv)    make the payments on account of the Adequate Protection Obligations provided for in this Final Order; and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(e)    Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of the Interim Order and this Final Order for all purposes during the Chapter 11 Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the dismissal of any Case. No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents or this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under

-15-

any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(f)     The Guarantors hereby are authorized and directed to jointly, severally and unconditionally guarantee in full all of the DIP Obligations of the Borrower and to incur any DIP Obligations and DIP Liens in connection therewith.

7.     *DIP Budget.*

(a)     Except as otherwise provided herein or in the DIP Documents, the Debtors may only use Cash Collateral and the proceeds of the DIP Facility in accordance with a projected statement of sources and uses of cash for the Debtors for the 13 calendar weeks (but not any preceding weeks) attached hereto as **Exhibit 1** (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of this Final Order and the DIP Documents, the "DIP Budget"), subject to permitted variances as set forth in the DIP Documents, including without limitation for: (A) working capital requirements; (B) general corporate purposes; and (C) the costs and expenses (including making payments on account of the Adequate Protection Obligations hereunder and payment of the allowed fees and expenses of professionals retained by the Debtors' estates) of administering the Chapter 11 Cases (including payments under the Carve Out as provided herein).  On the Monday (or, if such Monday is not a Business Day (as defined in the DIP Credit Agreement), the immediately succeeding Business Day) of each week following the week in which the Petition Date occurs, the Debtors shall deliver an updated DIP Budget, in each case substantially in the form attached hereto as **Exhibit 1** (with only such changes thereto as the

Required Lenders shall agree in their sole discretion) or is otherwise in form and substance satisfactory to the Required Lenders in their sole discretion.

(b)     By 7:00 p.m. (New York City Time) on the third (3rd) Business Day after the end of each Testing Period (as defined in the DIP Credit Agreement), commencing with the Testing Period that ends on the last day of the third (3rd) Weekly Period after the Petition Date and weekly, the Debtors shall deliver to (i) the DIP Agent, and (ii) the DIP Lenders (with a copy to the DIP Lenders' advisors), a variance report, in form and substance satisfactory to the Required Lenders, showing for the Testing Period (1) the variance (as compared to the applicable DIP Budget) of the cash receipts (on a line item by line item basis and an aggregate basis for all line items) of the Debtors for the applicable period, and (2) the variance (as compared to the applicable DIP Budget) of the cash disbursements (on a line item by line item basis and an aggregate basis for all line items) made by the Debtors set forth in the DIP Budget for the applicable period (the "Variance Report").  Without giving effect to the making of DIP Loans or the repayments or prepayments of DIP Loans, as of the last day of each four-week period (or any portion thereof) commencing for the period ended after the fourth full week after the Petition Date), it shall be an Event of Default under the DIP Documents if:  (i) disbursements (as set forth in the Variance Report) for such period exceed 110% of the amount of disbursements projected in the applicable DIP Budget; or (ii) receipts (as set forth in the Variance Report) for such period to be less than 90% of the amount of receipts projected in the applicable DIP Budget.

(c)     The consent of the DIP Lenders to any applicable DIP Budget shall not be construed as consent to the use of any Cash Collateral or DIP Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on any applicable DIP Budget have been expended.

8.      *Reporting Requirements/Access to Records*.  The Debtors shall provide the DIP Lenders with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Agent and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Agent and the DIP Lenders to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and relevant financial advisors; *provided that* nothing in this paragraph 8 or otherwise (x) shall require the Debtors or their advisors to furnish to, or discuss with, the DIP Agent and the DIP Lenders any materials (whether prepared by the Debtors' financial advisors or legal advisors or otherwise) or other information subject to any attorney-client or other privilege or confidentiality obligations or (y) shall be construed to obligate any of the aforementioned advisors to disclose any information or to otherwise take or refrain from taking any action, absent an express contractual requirement to do so.

9.      *DIP Superpriority Claims*.  Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agent and the DIP Lenders, against each of the Debtors' estates (the "DIP Superpriority Claims"), without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726,

1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and, subject to paragraph 22 of this Final Order, have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including the proceeds of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions" and any proceeds thereof, the "Avoidance Proceeds"), subject only to the payment of the Carve Out to the extent specifically provided for herein.  Except as set forth in, or permitted by, this Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

10.     *DIP Liens*.  As security for the DIP Obligations, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve Out to the extent specifically provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, pursuant to this Final Order and the DIP Documents, the "DIP Liens").  Other than as set forth for Avoidance Actions within, the DIP Liens were effective and automatically perfected upon the date of the Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined herein):

(a)     <u>First Lien on Unencumbered Property</u>.  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (excluding Avoidance Actions but including the Avoidance Proceeds), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.

(b)     <u>Liens Priming the Prepetition First Liens and Prepetition Second Liens</u>.  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected

first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition First Liens securing the Prepetition 1L Obligations or the Prepetition Second Liens securing the Prepetition 2L Obligations.

(c)    <u>Liens Junior to Certain Other Liens</u>.    Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition

Date, if any, that are senior to the liens securing the Prepetition 1L Obligations or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition 1L Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "Permitted Liens").

11.    *Carve Out.*

(a)    Carve Out.  As used in this Final Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, whether by interim order, procedural order, or otherwise, and, with respect to the amounts in clause (x) below, to the extent provided for in the DIP Budget, and all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and an official committee of unsecured creditors (the "Creditors' Committee"), if any, pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (x) at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (but not to exceed the amount of Allowed Professional Fees specified in the applicable DIP Budget for the period from the Petition Date to the date of the

Carve Out Trigger Notice, the "Pre-Carve Out Trigger Amount"), plus (y) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, plus (z) any amounts required to be paid to Guggenheim Securities, LLC on account of any Transaction Fee under and as defined in that certain engagement letter between Guggenheim Securities, LLC and the Debtors, effective as of August 11, 2023 (the "GS Engagement Letter"), incurred at any time, before or after delivery of a Carve-Out Trigger Notice, and payable under sections 328, 330, and/or 331 of the Bankruptcy Code, and allowed by order of this Court at any time (provided, notwithstanding the foregoing, nothing herein shall preclude, prevent or limit any amount of any Sale Transaction Fee under and as defined in the GS Engagement Letter from being paid from the proceeds of the relevant Sale Transaction (as defined in the GS Engagement Letter) to the extent provided in any other order of the Court) (the amounts set forth in clauses (y) and (z) being the "Post-Carve Out Trigger Notice Cap" and the amounts set forth in clauses (x), (y) and (z), net of any unused retainers held by or on behalf of such Professional Persons, collectively, the "Carve-Out Amount").  For the avoidance of doubt, the maximum aggregate Pre-Carve-Out Trigger Amount shall not exceed the cumulative amount set forth in the applicable DIP Budget for the Professional Persons incurred from the Petition Date to the date of the Carve Out Trigger Notice.  Within three business days of the receipt of a Carve-Out Trigger Notice, each Professional Person shall provide its reasonable, good-faith estimate of the amount of its fees and expenses to be included in the Pre-Carve Out Trigger Amount.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors'

Committee (if appointed) providing that a Termination Event has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)       The Debtors shall be authorized and permitted to establish and maintain an escrow, to be held solely for the benefit of the Professional Persons and fund such escrow on a weekly basis the amount of the professional fees for the prior week set forth in the DIP Budget (solely to the extent of Carve-Out Amounts deposited, the "Funded Reserve Account"), to satisfy the Carve-Out.  The Funded Reserve Account shall be funded on a weekly basis (starting on the Closing Date and then on the first business day of each week, and ending on the date upon which a Carve-Out Trigger Notice is delivered) with the amount for Professional Persons set forth in the DIP Budget for that week.  After the delivery of a Carve-Out Trigger Notice, notwithstanding anything herein to the contrary, the Debtors shall be authorized to deposit cash on hand into the Funded Reserve Account up to the amount of the Carve-Out Amount, less cash the Debtors reasonably believe is necessary to maintain operations.  Except with respect to any amounts covered by 11(a)(iii)(z) above, the funds on deposit in the Funded Reserve Account shall be the sole source available to satisfy the obligations benefiting from the Carve-Out.  The Debtors shall disburse funds on deposit in the Funded Reserve Account to satisfy the obligations benefiting from the Carve-Out, and shall be permitted to make such disbursement at any time, including following delivery of a Carve-Out Trigger Notice.

(c)       Application of Funded Reserve Account.  All funds in the Funded Reserve Account shall be used to pay the obligations set forth in Carve Out, until paid in full, and then, to the extent the Funded Reserve Account has not been reduced to zero, as follows: (1) first, to the DIP Agent for the benefit of the DIP Lenders, in accordance with the DIP Credit Agreement, until the DIP Facility is paid in full; (2) second, to the Prepetition 1L Agent, for the benefit of the Prepetition

1L Lenders, in accordance with the Prepetition 1L Documents; and (3) third, to the Prepetition 2L Collateral Agent, for the benefit of the Prepetition 2L Lenders, in accordance with the Prepetition 2L Documents.  Notwithstanding anything to the contrary in the DIP Documents, the Interim Order, or this Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Funded Reserve Account has been fully funded, but shall have DIP Liens and DIP Superpriority Claims in any residual interest in the funds constituting the Funded Reserve Account, with any excess paid to the DIP Agent for application.  Further, notwithstanding anything to the contrary in the Interim Order or this Final Order, (i) the failure of the Funded Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (ii) in no way shall the DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Funded Reserve Account or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors, nor as a cap or limitation on the amount of fees due and payable by the Debtors under paragraph 11(a)(i) of this Final Order.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP  Facility, any Prepetition 1L Documents or any Prepetition 2L Documents, the Carve Out shall be senior to the DIP Superpriority Claims, the DIP Liens, the First Lien Adequate Protection Liens (as defined herein), the First Lien Adequate Protection Superpriority Claim (as defined herein), the Prepetition First Liens, the Prepetition Second Liens, the Prepetition 1L Obligations, the Prepetition 2L Obligations, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Prepetition 1L Obligations, or the Prepetition 2L Obligations.

(d)     <u>Reduction for Unused Retainers</u>.  Prior to any payment from the Funded Reserve Account, each Professional Person must apply any unused retainers held by or on behalf of such Professional Person as of the Petition Date to satisfy its Allowed Professional Fees prior to receiving payment from the funds in the Funded Reserve Amount for its Allowed Professional Fees.

(e)     <u>Carve Out Procedure</u>.  Debtors must, upon reasonable request of DIP Agent, but no less frequently than once every two (2) weeks, provide to DIP Agent a written report ("<u>Carve Out Report</u>"), in which Debtors disclose their then current estimate of:  (1) the aggregate amount of unpaid professional fees, costs, and expenses accrued or incurred by the Professional Persons through the date of the Carve Out Report; and (2) the projected fees, costs, and expenses of the Professional Persons for the thirty (30) day period following the date of such Carve Out Report.

(f)     <u>Reservation of Rights</u>.  Nothing herein may be construed as consent by the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties to the allowance of any fees, costs, or expenses of the Professionals Persons or will affect the right of DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties to object to the allowance and payment of any such fees, costs, or expenses, or the right of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties to the return of any portion of the Carve Out that is funded with respect to fees, costs, and expenses for a Professional Person that are approved on an interim basis, but that are later denied on a final basis.

(g)     <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  Subject to paragraph 12 of this Final Order, neither the DIP Agent, the DIP Lenders, nor the Prepetition 1L Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under

any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed

to obligate DIP Agent, the DIP Lenders, nor the Prepetition 1L Secured Parties, nor the Debtors,

in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to

guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

12.     *Limitation on Charging Expenses Against Collateral*.  Effective as of the Petition

Date, no expenses of administration of the Chapter 11 Cases or any future proceeding that may

result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy

Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral

(except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition 1L

Secured Parties pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of

law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, and the

Prepetition 1L Secured Parties, as applicable, and no such consent shall be implied from any other

action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured

Parties.

13.     *No Marshaling/Application of Proceeds*.  Effective as of the Petition Date, the DIP

Agent and the Prepetition 1L Agent shall be entitled to apply the payments or proceeds of the DIP

Collateral and the Prepetition Collateral in accordance with the provisions of the Interim Order or

this Final Order, as applicable, the DIP Documents, the Intercreditor Agreement, or the Prepetition

1L Documents, each as applicable, and in no event shall the DIP Agent, the DIP Lenders, or any

of the Prepetition 1L Secured Parties be subject to the equitable doctrine of "marshaling" or any

other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

14.     *Equities of the Case*.  Effective as of the Petition Date, (i) the DIP Agent, the DIP

Lenders, and the Prepetition 1L Secured Parties shall be entitled to all of the rights and benefits of

Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

15.    *Use of Cash Collateral*.    The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Final Order, the DIP Documents and the applicable DIP Budget including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in the Interim Order, this Final Order and the DIP Documents.  Except on the terms and conditions of this Final Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

16.    *Adequate Protection for the Prepetition 1L Secured Parties*.    Subject only to the Carve Out, the rights and limitations set forth in paragraphs 27 and 28 of this Final Order, and the terms of this Final Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition 1L Agent, for the benefit of themselves and the Prepetition 1L Lenders, are hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)    First Lien Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, additional and replacement valid, binding, enforceable non-avoidable,

and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral (which for the avoidance of doubt, excludes Avoidance Actions, but includes the Avoidance Proceeds).  Subject to the terms of this Final Order, the First Lien Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any).  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition First Liens and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b)      First Lien Adequate Protection Superpriority Claim.   As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and the DIP Superpriority Claims (the "First Lien Adequate Protection Superpriority Claim").  The First Lien Adequate Protection Superpriority Claim shall be payable from and, subject to paragraph 22 of this Final Order, have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including the Avoidance Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the First Lien Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation,

administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition 1L Secured Parties shall not receive or retain any payments, property or other amounts in respect of the First Lien Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(c)    <u>Fees and Expenses</u>.  As further adequate protection, the Debtors are authorized and directed to pay, without further Bankruptcy Court order, reasonable and documented fees and expenses (the "<u>First Lien Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition 1L Agent and Prepetition 1L Lenders, including, without limitation, the reasonable and documented fees and expenses of Ropes & Gray, LLP and Chipman Brown Cicero & Cole, LLP counsel to the Prepetition 1L Agent.  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.  The applicable professional shall serve copies of the invoices supporting the First Lien Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any First Lien Adequate Protection Fees shall be subject to prior ten day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee shall file with this Bankruptcy Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Bankruptcy Court.  If no objection is filed within such ten day review period, such invoice shall be paid without further order of the Bankruptcy Court within five days following the expiration of the foregoing review

period and shall not be subject to any further review, challenge, or disgorgement. For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney- client privilege or any benefits of the attorney work product doctrine.

(d)    First Lien Accrued Adequate Protection Payments. As further adequate protection, the Prepetition 1L Agent, on behalf of the Prepetition 1L Lenders, shall receive, effective as of the date of the Interim Order, monthly adequate protection payments (the "First Lien Accrued Adequate Protection Payments") payable in-kind on the thirtieth day of each month equal to the interest at the Applicable Rate plus the Default Rate (as such terms are defined in the Prepetition 1L Credit Agreement) that would otherwise be owed to the Prepetition 1L Lenders under the Prepetition 1L Credit Agreement during such monthly period in respect of the Prepetition 1L Obligations, until such time as the full Prepetition 1L Obligations Amount is indefeasibly and irrevocably (x) paid in full, in cash; or (y) fully converted into DIP Obligations.

17.    *Section 507(b) Reservation*. Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition 1L Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases. Nothing contained herein shall be deemed a finding by the Bankruptcy Court, or an acknowledgment by any of the Prepetition 1L Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition 1L Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18.    *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business*. Except as expressly permitted under the "first day" pleadings or the DIP Documents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business,

or seek authority of this Bankruptcy Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Required Lenders at least five days (or such shorter period as the DIP Agent, at the direction of the Required Lenders, may agree) prior to the date on which the Debtors seek the Bankruptcy Court's authority for such use, sale, or lease. Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Final Order), the Debtors are authorized and shall promptly pay, without further notice or order of this Bankruptcy Court, the DIP Agent, for the benefit of the DIP Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds.  Upon indefeasible and irrevocable payment in full of the DIP Obligations, subject to the Carve Out and Permitted Liens, and subject to the rights and limitations set forth in paragraphs 27 and 28 of this Final Order, the Debtors are authorized and shall promptly pay, without further notice or order of this Bankruptcy Court, the Prepetition Agent, for the benefit of the Prepetition 1L Lenders, 100% of the net cash proceeds resulting from any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Final Order) no later than the second business day following receipt of such proceeds.  Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any casualty, condemnation, or similar event with respect to property that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay to the DIP Agent, for the benefit of the DIP Parties, any insurance proceeds, condemnation award, or similar payment (excluding any amounts on account of any D&O policies) no later than the second

business day following receipt of payment by the Debtors, unless the Required Lenders consent, each in its sole discretion, in writing, to the funds being reinvested by the Debtors.

19. *Insurance.* At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date. The DIP Agent is, and effective as of the date of the Interim Order, was deemed to be, without any further action or notice, named as additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

20. *Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition 1L Secured Parties.* Notwithstanding any other provision in this Final Order to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition 1L Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection; provided that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Final Order and the DIP Documents; (b) any of the rights of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, (iii) seek to propose, subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or

privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties. The delay in or failure of the DIP Agent, the DIP Lenders and/or the Prepetition 1L Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders' or the Prepetition 1L Secured Parties' rights and remedies.

21.     *Termination Event*.  Subject to paragraph 22, the Debtors' authorization to use Cash Collateral and the proceeds of the DIP Facility pursuant to this Final Order shall automatically terminate, and the DIP Obligations shall become due and payable, without further notice or action by the Bankruptcy Court following the earliest to occur of any of the following (each a "Termination Event"): (a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement); (b) the Debtors' failure to (i) comply with any provision of this Final Order, (ii) comply with any other covenant or agreement specified in this Final Order or the DIP Credit Agreement (which covenants and agreements, together with any applicable grace periods, are explicitly incorporated by reference into this Final Order), or (iii) comply with any of the milestones set forth in Schedule 7.01(x) of the DIP Credit Agreement; or (c) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

22.     *Remedies Upon a Termination Event*.  The Debtors shall immediately provide notice to counsel to the DIP Agent, the DIP Lenders, and the Prepetition 1L Agent (with a copy to counsel to the Creditors' Committee (if any)), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 22) and the DIP Obligations shall become due and payable. Upon the occurrence of a Termination Event and following the giving of not less than five calendar days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to

the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), (a) the DIP Agent and the DIP Lenders may exercise any rights and remedies against the DIP Collateral available to them under this Final Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility and (b) the Prepetition 1L Secured Parties may exercise any rights and remedies to satisfy the Prepetition 1L Obligations, the First Lien Adequate Protection Superpriority Claims and any other First Lien Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, Permitted Liens and, in each case, the Carve Out.  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties at the end of the Notice Period, without further notice or order of the Bankruptcy Court, unless the DIP Agent, the DIP Lenders, the Prepetition 1L Agent, and the Prepetition 1L Lenders elect otherwise in a written notice to the Debtors, which may be by email.  Upon termination of the automatic stay, the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties shall be permitted to exercise all rights and remedies set forth herein, in the DIP Documents, and the Prepetition 1L Documents, as applicable, and as otherwise available at law against the DIP Collateral or Prepetition Collateral, without any further order of or application or motion to the Bankruptcy Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties pursuant to the DIP Documents, the Prepetition 1L Documents, or this Final Order; provided that during the Notice Period the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a Termination Event)

or Cash Collateral only to (i) fund operations in accordance with the DIP Credit Agreement and the DIP Budget and (ii) to fund the Funded Reserve Account; provided further that during the Notice Period the Debtors, the DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis to consider whether a Termination Event has occurred; provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Bankruptcy Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five business days after delivery of the Enforcement Notice; provided further that any fees and expenses incurred by the Debtors or the Creditors Committee during the Notice Period shall permanently reduce the Post-Carve Out Trigger Notice Cap.  Any party in interest shall be entitled to seek an emergency hearing for the purpose of contesting whether assets constitute assets of the Debtors' estates and nothing in this Final Order shall affect any party in interest's rights or positions at such hearing.

23.    *No Waiver for Failure to Seek Relief*.  The failure or delay of the DIP Agent, the DIP Lenders or any of the Prepetition 1L Secured Parties to exercise rights and remedies under this Final Order, the DIP Documents, the Prepetition 1L Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

24.    *Perfection of the DIP Liens and Adequate Protection Liens*.

(a)    The DIP Agent and the Prepetition 1L Agent are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agent or the Prepetition 1L

Agent shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Final Order, and subject to the rights and limitations set forth in paragraphs 27 and 28 of this Final Order), at the time and on the date of entry of the Interim Order.  Upon the request of the DIP Agent or the Prepetition 1L Agent, as applicable, each of the Prepetition 1L Secured Parties and the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition 1L Secured Parties, without representation or warranty of any kind) to enable the DIP Agent or the Prepetition 1L Agent to further validate, perfect, preserve, and enforce the DIP Liens and the First Lien Adequate Protection Liens, respectively. All such documents will be deemed to have been recorded and filed as of the Petition Date. Notwithstanding anything to the contrary herein, but subject to the rights and limitations set forth in paragraphs 27 and 28 of this Final Order, any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction previously filed by the Prepetition 1L Agent in order to validate and perfect the liens securing the Prepetition 1L Obligations shall remain in existence and shall be deemed postpetition filings to validate and perfect the liens securing the Term Loans, including, without limitations, the Roll Up Loans.

(b)     A certified copy of the Interim Order or this Final Order may, in the discretion of the DIP Agent or the Prepetition 1L Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of the Interim

Order or this Final Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of the Interim Order.

(c)    Any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, shall be deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Final Order.

25.    *Preservation of Rights Granted Under this Final Order*.

(a)    Subject to the Carve Out, other than as set forth in this Final Order, neither the DIP Liens nor the First Lien Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the First Lien Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)    To the extent provided in Section 364(e), in the event this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition 1L Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Final Order shall be governed in all respects by the original provisions of this Final Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition 1L Secured Parties shall be entitled to the protections

afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(c)    Subject to the Carve Out, unless and until all DIP Obligations, Prepetition 1L Obligations, and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents and with the prior written consent of the DIP Agent and the Required Lenders (x) any modification, stay, vacatur, or amendment of this Final Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the First Lien Adequate Protection Superpriority Claims, and the Prepetition 1L Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the First Lien Adequate Protection Liens, or the Prepetition First Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Final Order; or (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor.  Further, unless and until all DIP Obligations, Prepetition 1L Obligations, and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the

following shall each be an Event of Default under the DIP Documents: (x) an order converting or dismissing any of the Chapter 11 Cases; (y) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (z) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)     Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to the Interim Order or this Final Order, shall continue in full force and effect and shall maintain their priorities as provided in the Interim Order or this Final Order until all DIP Obligations and First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, First Lien Adequate Protection Liens, First Lien Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to the Interim Order or this Final Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Liens (subject to the rights and limitations in paragraphs 27 and 28 of this Final Order), the First Lien Adequate Protection Superpriority Claims (subject to the rights and limitations in paragraphs 27 and 28 of this Final Order), and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition 1L Agent, and the Prepetition 1L Lenders granted by the provisions of the Interim Order or this Final Order and the DIP Documents shall survive, shall maintain their priority as provided in the Interim

Order or this Final Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or First Lien Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.   The DIP Liens, the DIP Superpriority Claims, the First Lien Adequate Protection Obligations (subject to the rights and limitations in paragraphs 27 and 28 of this Final Order) and all other rights and remedies of the DIP Parties and the Prepetition 1L Secured Parties granted by the provisions of this Final Order shall continue in full force and effect until the DIP Obligations and the First Lien Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders).

26.    *Expenses and Indemnification*.

(a)    All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agent and the DIP Lenders (collectively, the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Facility, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agent and the DIP Lenders, for enforcement costs and

documentary taxes associated with the DIP Facility and the transactions contemplated thereby, are to be paid by the Debtors.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if any), without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period.

(b)     As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and other DIP Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, willful misconduct of such person (or their related persons), or a successful Claim or Defense (as defined below) in accordance with paragraphs 27 and 28 of this Final Order.  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection

with the transactions contemplated hereby, except to the extent such liability is found in an final

non- appealable judgment by a court of competent jurisdiction to have resulted solely from such

Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall

any Indemnified Person be liable on any theory of liability for any special, indirect, consequential,

or punitive damages.

     27.    *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral*

     (a)    Notwithstanding anything to the contrary set forth in this Final Order, none of the

DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash

Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein),

initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action,

suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type

(i) against any of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties (each in

their capacities as such) or seeking relief that would impair the rights and remedies of the DIP

Agent, the DIP Lenders, or the Prepetition 1L Secured Parties (each in their capacities as such)

under the DIP Documents, this Final Order, or the Prepetition 1L Documents to the extent

permitted or provided hereunder, including, without limitation, for the payment of any services

rendered by the professionals retained by the Debtors or any Creditors' Committee in connection

with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion,

objection, defense, or other contested matter, the purpose of which is to seek, or the result of which

would be to obtain, any order, judgment, determination, declaration, or similar relief that would

impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties

to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking

affirmative relief against any of the DIP Agent, the DIP Lenders or the Prepetition 1L Secured

Parties related to the DIP Obligations or the Prepetition 1L Obligations, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral, the Prepetition 1L Obligations or the Prepetition First Liens, or (iii) for monetary, injunctive, or other affirmative relief against the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties (each in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition 1L Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations, the Prepetition 1L Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition First Liens) held by or on behalf of each of the Prepetition 1L Secured Parties related to the Prepetition 1L Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition 1L Obligations, or the Prepetition First Liens; (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens; or (y) any of the Prepetition First Liens or any other rights or interests of any of the Prepetition 1L Secured Parties related to the Prepetition 1L Obligations or the Prepetition First Liens; and (e) assert any claims, defenses, or any other causes of action any non- Debtor affiliates

with respect to prepetition relationships with the Debtors; <u>provided</u> that (i) no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the foregoing matters with respect to the Prepetition 1L Obligations, and the Prepetition First Liens within the Challenge Period (as defined herein) (the "<u>Challenge Budget</u>").

(b)     All fees and expenses of the Committee Professionals in incurred in connection with the investigation of the matters described in paragraph 27(a) in excess of the Challenge Budget shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

28.     *Effect of Stipulations on Third Parties.*

(a)     The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in the Interim Order and this Final Order are binding on the Debtors, their respective representatives, successors and assigns.  The acknowledgments, stipulations, admissions, waivers, and releases contained in this Final Order shall also be binding upon the Debtors' estate and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless (i) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Prepetition First Liens or the Prepetition 1L Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests, or defenses (collectively, the "<u>Claims and Defenses</u>") against the Prepetition 1L Secured Parties in connection with any matter related to the Prepetition Collateral, the Prepetition First Liens or the Prepetition 1L Obligations by no later than the date

that is seventy-five (75) days after the date of entry of the Interim Order (such time period, the "Challenge Period"); provided that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge Period shall be extended, solely with respect to such Trustee, until the later of (1) the Challenge Period and (2) the date that is 10 calendar days from the date such Trustee is appointed; and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Bankruptcy Court: (x) the Prepetition 1L Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition First Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected and of the priority specified in paragraphs 4(b) and 4(d), not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (z) the Prepetition 1L Obligations, the Prepetition First Liens on the Prepetition Collateral, and the Prepetition 1L Secured Parties (in their capacities as such) shall not be subject to any other or further challenge and any party in interest shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action,

including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, (A) the stipulations and admissions contained in the Interim Order and this Final Order shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and any other party in these cases, including any Trustee, except as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding and (B) any Claims and Defenses not brought in such adversary proceeding shall be forever barred; provided that, if and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors' estates and all parties in interest.

(b)    Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, any challenge with respect to the Prepetition 1L Documents or the Prepetition 1L Obligations.

29.    *Release.*  Subject to the rights and limitations set forth in paragraphs 27 and 28 of this Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition 1L Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment

advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition 1L Obligations or the Prepetition First Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties.

30.     *Credit Bidding*.  (a) The DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required Lenders and on behalf of the DIP Parties, shall have, pursuant and subject to Bankruptcy Code section 363(k), the right to credit bid up to the full amount of any DIP Obligations (including, without limitation, the Roll-Up Loans) in the sale of any of the DIP Collateral, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, and (b) subject to the rights and limitations in paragraphs 27 and 28 of this Final Order and subject to

the satisfaction of the DIP Obligations, or as otherwise consented to by the DIP Agent (at the direction of the Required Lenders), the Prepetition 1L Agent (on behalf of the Prepetition 1L Lenders) shall have the right to credit bid (x) up to the full amount of the Prepetition 1L Obligations and (y) the First Lien Adequate Protection Obligations in the sale of any of the Prepetition Collateral, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. The DIP Agent, at the direction of the Required Lenders, and on behalf of the DIP Parties, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Parties to any acquisition entity or joint venture formed in connection with such bid.

31.    *Final Order Governs*.  In the event of any inconsistency between the provisions of the Interim Order, the DIP Documents and this Final Order, the provisions of this Final Order shall govern.

32.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any Creditors' Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Prepetition 1L

Secured Parties, _provided_ that, except to the extent expressly set forth in this Final Order, the Prepetition 1L Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any Trustee or similar responsible person appointed for the estates of the Debtors.

33.    _Limitation of Liability_.  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Final Order, the DIP Documents, or the Prepetition 1L Documents, the DIP Agent, the DIP Lenders, and the Prepetition 1L Secured Parties, shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 _et seq._ as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Final Order, the DIP Documents or the Prepetition 1L Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Prepetition 1L Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

34.    _Effectiveness_.  This Final Order shall constitute findings of fact that shall take effect _nunc pro tunc_ to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and

enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final

Order.

35.     No later than two business days after the date of this Final Order, the Debtors shall

serve on the Notice Parties (a) a copy of this Final Order and shall file a certificate of service no

later than 24 hours after service.

36.     Chubb Reservation of Rights. For the avoidance of doubt: (i) nothing in this Final

Order and any document related thereto, including the DIP Documents, alters or modifies the terms

and conditions of any insurance policies or related agreements issued by ACE American Insurance

Company and Federal Insurance Company and each of their U.S.-based affiliates and successors

to the Debtors; provided, however, pursuant to paragraph 19 of this Final Order and the Interim

Order, the DIP Agent is, and effective as of the date of the Interim Order, was deemed to be,

without any further action or notice, named as additional lender's loss payee on each current

insurance policy maintained by the Debtors under which policy proceeds are payable to the insured

(as opposed to a third party claimant) and which in any way relates to the DIP Collateral; and (ii)

the proceeds of any insurance policy issued by Chubb shall only be considered to be DIP Collateral

to the extent such proceeds are payable to the Debtors (as opposed to a third party claimant)

pursuant to the terms of any such applicable insurance policy.

**Exhibit 1**

**DIP Budget**

**(To Be Filed)**

**<u>Exhibit 2</u>**

**DIP Credit Agreement**

**Execution Version**

**SENIOR SECURED SUPERPRIORITY PRIMING
DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

**Dated as of August 30, 2023**

**by and among**

**AGILETHOUGHT, INC.,**
a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,
as Holdings,

**AN GLOBAL LLC,**
a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,

**EACH OTHER SUBSIDIARY OF HOLDINGS
LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO,**
each as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code
as Guarantors,

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
as Lenders,

**and**

**BLUE TORCH FINANCE LLC,**
as Administrative Agent and Collateral Agent

137438523_22

## Table of Contents

**Page**

ARTICLE I DEFINITIONS; CERTAIN TERMS ................................................................ 2
    Section 1.01      Definitions ........................................................................... 2
    Section 1.02      Terms Generally ................................................................ 33
    Section 1.03      Certain Matters of Construction ........................................ 33
    Section 1.04      Accounting and Other Terms ............................................ 34
    Section 1.05      Time References ................................................................ 34
    Section 1.06      Obligation to Make Payments in Dollars........................... 35

ARTICLE II THE TERM LOANS .................................................................................... 35
    Section 2.01      Term Loans ....................................................................... 35
    Section 2.02      Making the Term Loans .................................................... 35
    Section 2.03      Repayment of Term Loans; Evidence of Debt .................. 37
    Section 2.04      Interest .............................................................................. 37
    Section 2.05      [Reserved] ......................................................................... 38
    Section 2.06      Reduction of Commitment; Prepayment of Term Loans.... 38
    Section 2.07      Fees .................................................................................. 40
    Section 2.08      SOFR Option .................................................................... 40
    Section 2.09      Funding Losses ................................................................. 42
    Section 2.10      Taxes ................................................................................ 42
    Section 2.11      Increased Costs and Reduced Return ............................... 45
    Section 2.12      Changes in Law; Impracticability or Illegality ................. 46

ARTICLE III [INTENTIONALLY OMITTED] ................................................................ 47

ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS ................. 47
    Section 4.01      Payments; Computations and Statements........................... 47
    Section 4.02      Sharing of Payments ......................................................... 48
    Section 4.03      Apportionment of Payments .............................................. 48
    Section 4.04      Defaulting Lenders ........................................................... 49

ARTICLE V CONDITIONS TO TERM LOANS.............................................................. 50
    Section 5.01      Conditions Precedent to Effectiveness and Funding Interim Term Loans ..... 50
    Section 5.02      Conditions Precedent to Final Term Loans ...................... 54
    Section 5.03      Conditions Precedent to Withdrawals From Funding Account..................... 55

ARTICLE VI REPRESENTATIONS AND WARRANTIES............................................. 56
    Section 6.01      Representations and Warranties ....................................... 56

ARTICLE VII COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS
.................................................................................................................................. 63
    Section 7.01      Affirmative Covenants ...................................................... 63
    Section 7.02      Negative Covenants........................................................... 75
    Section 7.03      Permitted Variances........................................................... 79
    Section 7.04      Additional Bankruptcy Matters ....................................... 79

i

ARTICLE VIII CASH MANAGEMENT ARRANGEMENTS AND OTHER COLLATERAL MATTERS ......................................................................................................... 81
    Section 8.01        Cash Management Arrangements .................................................. 81

ARTICLE IX EVENTS OF DEFAULT ............................................................................ 81
    Section 9.01        Events of Default ........................................................................ 81

ARTICLE X AGENTS ..................................................................................................... 87
    Section 10.01      Appointment .............................................................................. 87
    Section 10.02      Nature of Duties; Delegation ...................................................... 87
    Section 10.03      Rights, Exculpation, Etc. ............................................................ 88
    Section 10.04      Reliance ..................................................................................... 89
    Section 10.05      Indemnification .......................................................................... 89
    Section 10.06      Agents Individually ................................................................... 89
    Section 10.07      Successor Agent ......................................................................... 89
    Section 10.08      Collateral Matters ...................................................................... 90
    Section 10.09      Agency for Perfection ................................................................ 91
    Section 10.10      No Reliance on any Agent's Customer Identification Program ... 91
    Section 10.11      No Third Party Beneficiaries ...................................................... 92
    Section 10.12      No Fiduciary Relationship .......................................................... 92
    Section 10.13      Reports; Confidentiality; Disclaimers ........................................ 92
    Section 10.14      Collateral Custodian .................................................................. 92
    Section 10.15      Collateral Agent May File Proofs of Claim ................................. 93
    Section 10.16      Erroneous Distribution .............................................................. 93

ARTICLE XI GUARANTY ............................................................................................. 93
    Section 11.01      Guaranty .................................................................................... 93
    Section 11.02      Guaranty Absolute ..................................................................... 94
    Section 11.03      Waiver ....................................................................................... 95
    Section 11.04      Continuing Guaranty; Assignments ............................................ 95
    Section 11.05      Subrogation ................................................................................ 95
    Section 11.06      Contribution .............................................................................. 96

ARTICLE XII MISCELLANEOUS .................................................................................. 96
    Section 12.01      Notices, Etc. .............................................................................. 96
    Section 12.02      Amendments, Etc. ...................................................................... 98
    Section 12.03      No Waiver; Remedies, Etc. ...................................................... 100
    Section 12.04      Expenses; Taxes; Attorneys' Fees ............................................ 100
    Section 12.05      Right of Set-off ........................................................................ 101
    Section 12.06      Severability .............................................................................. 102
    Section 12.07      Assignments and Participations ................................................ 102
    Section 12.08      Counterparts ............................................................................. 105
    Section 12.09      GOVERNING LAW ................................................................ 105
    Section 12.10      Submission to Jurisdiction ........................................................ 105
    Section 12.11      Waiver of Venue ...................................................................... 106
    Section 12.12      Service of Process .................................................................... 106
    Section 12.13      Consent by the Agents and Lenders .......................................... 106
    Section 12.14      No Party Deemed Drafter .......................................................... 106
    Section 12.15      Reinstatement; Certain Payments .............................................. 106
    Section 12.16      Indemnification; Limitation of Liability for Certain Damages ... 106

Section 12.17    Records ........................................................................................... 107
Section 12.18    Binding Effect ................................................................................. 107
Section 12.19    Highest Lawful Rate ...................................................................... 107
Section 12.20    Confidentiality ................................................................................ 108
Section 12.21    Public Disclosure ........................................................................... 109
Section 12.22    Integration ....................................................................................... 109
Section 12.23    USA PATRIOT Act ........................................................................ 109

iii

<u>SCHEDULES AND EXHIBITS</u>

Schedule 1.01(A)   Lenders and Lenders' Term Loan Commitments
Schedule 1.01(B)   Facilities
Schedule 1.01(C)   Mexican Security Agreements
Schedule 1.01(D)   Permitted Letters of Credit
Schedule 1.01(E)   Weekly Periods
Schedule 6.01(e)   Capitalization; Subsidiaries
Schedule 6.01(f)   Litigation
Schedule 6.01(i)   ERISA
Schedule 6.01(j)   Unpaid Taxes
Schedule 6.01(l)   Nature of Business
Schedule 6.01(p)   Employee and Labor Matters
Schedule 6.01(q)   Environmental Matters
Schedule 6.01(r)   Insurance
Schedule 6.01(u)   Intellectual Property
Schedule 6.01(w)   Material Contracts
Schedule 7.01(d)   Preservation of Existence, Etc.
Schedule 7.01(r)   Post-Closing Matters
Schedule 7.01(x)   Milestones
Schedule 7.02(a)   Prepetition Liens
Schedule 7.02(b)   Prepetition Indebtedness
Schedule 7.02(c)   Fundamental Changes
Schedule 7.02(d)   Change in Nature of Business
Schedule 7.02(e)   Prepetition Investments
Schedule 7.02(k)   Limitations on Dividends and Other Payment Restrictions
Schedule 8.01      Cash Management Accounts

Exhibit A      Form of Joinder Agreement
Exhibit B      Form of Assignment and Acceptance
Exhibit C      Form of Notice of Borrowing
Exhibit D      Form of SOFR Notice
Exhibit E      Form of Compliance Certificate
Exhibit F      Interim Order
Exhibit G-1    13-Week Cash Flow Forecast as of Effective Date
Exhibit G-2    Projected Daily Cash Flow Schedule as of Effective Date
Exhibit 2.09(d)   Forms of U.S. Tax Compliance Certificate

## SENIOR SECURED SUPERPRIORITY PRIMING
## DEBTOR-IN-POSSESSION FINANCING AGREEMENT

Senior Secured Superpriority Priming Debtor-In-Possession Financing Agreement, dated as of August 30, 2023, by and among AgileThought, Inc., a Delaware corporation ("Holdings"), AN Global LLC, a Delaware limited liability company (the "Borrower"), each subsidiary of Holdings listed as a "Guarantor" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each a "Guarantor" and collectively, the "Guarantors"), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders"), Blue Torch Finance LLC, a Delaware limited liability company ("Blue Torch"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent"), and Blue Torch, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agents").

## RECITALS

**WHEREAS**, on August 28, 2023 (the "Petition Date"), the Borrower commenced a voluntary case (the "Borrower's Case") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 23-11294;

**WHEREAS**, Holdings and the other Guarantors commenced voluntary cases (together with the Borrower's Case, the "Chapter 11 Cases") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

**WHEREAS**, the Borrower and the Guarantors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrower has asked the Lenders to make loans and advances to the Borrower comprised of a term loan facility in an aggregate principal amount of not less than $118,637,658.01 of which (x) $22,700,000 shall be new money Term Loans and (y) not less than $95,937,658.01 shall be Roll-Up Loans. The Lenders have severally, and not jointly, agreed to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth; and

**WHEREAS**, to provide security for the repayment of the Obligations, the Loan Parties will provide and grant to the Collateral Agent, for its benefit and the benefit of the Secured Parties, security interests, liens, and other rights and protections pursuant to the terms hereof, and security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein and in the Bankruptcy Court DIP Orders.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

# DEFINITIONS; CERTAIN TERMS

Section 1.01    <u>Definitions</u>.  As used in this Agreement, the following terms shall have the respective meanings indicated below:

"<u>13-Week Cash Flow Forecast</u>" has the meaning specified therefor in Section 7.01(a)(xix).

"<u>Account</u>" or "<u>Accounts</u>" is defined in the UCC.

"<u>Account Debtor</u>" means, with respect to any Person, each debtor, customer, or obligor in any way obligated on or in connection with any Account of such Person.

"<u>Action</u>" has the meaning specified therefor in Section 12.13.

"<u>Additional Amount</u>" has the meaning specified therefor in Section 2.10(a).

"<u>Adjusted Term SOFR</u>" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation <u>plus</u> (b) the Term SOFR Adjustment.

"<u>Administrative Agent</u>" has the meaning specified therefor in the preamble hereto.

"<u>Administrative Agent's Accounts</u>" means one or more accounts designated by the Administrative Agent at a bank designated by the Administrative Agent from time to time as the accounts into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

 "<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"<u>Agent</u>" and "<u>Agents</u>" have the respective meanings specified therefor in the preamble hereto.

"<u>Agency Fee</u>" has the meaning specified therefor in Section 2.07(c).

"<u>Aggregate Payments</u>" has the meaning specified therefor in Section 11.06.

"<u>Agreement</u>" means this Financing Agreement, including all amendments, restatements, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"<u>AGS Indebtedness</u>" means Indebtedness in the aggregate principal amount of $673,000 pursuant to that certain Subordinated Promissory Note, dated as of June 24, 2021, by Holdings in favor of AGS Group LLC.

2

"AGS Subordination Agreement" means that certain Subordination Agreement, dated as of June 24, 2021, by and among the Borrower, Holdings, the Prepetition 1L Agent (as successor administrative agent) and AGS Group LLC, with respect to the AGS Indebtedness.

"AN USA" means AN USA, a California corporation.

"Anti-Corruption Laws" means all Requirements of Law concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), the UK Bribery Act of 2010, and the anti-bribery and anti-corruption laws and regulations of those jurisdictions in which the Loan Parties do business.

"Anti-Money Laundering Laws" means all Requirements of Law concerning or relating to terrorism or money laundering, including, without limitation, the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT Act and the Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5332 and 12 U.S.C. §§ 1818(s), 1820(b) and §§ 1951-1959) and the rules and regulations thereunder, and any law prohibiting or directed against the financing or support of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B).

"Applicable Margin" means, as of any date of determination, (i) with respect to the interest rate applicable to the Roll-Up Loans (or any portion thereof), 10.00% per annum and (ii) with respect to the interest rate applicable to the Interim Term Loans and Final Term Loans (or any portions thereof), (x) with respect to any Reference Rate Loan, 10.00% per annum and (y) with respect to any SOFR Loan, 11.00% per annum.

"Approved Independent Director" has the meaning specified therefor in Section 7.01(s)(ii).

"Asset Purchase Agreement" means, prior to its execution, that certain proposed Asset Purchase Agreement, by and among Holdings and certain Subsidiaries of Holdings party thereto, as sellers, and one or more Affiliates of the Collateral Agent, as buyer, and, following its execution, the executed version thereof.

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Administrative Agent, in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Administrative Agent.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, treasurer or other financial officer performing similar functions, secretary, president or executive vice president of such Person.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" has the meaning specified therefor in the recitals hereto.

"Bankruptcy Court DIP Orders" means the Interim Order and, upon entry thereof and thereafter, the Final Order, as applicable and as the context requires.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event and a replacement of the applicable Benchmark has occurred pursuant to Section 2.08(f), then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.08(f).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate and (b) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by the Administrative Agent and the Required Lenders as the replacement Benchmark in their reasonable discretion; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Reference Rate," the definition of "Business Day," the definition of "Interest Period," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Benchmark Replacement Date" means a date and time determined by the Administrative Agent, which date shall be no later than the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative.

"Benchmark Transition Event" means, with respect to any then-current Benchmark the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark or (b) all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"Bid Procedures Motion" has the meaning specified therefor in Section 5.01(m)(iii).

"Bid Procedures Order" has the meaning specified therefor in Section 5.02(h).

"Blue Torch" has the meaning specified therefor in the preamble hereto.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, the managing member or members, any controlling committee or board of directors of such company, the manager or board of managers, the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"Borrower" has the meaning specified therefor in the preamble hereto.

"Borrower's Case" has the meaning specified therefor in the Recitals hereto.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close; provided that for purposes of determining the borrowing, payment or continuation of, or determination of interest rate on, SOFR Loans, "Business Day" shall exclude any day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"Capital Expenditures" means, with respect to any Person for any period, the sum of (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed, including all Capitalized Lease Obligations, obligations under synthetic leases and capitalized software costs that are paid or due and payable during such period and (b) to the extent not covered by clause (a) above, the aggregate of all expenditures by such Person and its Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person.

"Capitalized Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning specified in the Bankruptcy Court DIP Orders.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than 270 days after the date of issue rated P 1 by Moody's or A 1 by Standard & Poor's; (c) certificates of deposit maturing not more than 270 days after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a

combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; and (f) marketable tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within 270 days from the date of acquisition thereof.

"Cash Management Accounts" means the bank accounts of each Domestic Loan Party and each of their Domestic Subsidiaries maintained at one or more Cash Management Banks listed on Schedule 8.01 hereto.

"Cash Management Bank" has the meaning specified therefor in Section 8.01(a).

"Cash Management Order" has the meaning specified therefor in Section 5.01(m)(iv).

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning specified therefor in the recitals hereto.

"Closing Fee" has the meaning specified therefor in Section 2.07(a).

"Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Document" has the meaning specified therefor in Section 12.02(b)(iii).

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and tax refunds).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a Compliance Certificate, substantially in the form of Exhibit E, duly executed by an Authorized Officer of the Borrower.

137438523_22

"Connection Income Taxes" means Other Connection Taxes that are imposed or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consenting Group" means (a) the CRO, (b) FTI and (c) either Juan José Perojo or Ernesto Florese of Deloitte Asesoría Financiera, S.C.

"Contingent Indemnity Obligations" means any Obligation constituting a contingent indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made with respect thereto.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, and (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract (other than any Petty Cash Account), an agreement, in form and substance satisfactory to the Collateral Agent, among the Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and each Domestic Loan Party or Domestic Subsidiary maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"CRO" means James Feltman as the duly appointed chief restructuring officer of the Borrower and the other Loan Parties.

"Current Value" has the meaning specified therefor in Section 7.01(m).

"Debtor Relief Law" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States, United Mexico States, or other applicable jurisdiction from time to time in effect.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Term Loans within two (2) Business Days of the date such Term Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder  within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Term Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity.  Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"DIP Superpriority Claim" means an allowed superpriority expense claim pursuant to Bankruptcy Code Sections 364(c)(1), 503, and 507 granted pursuant to the Bankruptcy Court DIP Orders.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells (including, without limitation, any sale leaseback transaction), assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration

137438523_22

therefor consists of cash, securities or other assets owned by the acquiring Person.  For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, or (c) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification).

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is 91 days after the Final Maturity Date.

"Dollar," "Dollars" and the symbol "$" each means lawful money of the United States of America.

"Domestic Loan Party" means each Loan Party that is organized and existing under the laws of the United States or any state or commonwealth thereof or under the laws of the District of Columbia.

"Domestic Subsidiary" means any Subsidiary of Holdings that is organized and existing under the laws of the United States or any state or commonwealth thereof or under the laws of the District of Columbia.

"Effective Date" has the meaning specified therefor in Section 5.01.

"Employee Plan" means an employee benefit plan within the meaning of Section 3(3) of ERISA (other than a Multiemployer Plan), regardless of whether subject to ERISA, that any Loan Party maintains, sponsors or contributes to or is obligated to contribute to.

"Environmental Claim" means any action, suit, complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication, from any Person or Governmental Authority relating to or arising out of any threatened, alleged or actual (a) violation of, non-compliance with, or liability under, any Environmental Law, or (b) the manufacture, use, handling, processing, distribution, labeling, generation, transportation, storage, treatment, Release, threatened Release, disposal or arranging for the disposal of, or exposure to, any Hazardous Materials.

"Environmental Law" means any Requirement of Law relating to, regulating or governing (i) the pollution or protection of the environment, any environmental media, natural resources, human health or safety, or (ii) the manufacture, use, handling, processing, distribution, labeling, generation, transportation, storage, treatment, Release, threatened Release, disposal or arranging for the disposal of, or exposure to, any Hazardous Materials.

"Environmental Liability" means all liabilities (contingent or otherwise, known or unknown), monetary obligations, losses (including monies paid in settlement), damages, natural resource damages, costs and expenses (including all reasonable fees, costs, client charges and expenses of counsel,

experts and consultants), fines, penalties, sanctions and interest arising directly or indirectly as a result of, from, or based upon (a) any Environmental Claim, (b) any actual, alleged or threatened violation of or non-compliance with any Environmental Law or Environmental Permit, (c) any actual, alleged or threatened Release of, or exposure to, Hazardous Materials, (d) any Remedial Action, (e) any adverse environmental condition or (f) any contract, agreement or other arrangement pursuant to which liability is assumed or imposed contractually or by operation of law with respect to any of the foregoing clauses (a)-(e).

"Environmental Lien" means any Lien in favor of any Governmental Authority arising out of any Environmental Liability.

"Environmental Permit" means any permit, license, authorization, approval, registration or entitlement required by or issued pursuant to any Environmental Law or by any Governmental Authority pursuant to Environmental Law.

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by Holdings of any cash capital contributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" or under "common control" within the meaning of Sections 414(b), (c) (m) or (o) of the Internal Revenue Code or Sections 4001(a)(14) or 4001(b)(1) of ERISA.

"ERISA Event" means (a) the occurrence of a Reportable Event with respect to any Pension Plan; (b) the failure to meet the minimum funding standards of Section 412 or 430 of the Internal Revenue Code or Section 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA) or the failure to make a contribution or installment required under Section 412 or Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); (d) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Internal Revenue Code or Section 305 of ERISA; (e) the filing of a notice of intent to terminate a Pension Plan or the treatment of an amendment to a Pension Plan as a termination under Section 4041 of ERISA; (f) the withdrawal by any Loan Party or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to any Loan Party or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any

Pension Plan; (h) the imposition of liability on any Loan Party or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069(a) of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of any Loan Party or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan or the receipt by any Loan Party or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is insolvent pursuant to Section 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the occurrence of an act or omission which could give rise to the imposition on any Loan Party of material fines, penalties, taxes or related charges under Sections 4975 or 4971 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Plan or Pension Plan; (k) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent, upon any Loan Party or any of its ERISA Affiliates; (l) the assertion of a claim (other than routine claims for benefits) against any Employee Plan or the assets thereof, or against any Loan Party or any of its ERISA Affiliates in connection with any Pension Plan or Multiemployer Plan; (m) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any such Pension Plan (or such other Employee Plan) to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (n) the imposition on any Loan Party of any material fine, excise tax or penalty with respect to any Employee Plan, Pension Plan, or Multiemployer Plan resulting from any noncompliance with any Requirements of Law; (o) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; or (p) the occurrence of any Foreign Plan Event.

"Erroneous Distribution" has the meaning specified therefor in Section 10.16.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means any deposit account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's employees up to the amount of such obligations due for the immediately succeeding payroll period.

"Excluded Equity Issuance" means (a) in the event that Holdings or any of its Subsidiaries forms any Subsidiary in accordance with this Agreement, the issuance by such Subsidiary of Equity Interests to Holdings or such Subsidiary, as applicable, (b) the issuance of Equity Interests by Holdings to any Person that is an equity holder of Holdings prior to such issuance (an "Equity Holder") so long as such Equity Holder did not acquire any Equity Interests of Holdings so as to become an Equity Holder concurrently with, or in contemplation of, the issuance of such Equity Interests to such Equity Holder, (c) the issuance of Equity Interests of Holdings to directors, officers and employees of Holdings and its Subsidiaries pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors of Holdings, and (d) the issuance of Equity Interests by a Subsidiary of Holdings to its parent or member in connection with the contribution by such parent or member to such Subsidiary of the proceeds of an issuance described in clauses (a) – (c) above.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity

Exchange Act at the time the guarantee of such Guarantor becomes effective with respect to such related Swap Obligation.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or Term Loan Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or Term Loan Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.10, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.10(d) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order No. 13224" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Exit Fee" means a fee equal to 5.00% of the aggregate principal amount of the Term Loans, which fee shall be payable at the times specified in this Agreement (but in no event later than the date of repayment in full of all other Obligations hereunder, or, if sooner, the date of a deemed payment or reduction of the Obligations in connection with any credit bit by the Agents or Lenders); provided that, to the extent that (i) Second Additional Term Loans (as defined in the Prepetition 1L Credit Agreement) have been converted into Roll-Up Loans and (ii) the Roll-Up Loans include the fee of 4.00% payable on the Second Additional Term Loans (in accordance with the agreement entered into in connection with the Second Additional Term Loans and Section 2.01(a)(iv) hereof), then only an additional 1.00% Exit Fee shall apply to such amount of Roll-Up Loans (which amount, for the avoidance of doubt, shall include the aggregate amount of Roll-Up Loans under clauses (i) and (ii) above).

"Exitus Indebtedness" means Indebtedness in the aggregate principal amount of $1,580,000 pursuant to that certain Simple Loan Facility Agreement and related promissory note, in each case, dated as of July 26, 2021 by the Exitus Obligor in favor of Exitus Capital, S.A.P.I. de C.V.

"Exitus Obligor" means AgileThought Digital Solutions, S.A.P.I. de C.V.

"Exitus Subordination Agreement" means that certain Subordination Agreement, dated as of July 26, 2021, by and among the Prepetition 1L Agent (as successor administrative agent), Holdings, the Borrower, AgileThought Digital Solutions S.A.P.I. de C.V. and Exitus Capital, S.A.P.I. de C.V.

"Extraordinary Receipts" means any cash received by Holdings or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.06(c)(ii) or (iii) hereof or proceeds of Indebtedness), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than to the extent such insurance proceeds are (i) immediately payable to a Person that is not Holdings or any of its Subsidiaries in accordance with applicable Requirements of Law or with Contractual Obligations entered into in the ordinary course of business or (ii) received by Holdings or any of its Subsidiaries as reimbursement for any out-of-pocket costs incurred or made by such Person prior to the receipt thereof directly related to the event

12

resulting from the payment of such proceeds), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of Holdings or any of its Subsidiaries or (ii) received by Holdings or any of its Subsidiaries as reimbursement for any costs previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received in connection with any purchase agreement.

"<u>Facility</u>" means the real property identified on Schedule 1.01(B) and any New Facility hereafter acquired by Holdings or any of its Subsidiaries, including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"<u>Fair Share Contribution Amount</u>" has the meaning specified therefor in Section 11.06.

"<u>FASB ASC</u>" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal, tax or regulatory legislation, rules or official practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of Sections 1471 through 1474 of the Internal Revenue Code and the Treasury Regulations thereunder.

"<u>FCPA</u>" has the meaning specified therefor in the definition of Anti-Corruption Laws.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Final Maturity Date</u>" means the earliest of (a) November 27, 2023 or if such day is not a Business Day, the preceding Business Day, (b) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (c) 23 days after the Bankruptcy Court's entry of the Interim Order (subject to Bankruptcy Court availability), unless, on or before such day, the Final Order shall have been entered by the Bankruptcy Court, (d) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (e) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (f) the date of substantial consummation of a sale of all or substantially all of the assets (and, to the extent applicable, the equity) of the Loan Parties as set forth in and pursuant to the Asset Purchase Agreement or another acquisition agreement approved by the Bankruptcy Court in its Sale Order (as defined in Schedule 7.01(x)), and (g) such earlier date on which the Obligations shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"<u>Final Order</u>" means a final order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents under sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered on or substantially contemporaneously with a final hearing, in form and substance satisfactory to the Agents and Lenders (in their sole discretion).

13

"Final Term Loans" has the meaning specified therefor in Section 2.01(a)(iii) hereof.

"Financial Advisor" has the meaning specified therefor in Section 7.01(s)(i) hereof.

"Financial Statements" means (a) the audited consolidated balance sheet of Holdings and its Subsidiaries for the Fiscal Year ended December 31, 2022, and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Year then ended, and (b) the unaudited consolidated balance sheets of Holdings and its Subsidiaries for the Fiscal Quarters ended March 31, 2023 and June 30, 2023, and the related consolidated statement of operations, shareholder's equity and cash flows for such Fiscal Quarters.

"Fiscal Quarter" means a fiscal quarter of a Fiscal Year.

"Fiscal Year" means the fiscal year of Holdings and its Subsidiaries ending on December 31 of each year.

"Floor" means a rate of interest equal to 1.00% per annum.

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party that is subject to any Requirements of Laws other than, or in addition to, the laws of the United States or any state thereof or the laws of the District of Columbia.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any Requirement of Law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make any required contribution or payment under any Requirement of Law within the time permitted by any Requirement of Law for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any Subsidiary under any law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction with respect to a Foreign Plan that is prohibited under any Requirement of Law and that could reasonably be expected to result in the incurrence of any liability by any Loan Party or any Subsidiary, or the imposition on any Loan Party or any Subsidiary of any material fine, excise tax or penalty with respect to a Foreign Plan resulting from any noncompliance with any Requirement of Law.

"Foreign Loan Party" means any Loan Party that is not a Domestic Loan Party.

"Foreign Subsidiary" means any Subsidiary of Holdings that is not a Domestic Subsidiary.

"FTI" has the meaning specified therefor in Section 7.01(v).

"Funding Account" means that certain account number ending in 5656 of the Administrative Agent.

"Funding Losses" has the meaning specified therefor in Section 2.08(e).

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

14

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents); (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation, incorporation or organization with the applicable Governmental Authority in the jurisdiction of its formation, incorporation or organization.

"Governmental Authority" means any nation or government, any foreign, Federal, state, territory, provincial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) Holdings, and each other Subsidiary of Holdings (other than the Borrower) listed as a "Guarantor" on the signature pages hereto, and (b) each other Person which guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in Article XI hereof and (b) each other guaranty, in form and substance satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"Hazardous Material" means any element, material, substance, waste, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic or hazardous substance, hazardous waste, universal waste, special waste, or solid waste or is otherwise characterized by words of similar import under any Environmental Law or that is regulated under, or for which liability or standards of care are imposed, pursuant to any Environmental Law, including, without limitation, petroleum, polychlorinated biphenyls; asbestos-containing materials, lead or lead-containing materials, urea formaldehyde-containing materials, radioactive materials, radon, per- and polyfluoroalkyl substances and mold.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Historical Tax Liability" has the meaning set forth on Schedule 6.01(j).

"Holdings" has the meaning specified therefor in the preamble hereto.

"Indebtedness" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of

137438523_22

such Person's business and not overdue by more than 30 days and any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) [reserved]; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.  The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Matters" has the meaning specified therefor in Section 12.16.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified therefor in Section 12.16.

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"Intellectual Property" has the meaning specified therefor in the Security Agreements.

"Intellectual Property Contracts" means all agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"Intercompany Subordination Agreement" means an Intercompany Subordination Agreement made by Holdings and its Subsidiaries in favor of the Collateral Agent for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent.

"Interest Period" means, with respect to each SOFR Loan, a period commencing on the date of the making of such SOFR Loan (or the continuation of a SOFR Loan or the conversion of a Reference Rate Loan to a SOFR Loan) and ending three months thereafter (or, if agreed by the Lenders in their sole discretion upon the request of the Borrower, one month thereafter); provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon the Term SOFR Reference Rate from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at

16

the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is one or three months after the date on which the Interest Period began, as applicable, and (e) the Borrower may not elect an Interest Period which will end after the Final Maturity Date.

"Interim Order" means the order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents for an interim period under sections 364(c) and (d) of the Bankruptcy Code and entered after a hearing, in the form attached as Exhibit F hereto.

"Interim Term Loans" has the meaning specified therefor in Section 2.01(a)(ii) hereof.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account or cash.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"Investment Banker" has the meaning specified therefor in Section 7.01(s)(iii).

"Joinder Agreement" means a Joinder Agreement, substantially in the form of Exhibit A, duly executed by a Subsidiary of a Loan Party made a party hereto pursuant to Section 7.01(b).

"Lease" means any lease, sublease or license of, or other agreement granting a possessory interest in, real property to which any Loan Party or any of its Subsidiaries is a party as lessor, lessee, sublessor, sublessee, licensor or licensee.

"Lender" has the meaning specified therefor in the preamble hereto.

"Lien" means any mortgage, deed of trust, deed to secure debt, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any collateral assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged with all Term Loans made to, and all other Obligations incurred by, the Borrower.

"<u>Loan Document</u>" means this Agreement, the Bankruptcy Court DIP Orders, any Control Agreement, any Guaranty, the Intercompany Subordination Agreement, the Prepetition Intercreditor Agreement, the AGS Subordination Agreement, the Exitus Subordination Agreement, any Joinder Agreement, any Mortgage, the Security Agreements, any landlord waiver, any collateral access agreement, any Perfection Certificate and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Term Loan or any other Obligation, in each case, as amended, amended and restated, supplemented or otherwise modified, renewed or replaced from time to time.

"<u>Loan Party</u>" means each of the Borrower and each Guarantor and "<u>Loan Parties</u>" means the Borrower and the Guarantors, collectively.

"<u>Material Adverse Effect</u>" means any event, development, state of facts, change, circumstance, occurrence, condition or effect that, either individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect on any of (a) the operations, assets, liabilities, financial condition or prospects of the Loan Parties and their respective Subsidiaries, taken as a whole, (b) the ability of the Loan Parties to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of a Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on Collateral having a fair market value in excess of $250,000.

"<u>Material Contract</u>" means, with respect to any Person, (a) each contract listed on Schedule 6.01(w), (b) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $250,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium), and (c) each other contract or agreement as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"<u>Mexican Loan Parties</u>" means AgileThought Digital Solutions, S.A.P.I. de C.V., AgileThought Mexico, S.A. de C.V., and Faktos Inc., S.A.P.I de C.V., and any other Subsidiary formed under the laws of the United Mexican States that is, or may be, subject to the Historical Tax Liability.

"<u>Mexican Security Agreements</u>" means, collectively, the pledge agreements listed in Schedule 1.01(C), in each case, in form and substance satisfactory to the Collateral Agent, made by the Mexican Loan Parties in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgage</u>" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"<u>Multiemployer Plan</u>" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to at any time during the preceding six calendar years.

"<u>Net Cash Proceeds</u>" means, with respect to any issuance or incurrence of any Indebtedness, any Equity Issuance, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith, (b) transfer taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, and (c) net income taxes to be paid in connection therewith (after taking into account any tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"<u>New Facility</u>" has the meaning specified therefor in Section 7.01(m).

"<u>Notice of Borrowing</u>" has the meaning specified therefor in Section 2.02(a).

"<u>Obligations</u>" means all present and future indebtedness, obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding, other than the Chapter 11 Cases) to pay principal, interest, the Exit Fee, charges, expenses, fees, premiums, attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person.

"<u>OFAC</u>" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"<u>Operating Disbursements</u>" means the line item marked as "Operating Disbursements" set forth in the 13-Week Cash Flow Forecast.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"<u>Participant Register</u>" has the meaning specified therefor in Section 12.07(i).

19

"Payment Office" means the Administrative Agent's office located at 150 East 58th Street, 39th Floor, New York, New York 10155, or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Borrower.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means an "employee pension benefit plan" as defined in Section 3(2) of ERISA that is subject to Section 412 of the Internal Revenue Code, Section 302 of ERISA or Title IV of ERISA maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party or any of its ERISA Affiliates at any time during the preceding six calendar years.

"Perfection Certificate" means a certificate in form and substance satisfactory to the Collateral Agent providing information with respect to the property of each Loan Party.

"Periodic Term SOFR Determination Day" has the meaning specified therefor in the definition of Term SOFR.

"Permitted Disposition" means:

(a)     a sale of Inventory in the ordinary course of business;

(b)     licensing, on a non-exclusive basis, of Intellectual Property rights in the ordinary course of business;

(c)     leasing or subleasing assets in the ordinary course of business;

(d)     (i) the lapse of Registered Intellectual Property of Holdings and its Subsidiaries to the extent such intellectual property is not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of business so long as (in each case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

(e)     [reserved];

(f)     any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(g)     so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets (i) from Holdings or any of its Domestic Subsidiaries (other than AN USA) to a Loan Party that is a Domestic Subsidiary of Holdings, (ii) from any Subsidiary of Holdings that is not a Loan Party (or is the Mexican Loan Parties) to any other Subsidiary of Holdings (other than the Mexican Loan Parties or AN USA) but only in compliance with the terms of the Asset Purchase Agreement, (iii) from any Foreign Subsidiary to a Domestic Subsidiary or to another Foreign Subsidiary (other than the Mexican Loan Parties), or (iv) from any Mexican Loan Party to any other Mexican Loan Party or AN USA;

(h)     Permitted Factoring Dispositions;

(i)     Disposition of obsolete or worn-out equipment in the ordinary course of business, in an aggregate amount not to exceed, for Holdings and its Subsidiaries, $50,000 in any Fiscal Year; and

137438523_22

(j)    Disposition of property or assets not otherwise permitted in clauses (a) through (i) above for cash in the ordinary course of business for not less than the fair market value of such property or assets, in an aggregate amount not to exceed, for all Loan Parties and their Subsidiaries, $50,000 in any Fiscal Year;

provided that the Net Cash Proceeds of such Dispositions are paid to the Administrative Agent for the benefit of the Agents and the Lenders pursuant to the terms of Section 2.06(c)(ii).

"Permitted Factoring Dispositions" means any Disposition of Accounts by AgileThought Digital Solutions, S.A.P.I. de C.V. via a factoring, reverse factoring or confirming arrangement to any Person that is not an Affiliate of any Loan Party or Subsidiary thereof, in the ordinary course of business and consistent with past practices, so long as the aggregate face value of all such Accounts that have been so factored, reversed factored or confirmed and not been paid by the account debtor thereof shall not exceed 15,550,000 Mexican pesos at any one time outstanding.

"Permitted Holder" means each of (i) Macfran S.A. de C.V., (ii) Invertis LLC., (iii) Diego Zavala, (iv) Mauricio Rioseco, (v) Banco Nacional de México, S.A., Member of Grupo Financiero Banamex, División Fiduciaria, in its capacity as trustee of the trust No. F/17938-6 (Credit Suisse), (vi) Banco Nacional de México, S.A., Member of Grupo Financiero Banamex, División Fiduciaria, in its capacity as trustee of the trust No. F/17937-8 (Credit Suisse), (vii) Banco Nacional de México, S.A., Member of Grupo Financiero Banamex, División Fiduciaria, in its capacity as trustee of the irrevocable trust for the issuance of senior bonds No. F/173183 (Nexxus), (viii) Nexxus Capital Private Equity Fund, VI, LP, (ix) Mauricio Garduño González Elizondo, (x) Rodrigo Franco Hernández, (xi) MZM Estrategia, S.A.P.I. de C.V., (xii) Isabelle Richard, (xiii) Georgina Rojas Aboumrad, (xiv) Alejandro Rojas Domene, (xv) Miguel Angel Ambrosi Herrera, (xvi) Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero acting as trustee pursuant to the Contrato de Fideicomiso Irrevocable de Emisión de Cert. Bursátiles Fid. de Desarrollo N.F2416 (LIV Mexico Growth IV N.F2416) and (xvii) LIV Mexico Growth Fund IV, L.P.

"Permitted Indebtedness" means:

(a)    any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)    Prepetition 1L Obligations, Prepetition 2L Obligations, and any other Indebtedness outstanding and incurred prior to the Petition Date and listed on Schedule 7.02(b);

(c)    Permitted Purchase Money Indebtedness;

(d)    Permitted Intercompany Investments;

(e)    Indebtedness incurred in the ordinary course of business under performance, surety, statutory, and appeal bonds;

(f)    Indebtedness owed to any Person providing, or providing financing for, property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(g)    Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business and that is timely paid in accordance with the terms of such cards;

(h)    Indebtedness arising from Permitted Factoring Dispositions;

(i)    the AGS Indebtedness; provided, that such Indebtedness is subject to, and permitted by, the AGS Subordination Agreement;

(j)    the Exitus Indebtedness; provided, that such Indebtedness is subject to, and permitted by, the Exitus Subordination Agreement;

(k)    to the extent constituting Indebtedness, the Unpaid Taxes;

(l)    PPP Indebtedness incurred prior to the Petition Date and in an aggregate amount not to exceed $180,000;

(m)    Indebtedness in respect of letters of credit issued by third party financial institutions for the benefit of the parties listed on Schedule 1.01(D), so long as the maximum aggregate face amount of such letters of credit shall not exceed 6,900,000 Mexican persons;

(n)    Contingent Obligations of (i) any Loan Party consisting of guaranties of Indebtedness or other obligations of Holdings or any of its Subsidiaries (other than the Mexican Loan Parties or AN USA) and (ii) any Mexican Loan Party consisting of guaranties of Indebtedness or other obligations of any other Mexican Loan Party or AN USA; provided, that (A) such Indebtedness or other obligations are otherwise permitted to be incurred by Holdings, any such Subsidiary, such Mexican Loan Party or AN USA (as applicable) pursuant to this Agreement and (B) such guaranties are provided in the ordinary course of business and consistent with past practices; and

(o)    other unsecured Indebtedness owed to any Person that is not an Affiliate of the Borrower or any of its Subsidiaries, in an aggregate outstanding amount not to exceed $100,000 at any time.

"Permitted Intercompany Investments" means Investments made by (a) a Domestic Loan Party to or in another Domestic Loan Party (other than AN USA), (b) a Foreign Loan Party to or in another Foreign Loan Party (other than a Mexican Loan Party), (c) a Foreign Loan Party to or in a Domestic Loan Party (other than AN USA), (d) a Domestic Loan Party to or in a Foreign Loan Party (other than a Mexican Loan Party and other than AN USA), so long as (i) such Investment is made in the ordinary course of business and consistent with past practices, (ii) the amount of such Investment is reflected in the then-applicable Projected Daily Cash Flow Schedule or 13-Week Cash Flow Forecast, and (iii) the aggregate amount of all Investments made pursuant to this clause (d) does not exceed $50,000 at any one time outstanding, (e) a Mexican Loan Party to or in another Mexican Loan Party or AN USA, (f) a Subsidiary that is not a Loan Party to or in a Domestic Loan Party (other than AN USA), (g) a Domestic Loan Party to or in a Mexican Loan Party or any other Foreign Subsidiary to the extent expressly permitted in the then-applicable Projected Daily Cash Flow Schedule or 13-Week Cash Flow Forecast, and (h) a Subsidiary that is not a Loan Party to or in another Subsidiary that is not a Loan Party; provided that, in the case of a loan or advance pursuant to each of clauses (a) through (g) above, the loan or advance is subject to a global intercompany loan note, together with an endorsement executed in blank, in each case, in form and substance satisfactory to the Required Lenders and the parties thereto are party to the Intercompany Subordination Agreement.

"Permitted Investments" means:

(a)      Investments in cash and Cash Equivalents;

(b)      Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)      advances made in connection with purchases of goods or services in the ordinary course of business;

(d)      Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(e)      Investments existing on the date hereof, as set forth on Schedule 7.02(e) hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof; and

(f)      Permitted Intercompany Investments.

"Permitted Liens" means:

(a)      Liens securing the Obligations;

(b)      Liens for taxes, assessments and governmental charges the payment of which is not required under Section 7.01(c)(ii) and which is not a Lien arising in connection with the Historical Tax Liability;

(c)      Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)      Liens described on Schedule 7.02(a), provided, that any such Lien shall only secure the Indebtedness that it secures on the Petition Date;

(e)      purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business to secure Permitted Purchase Money Indebtedness so long as such Lien only (i) attaches to such property and (ii) secures the Indebtedness that was incurred to acquire such property;

(f)      deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)      with respect to any Facility, easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations

for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h)　　Liens of landlords and mortgagees of landlords (i) arising by statute or under any Lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord, or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)　　the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease), in each case extending only to such personal property;

(j)　　non-exclusive licenses of Intellectual Property rights in the ordinary course of business;

(k)　　judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 9.01(j);

(l)　　rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(m)　　Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(n)　　Liens on cash collateral securing Indebtedness and obligations relating thereto that is permitted, and not securing any obligations in excess of the amount that is permitted, under clause (m) of the definition of Permitted Indebtedness;

(o)　　Liens securing the (x) Prepetition 1L Obligations and (y) Prepetition 2L Obligations up to the amount outstanding on the Petition Date and to the extent subject to the Prepetition Intercreditor Agreement; and

(p)　　other Liens granted to any Person that is not an Affiliate of the Borrower or any Subsidiary of the Borrower in the ordinary course of business, so long as such Liens secure obligations in an aggregate outstanding amount that does not exceed $50,000 at any time.

"Permitted Purchase Money Indebtedness" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations) incurred to finance the acquisition of any fixed assets secured by a Lien permitted under clause (e) of the definition of "Permitted Liens"; provided, that:

(a)　　such Indebtedness is incurred within 30 days after such acquisition,

(b)　　such Indebtedness when incurred shall not exceed the purchase price of the asset financed, and

24

(c)    the aggregate principal amount of all such Indebtedness shall not exceed (i) in the case of any such Indebtedness that finances equipment used by employees and consultants of any Loan Party or any of its Subsidiaries in connection with the performance of customer projects, $360,000 at any time outstanding and (ii) in the case of all other such Indebtedness, $50,000 at any time outstanding.

"Permitted Restricted Payments" means any of the following Restricted Payments made by:

(a)    any Loan Party to Holdings up to the amounts expressly set forth in the then-applicable Projected Daily Cash Flow Schedule or 13-Week Cash Flow Forecast and which is necessary to pay taxes and other customary expenses as and when due and owing by Holdings in the ordinary course of its business as a public holding company (including salaries and related reasonable and customary expenses incurred by employees of Holdings), so long as no Default or Event of Default shall have occurred and be continuing or would result from the making of such payment,

(b)    (i) any Loan Party that is a Domestic Subsidiary of Holdings to any other Loan Party that is a Domestic Subsidiary of Holdings (other than to AN USA), (ii) any Loan Party that is a Foreign Subsidiary of Holdings to any other Loan Party that is a Foreign Subsidiary (other than to the Mexican Loan Parties), (iii) any Foreign Subsidiary of Holdings that is not a Loan Party to any other Foreign Subsidiary of Holdings that is a not a Loan Party (other than to the Mexican Loan Parties), (iv) any Foreign Loan Party to any Domestic Loan Party (other than to AN USA) or (v) any Mexican Loan Party or any Subsidiary of any Mexican Loan Party to any other Mexican Loan Party or any other Subsidiary of any Mexican Loan Party; and

(c)    any Subsidiary of Holdings that is not a Loan Party to any Loan Party (other than a Mexican Loan Party or AN USA) or any other Subsidiary of Holdings that is not a Loan Party; and

(d)    Holdings to pay dividends in the form of common Equity Interests.

"Permitted Specified Liens" means Permitted Liens described in clauses (a) and (q) of the definition of Permitted Liens.

"Permitted Variance" has the meaning specified therefor in Section 7.03 hereof.

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" has the meaning specified therefor in the Recitals hereto.

"Petty Cash Accounts" means Cash Management Accounts with deposits at any time in an aggregate amount not in excess of $50,000 for any one account and $150,000 in the aggregate for all such accounts.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.00%, or, if a rate of

interest is not otherwise in effect, interest at the highest rate specified herein for any Term Loan then outstanding prior to an Event of Default plus 2.00%.

"PPP Indebtedness" means, collectively, certain Indebtedness pursuant to the Paycheck Protection Program of the Small Business Administration (a) between Bank of America, as lender, and AgileThought, LLC, as borrower, in the original aggregate principal amount of $7,590,117, (b) between Bank of America, as lender, and AN USA LLC, as borrower, in the original aggregate principal amount of $256,785, (c) between Bank of America, as lender, and 4th Source, LLC, as borrower, in the original aggregate principal amount of $1,242,600, and (d) between Bank of America, as lender, and AGS Alpama Global Services LLC, as borrower, in the original aggregate principal amount of $180,507.

"Prepetition 1L Agent" means Blue Torch Finance LLC, a Delaware limited liability company, in its capacities as administrative agent and collateral agent under the Prepetition 1L Documents, or any successor administrative agent and collateral agent under the Prepetition 1L Documents.

"Prepetition 1L Credit Agreement" means that certain Financing Agreement, dated as of May 27, 2022 (as amended, supplemented or otherwise modified on or prior to the date hereof), by and among the Borrower, the Guarantors, the Prepetition 1L Lenders party thereto and the Prepetition 1L Agent.

"Prepetition 1L Documents" means the Prepetition 1L Credit Agreement and the other "Loan Documents" (as defined in the Prepetition 1L Credit Agreement).

"Prepetition 1L Lenders" means the lenders under the Prepetition 1L Credit Agreement.

"Prepetition 1L Obligations" means the "Obligations" (as defined in the Prepetition 1L Credit Agreement).

"Prepetition 2L Collateral Agent" means GLAS Americas LLC.

"Prepetition 2L Credit Agreement" means that certain Credit Agreement, dated as of November 22, 2021 (as (i) amended by that certain Amendment No. 1 to the Credit Agreement dated as of December 9, 2021, (ii) amended by that certain Amendment No. 2 to the Credit Agreement dated as of March 30, 2022, (iii) amended by that certain Amendment No. 3 to the Credit Agreement dated as of the date of this Agreement, (iv) amended by that certain Amendment No. 4 to the Credit Agreement dated as of August 10, 2022, (v) amended by that certain Amendment No. 5 to the Credit Agreement dated as of November 22, 2022, (vi) amended by that certain Amendment No. 6 to the Credit Agreement dated as of March 7, 2023 and that certain Waiver to Credit Agreement dated as of March 7, 2023, and (vii) modified by that certain Forbearance Agreement dated as of April 18, 2023) by and among the Loan Parties party thereto, the lenders party thereto, the Prepetition 2L Collateral Agent, as collateral agent, and GLAS USA LLC, as administrative agent.

"Prepetition 2L Documents" means the Prepetition 2L Credit Agreement, the Prepetition Intercreditor Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"Prepetition 2L Obligations" means the "Obligations" (as defined in the Prepetition 2L Credit Agreement).

"Prepetition Documents" means the Prepetition 1L Documents, the Prepetition 2L Documents and each of the other agreements, instruments or documents executed pursuant thereto prior to the Petition Date.

137438523_22

"<u>Prepetition Indebtedness</u>" shall mean Indebtedness of the Borrower or any Guarantor outstanding, or secured, under the Prepetition Documents and outstanding as of the Petition Date.

"<u>Prepetition Intercreditor Agreement</u>" means the Intercreditor Agreement, dated as of May 27, 2022 (as amended, supplemented or otherwise modified on or prior to the date hereof), by and among the Prepetition 1L Agent, the Prepetition 2L Collateral Agent, the Borrower and certain of the Guarantors.

"<u>Prepetition Obligations</u>" means all (i) Prepetition1L Obligations and (ii) Prepetition 2L Obligations.

"<u>Pro Rata Share</u>" means, with respect to a Lender's obligation, as set forth herein, to make the Term Loans, the right to receive payments of interest, fees, and principal with respect thereto, and for all other matters, the percentage obtained by dividing (i) such Lender's Term Loan Commitment, by (ii) the aggregate amount of the Term Loan Commitment of all Lenders, <u>provided</u> that if the Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Term Loans and the denominator shall be the aggregate unpaid principal amount of the Term Loans.

"<u>Projected Daily Cash Flow Schedule</u>" has the meaning specified therefor in Section 7.01(a)(xix).

"<u>Projections</u>" means financial projections of Holdings and its Subsidiaries delivered pursuant to Section 6.01(g)(ii), as updated from time to time pursuant to Section 7.01(a)(v).

"<u>Qualified Cash</u>" means, as of any date of determination, the aggregate amount of unrestricted cash on-hand of the Loan Parties.

"<u>Qualified Equity Interests</u>" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"<u>Real Property Deliverables</u>" means each of the following agreements, instruments and other documents in respect of each Facility, each in form and substance reasonably satisfactory to the Collateral Agent:

(a)     a Mortgage duly executed by the applicable Loan Party,

(b)     evidence of the recording of each Mortgage in such office or offices as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Collateral Agent and the Lenders thereunder;

(c)     a Title Insurance Policy or bring-down of the existing Title Insurance Policy with respect to each Mortgage, dated as of the date such Title Insurance Policy is required to be delivered to the Collateral Agent hereunder;

(d)     a current ALTA survey and a surveyor's certificate, certified to the Collateral Agent and to the issuer of the Title Insurance Policy with respect thereto by a professional surveyor licensed in the state in which such Facility is located and reasonably satisfactory to the Collateral Agent;

(e)     in the case of a leasehold interest, a certified copy of the Lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest;

137438523_22

(f)      a zoning report issued by a provider reasonably satisfactory to the Collateral Agent or a copy of each letter issued by the applicable Governmental Authority, evidencing each Facility's compliance with all applicable Requirements of Law, together with a copy of all certificates of occupancy issued with respect to each Facility;

(g)      an opinion of counsel, satisfactory to the Collateral Agent, in the state where such Facility is located with respect to the enforceability of the Mortgage to be recorded and such other matters as the Collateral Agent may reasonably request;

(h)      a Phase I Environmental Site Assessment prepared in accordance with the United States Environmental Protection Agency Standards and Practices for "All Appropriate Inquiries" under Section 101(3)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act as referenced in 40 CFR Part 312 and ASTM E-1527-13 "Standard Practice for Environmental Assessments" ("Phase I ESA" (and if reasonably requested by the Collateral Agent based upon the results of such Phase I ESA, a Phase II Environmental Site Assessment), by a nationally-recognized environmental consulting firm, reasonably satisfactory to the Collateral Agent; and

(i)      such other agreements, instruments, appraisals and other documents (including guarantees and opinions of counsel) as the Collateral Agent may reasonably require.

"Recipient" means any Agent and any Lender, as applicable.

"Reference Rate" means, for any period, the greatest of (a) 2.00% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) Adjusted Term SOFR (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis) plus 1.00% per annum, and (d) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Reference Rate Loan" means each portion of a Term Loan that bears interest at a rate determined by reference to the Reference Rate.

"Register" has the meaning specified therefor in Section 12.07(f).

"Registered Intellectual Property" means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the direct and indirect equityholders, partners, directors, officers, employees, agents, consultants, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates. For

137438523_22

the avoidance of doubt, each party hereto agrees that, for so long as FTI is acting as the financial advisor to counsel to the Agents, FTI shall be deemed to be a Related Party of the Agents.

"Relevant Governmental Body" means the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in any environmental media, including the indoor or outdoor  air, soil, surface or ground water, sediments or property.

"Remedial Action" means any action (a) to correct, mitigate, or address any actual, alleged or threatened violation of or non-compliance with any Environmental Law or Environmental Permit, or (b) to clean up, remove, remediate, mitigate, abate, contain, treat, monitor, assess, evaluate, investigate, prevent, minimize or in any other way address any environmental condition or the actual, alleged or threatened presence, Release or threatened Release of any Hazardous Materials (including the performance of pre-remedial studies and investigations and post-remedial operation and maintenance activities).

"Replacement Lender" has the meaning specified therefor in Section 12.02(c).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Required Lenders" means Lenders whose Pro Rata Shares aggregate at least 50.1%.

"Requirements of Law" means, with respect to any Person, collectively, the common law and any and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities), and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means (a) the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, together with any payment or distribution pursuant to a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (b) the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (c) the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (d) the return of any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or the making of any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such or (e) the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the

reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party.

"Revenue" means, for any period, the aggregate amount received by Holdings and its Subsidiaries during such period for the sale of good and/or the provision of services, determined in compliance with Accounting Standards Codification 606 (Revenue from Contracts with Customers) published by the Financial Accounting Standards Board.

"Roll-Up Loans" has the meaning specified therefore in Section 2.01(a)(iv) hereof.

"Sale" has the meaning specified therefor in Section 5.01(m)(iii) hereof.

"Sale and Leaseback Transaction" means, with respect to Holdings or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby Holdings or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sale Motion" has the meaning specified therefor in Section 5.01(m)(iii) hereof.

"Sanctioned Country" means, at any time, a country or territory that is the subject or target of any Sanctions that broadly prohibit dealings with that country or territory (which, as of the Effective Date, include the Crimea, Donetsk People's Republic, and Luhansk People's Republic territories of Ukraine, Cuba, Iran, Syria and North Korea).

"Sanctioned Person" means, at any time, (a) any Person listed in OFAC's Specially Designated Nationals and Blocked Persons List, OFAC's Sectoral Sanctions Identification List, and any other Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom, Germany, Canada, Australia, or other relevant sanctions authority, (b) a Person that resides in, is organized in or located in, or has a place of business in, a country or territory named on any list referred to in clause (a) of this definition or a country or territory that is designated as a "Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose subscription funds are transferred from or through any such jurisdiction (each of the foregoing in this clause (b), a "Sanction Target"), or a Person that owns 50% or more of the Equity Interests of, or is otherwise controlled by, or is acting on behalf of, one or more Sanction Targets, (c) any Person with whom or with which a U.S. Person is prohibited from dealing under any of the Sanctions, or (d) any Person owned or controlled by any Person or Persons described in clause (a) or (b).

"Sanctions" means Requirements of Law concerning or relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by OFAC, the U.S. Department of State, the European Union, or His Majesty's Treasury of the United Kingdom, or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Secured Obligations" has the meaning specified therefor in the Security Agreements.

"Secured Party" means any Agent and any Lender.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time. "Securitization" has the meaning specified therefor in Section 12.07(l).

"Security Agreements" means, collectively, the U.S. Security Agreement and the Mexican Security Agreements.

"SOFR" means a rate per annum equal to the secured overnight financing rate for such Business Day published by the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate) on the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org (or any successor source for the secured overnight financing rate identified as such by the administrator of the secured overnight financing rate from time to time).

"SOFR Deadline" has the meaning specified therefor in Section 2.08(a) hereof.

"SOFR Loan" means a Term Loan that bears interest at a rate based on Adjusted Term SOFR.

"SOFR Notice" has the meaning specified therefor in Section 2.08(a) hereof.

"SOFR Option" has the meaning specified therefor in Section 2.08(a) hereof.

"Standard & Poor's" means S&P Global Ratings, a business unit of Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc., and any successor thereto.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person.  References to a Subsidiary shall mean a Subsidiary of the Loan Parties unless the context expressly provides otherwise.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" has the meaning specified therefor in Section 2.01(a)(iv) hereof.

"Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to make a Term Loan (other than a Roll-Up Loan) to the Borrower in the amount set forth in

Schedule 1.01(A) hereto or in the Assignment and Acceptance pursuant to which such Lender became a Lender under this Agreement, as the same may be terminated or reduced from time to time in accordance with the terms of this Agreement, and "Term Loan Commitments" means the aggregate amount of each Lender's Term Loan Commitment.

"Term SOFR" means the Term SOFR Reference Rate for a three-month tenor on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding Business Day is not more than three (3) Business Days prior to such Periodic Term SOFR Determination Day; provided that if Term SOFR as so determined shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Term SOFR Adjustment" means a percentage per annum equal to (a) 0.11448% for an Interest Period of one month (it being acknowledged and agreed that the Borrower shall be permitted to select an Interest Period of one month for any SOFR Loan only if agreed by the Lenders in their sole discretion) and (b) 0.26161% for an Interest Period of three months.

"Termination Date" means the first date on which all of the Obligations are paid in full in cash and the Term Loan Commitment of each of Lender is terminated.

"Testing Period" means, (i) the period from the Petition Date through the last day of the second (2nd) Weekly Period thereafter, then (ii) the period from the Petition Date through the last day of the third (3rd) Weekly Period thereafter, and, thereafter, (iii) the period consisting of the prior four (4) Weekly Periods ending on the last day of each subsequent Weekly Period.

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued to the Collateral Agent by or on behalf of a title insurance company selected by or otherwise satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in 0.

"Unpaid Taxes" means the liabilities listed on Schedule 6.01(j).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Security Agreement" means that certain Pledge and Security Agreement, in form and substance satisfactory to the Collateral Agent, made by the Domestic Loan Parties in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001)) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"Variance" has the meaning specified therefor in Section 7.01(a)(xix).

"Variance Report" has the meaning specified therefor in Section 7.01(a)(xix).

"WARN" has the meaning specified therefor in Section 6.01(p).

"Weekly Period" means each period specified as a "Weekly Period" in Schedule 1.01(E).

"Withholding Agent" means any Loan Party and the Administrative Agent.

Section 1.02    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03    Certain Matters of Construction.  References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders. Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to

33

ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04 <u>Accounting and Other Terms</u>.

(a) Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP. For purposes of determining compliance with any incurrence or expenditure tests set forth in Section 7.01 and Section 7.02, any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time). Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 842 on the definitions and covenants herein, GAAP as in effect on December 31, 2018 shall be applied, (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of Holdings and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded and (iii) with respect to revenue recognition and the impact of such accounting in accordance with FASB ASC 606 on the definitions and covenants herein, GAAP as in effect on December 31, 2017 shall be applied.

(b) All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "<u>Uniform Commercial Code</u>" or the "<u>UCC</u>") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine.

Section 1.05 <u>Time References</u>. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; <u>provided</u>, <u>however</u>, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.

Section 1.06    Obligation to Make Payments in Dollars.  All payments to be made by any Loan Party of principal, interest, fees and other Obligations under any Loan Document shall be made in Dollars in same day funds, and no obligation of any Loan Party to make any such payment shall be discharged or satisfied by any payment other than payments made in Dollars in same day funds.

## ARTICLE II

## THE TERM LOANS

Section 2.01    Term Loans.  (a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth:

(i)    [reserved];

(ii)    each Lender severally agrees to fund its Term Loan Commitment by making a single Term Loan to the Borrower on the Effective Date in an aggregate principal amount not to exceed the lesser of (x) the amount of such Lender's Term Loan Commitment and (y) its Pro Rata Share of the aggregate amount of Term Loans approved by the Bankruptcy Court in the Interim Order to be extended prior to entry of the Final Order, which amount shall not exceed $11,200,000 (the aggregate amount of Term Loans funded pursuant to this clause (a)(ii), the "Interim Term Loans");

(iii)    each Lender severally agrees to fund its Term Loan Commitment (as in effect after giving effect to the Interim Term Loans) by making a single Term Loan to the Borrower on any Business Day following, but not later than the second (2nd) Business Day following, the Bankruptcy Court's entry of the Final Order, in an aggregate principal amount not to exceed the lesser of (x) the amount of such Lender's Term Loan Commitment as in effect at such time and (y) its Pro Rata Share of the amount of Term Loans approved by the Bankruptcy Court in the Final Order to be extended (the aggregate amount of Term Loans funded pursuant to this clause (a)(iii), the "Final Term Loans"); and

(iv)    upon entry of the Final Order, each Lender shall be deemed to have advanced an additional loan in an aggregate amount for all such loans equal to the amount of Obligations (as defined under the Prepetition 1L Credit Agreement) outstanding as of such date, which deemed loans will be deemed to have been converted on a cashless, dollar-for-dollar basis from the Obligations (as defined under the Prepetition 1L Credit Agreement) under the Prepetition 1L Credit Agreement (such loans, the "Roll-Up Loans"; the Roll-Up Loans, together with the Interim Term Loans and the Final Term Loans, when funded or deemed funded, the "Term Loans").

(b)    Notwithstanding the foregoing, the aggregate principal amount of Interim Term Loans and Final Term Loans shall not exceed the Term Loan Commitment.  Any principal amount of the Term Loans repaid or prepaid may not be reborrowed.

No portion of any Term Loan will be funded (initially or through participation, assignment, transfer or securitization) with plan assets of any plan covered by ERISA or Section 4975 of the Internal Revenue Code if it would cause the Borrower or any Guarantor to incur any prohibited transaction excise tax penalties under Section 4975 of the Internal Revenue Code.

Section 2.02    Making the Term Loans.  (a)  The Borrower shall give the Administrative Agent prior notice in writing, in substantially the form of Exhibit C hereto (a "Notice of Borrowing") or such other form approved by the Administrative Agent, not later than 5:00 p.m. (New York City time) on the date which is (i) in the case of the Interim Term Loans, two (2) Business Days prior to the Effective Date, subject to the entry of the Interim Order, and (iii) in the case of the Final Term Loans, two (2) Business

35

Days prior to the date of the proposed funding thereof (which such funding date shall be no later than two (2) Business Days after the date of entry of the Final Order). In the case of Roll-Up Loans, the Borrower shall be deemed to have given a Notice of Borrowing of such loans to be made on the date of entry of the Final Order and for such loans to be Reference Rate Loans. Any Notice of Borrowing for Interim Term Loans or Final Term Loans shall be irrevocable and shall specify (i) the principal amount of such proposed Term Loan, (ii) whether such Term Loan is requested to be an Interim Term Loan or a Final Term Loan, (iii) that such Term Loan is requested to be a Reference Rate Loan (or, if agreed by the Lenders in their sole discretion, a SOFR Loan), (iv) the use of the proceeds of such proposed Interim Term Loans or Final Term Loans, as applicable, which shall be, initially, to fund the Funding Account, and (v) the proposed borrowing date, which must be a Business Day, and with respect to the Interim Term Loans must be the Effective Date and with respect to the Final Term Loans must be not later than the second (2nd) Business Day following the Bankruptcy Court's entry of the Final Order. The Administrative Agent and the Lenders may act without liability upon the basis of written notice believed by the Administrative Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Administrative Agent). The Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of any such Notice of Borrowing. The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Term Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)      Each Notice of Borrowing pursuant to this Section 2.02 shall be irrevocable and the Borrower shall be bound to make a borrowing in accordance therewith.

(c)      (i)      Except as otherwise provided in this Section 2.02(c), all Term Loans borrowed on a date under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares of the Term Loan Commitment; it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Term Loan requested hereunder, nor shall the Term Loan Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Term Loan requested hereunder, and each Lender shall be obligated to make the Term Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

(ii)      Notwithstanding the requirements of Sections 2.02(a)(iv) and (v) and in order to reduce the number of fund transfers among the Borrower, the Agents and the Lenders, the Borrower may request that a portion of the Interim Term Loans or Final Term Loans, as applicable, be funded to the Borrower's account  for use thereof within two (2) Business Days in accordance with the then-applicable 13-Week Cash Flow Forecast. The Administrative Agent shall in no event fund any Interim Term Loans or Final Term Loans if the Administrative Agent shall have received written notice from the Collateral Agent or the Required Lenders on the Business Day prior to the date of the proposed loan that one or more of the conditions precedent contained in Section 5.02 will not be satisfied at the time of the proposed loan; provided, however, that the Administrative Agent shall not be required to determine that, or take notice whether, the conditions precedent in Section 5.02 5.02, or 5.03, as applicable, have been satisfied. Unless the Administrative Agent shall have provided notice to the Lenders that it does not intend to fund the Interim Term Loans or Final Term Loans, as applicable, each Lender shall make its Pro Rata Share of the Interim Term Loans or Final Term Loans, as applicable, available to the Administrative Agent, in immediately available funds, in the Administrative Agent's Accounts no later than 3:00 p.m. (New York City time) on the date of the proposed loan. The Administrative Agent will make the proceeds of such Interim Term Loans or Final Term Loans, as applicable, available to the Borrower on the day of the proposed loan by causing an amount, in immediately available funds, equal to the proceeds of all such Interim Term Loans or Final Term Loans, as applicable, received by the Administrative Agent in the Administrative Agent's

Accounts to be wired to an account designated by the Borrower in accordance with Sections 2.02(a) or 2.02(c)(ii).

Section 2.03    Repayment of Term Loans; Evidence of Debt.  (a)  The outstanding principal of all Term Loans shall be due and payable on the Final Maturity Date or, if earlier, on the date on which they are declared due and payable pursuant to the terms of this Agreement.

(b)    [Reserved].

(c)    Each Lender shall maintain, in accordance with its usual practice, an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Term Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Term Loan made, or deemed made, hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder, and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's Pro Rata Share thereof.

(e)    The entries made in the accounts maintained pursuant to Section 2.03(c) or Section 2.03(d) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to Section 2.03(c) and the accounts maintained pursuant to Section 2.03(d), the accounts maintained pursuant to Section 2.03(d) shall govern and control.

(f)    Any Lender may request that Term Loans made by it be evidenced by a promissory note.  In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by the Collateral Agent and reasonably acceptable to the Borrower.  Thereafter, the Term Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the payee named therein (or to such payee and its registered assigns).

Section 2.04    Interest.

(a)    Roll-Up Loans.  The Roll-Up Loans shall be Reference Rate Loans.  The Roll-Up Loans shall bear interest on the principal amount thereof from time to time outstanding, from the date of such deemed loan until repaid, at a rate per annum equal to the Reference Rate plus the Applicable Margin applicable to Roll-Up Loans.

(b)    Interim Term Loans and Final Term Loans.  Subject to the terms of this Agreement, unless the Lenders shall otherwise agree (in their sole discretion), the Interim Term Loans and Final Term Loans, or any portions thereof, shall be Reference Rate Loans.  Each portion of such Term Loan that is a Reference Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Term Loans until repaid, at a rate per annum equal to the Reference Rate plus the Applicable Margin applicable to Interim Term Loans and Final Term Loans, and each portion of such Term Loans that is a SOFR Loan shall bear interest on the principal amount thereof from time to time

37

outstanding, from the date of such Term Loans until repaid, at a rate per annum equal to Adjusted Term SOFR plus the Applicable Margin applicable to Interim Term Loans and Final Term Loans.

(c)      Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section 2.04(c), upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Term Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(d)      Interest Payment.  Interest on each Term Loan shall be payable (i) in the case of a Reference Rate Loan, monthly, in arrears, on the last Business Day of each month, commencing on the last Business Day of the month following the month in which such Term Loan is made or deemed made, (ii) in the case of a SOFR Loan, on the last day of the then effective Interest Period applicable to such Term Loan, and (iii) in the case of each Term Loan, on the Final Maturity Date (whether upon demand, by acceleration or otherwise).  Interest at the Post-Default Rate shall be payable on demand.  The Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may in its sole discretion, from time to time, charge the Loan Account pursuant to Section 4.01 with the amount of any interest payment due hereunder. Each interest payment (including at the Post-Default Rate) due hereunder shall be payable in full in kind and capitalized when such interest payment is due.

(e)      General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed. For the avoidance of doubt, no date of payment shall be included in any computation.

Section 2.05      [Reserved].

Section 2.06      Reduction of Commitment; Prepayment of Term Loans.

(a)      Reduction of Commitments. (i) The Term Loan Commitments shall terminate at 5:00 p.m. (New York City time) on the Effective Date unless the Interim Term Loans shall have funded at or prior to such time and (B) the Term Loan Commitments (as then in effect) shall terminate on the earlier of 5:00 p.m. (New York City time) on the date that is the second (2nd) Business Day following the Bankruptcy Court's entry of the Final Order and funding of the Final Term Loans.  Any amount of the Term Loan Commitments not funded on or prior to the date that is the second (2nd) Business Day following the Bankruptcy Court's entry of the Final Order shall be reduced to $0.

(b)      Optional Prepayment.

(i)      [Reserved].

(ii)      Term Loans.  The Borrower may, at any time and from time to time, by 5:00 p.m. (New York City time) upon at least five (5) Business Days' prior written notice to the Administrative Agent, prepay (or direct that funds on deposit in the Funding Account be used to prepay) the principal of the Term Loans, in whole or in part.  Each prepayment made pursuant to this Section 2.06(b)(ii) shall be accompanied by the payment of accrued and unpaid interest to the date of such payment on the amount prepaid plus an amount equal to the Exit Fee on the amount of such Term Loans being prepaid.  Each such prepayment of Term Loans shall be applied against the remaining principal amount due on the Roll-Up Loans, until paid in full, and then to all other Term Loans.

38

(iii)    Termination of Agreement.  The Borrower may, upon at least five (5) Business Days' prior written notice to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in full in cash, the Obligations, including an amount equal to the Exit Fee on the Term Loans being repaid.  If the Borrower has sent a notice of termination pursuant to this Section 2.06(b)(iii), then the Lenders' obligations to extend credit hereunder shall terminate and the Borrower shall be obligated to repay the Obligations (including the Exit Fee on all Term Loans then outstanding), in full in cash on the date set forth as the date of termination of this Agreement in such notice.

(c)    Mandatory Prepayment.

(i)    [Reserved].

(ii)    Immediately upon any Disposition (excluding Dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), (d), (f), (g), or (j) of the definition of Permitted Disposition) by any Loan Party or its Subsidiaries, the Borrower shall prepay the outstanding principal amount of the Term Loans in accordance with Section 2.06(c)(iv) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition, plus an amount equal to the Exit Fee on such Term Loans being prepaid, to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries (and not paid to the Administrative Agent as a prepayment of the Term Loans) shall exceed for all such Dispositions $50,000 in any Fiscal Year.  Nothing contained in this Section 2.06(c)(ii) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.02(c)(ii).

(iii)    Immediately upon the receipt of Net Cash Proceeds (A) from the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding amount of the Term Loans in accordance with Section 2.06(c)(iv) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith or (B) upon an Equity Issuance (other than any Excluded Equity Issuances), the Borrower shall prepay the outstanding amount of the Term Loans in accordance with Section 2.06(c)(iv) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith, plus an amount equal to the Exit Fee on such Term Loans being prepaid.  The provisions of this Section 2.06(c)(iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)    Immediately upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in accordance with Section 2.06(c)(iv) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith, plus an amount equal to the Exit Fee on such Term Loans being prepaid.

(v)    [Reserved].

(vi)    [Reserved].

(d)    Application of Payments.  Each prepayment pursuant to subsections (c)(ii), (c)(iii), and (c)(iv) above shall be applied, first, to the outstanding principal balance of the Roll-Up Loans and an amount equal to the Exit Fee on such Roll-Up Loans being prepaid, until paid in full, and second, to the outstanding principal balance of all other Term Loans and an amount equal to the Exit Fee on such Term Loans being prepaid, until paid in full in cash.  Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, if the Administrative Agent has elected, or has been directed by the Collateral Agent or the Required Lenders, to apply payments in respect of any Obligations

in accordance with Section 4.03(b), prepayments required under Section 2.06(c) shall be applied in the manner set forth in Section 4.03(b).

(e)      Interest and Fees.  Any prepayment made pursuant to this Section 2.06 shall be accompanied by (i) accrued and unpaid interest on the principal amount being prepaid to the date of prepayment plus the Exit Fee applicable thereto, and (ii) any Funding Losses payable pursuant to Section 2.08(e).

(f)      Cumulative Prepayments.  Except as otherwise expressly provided in this Section 2.06, payments with respect to any subsection of this Section 2.06 are in addition to payments made or required to be made under any other subsection of this Section 2.06.

Section 2.07      Fees.

(a)      Closing Fee.  The Borrower agrees to pay to the Administrative Agent, for the benefit of the Lenders in accordance with their Pro Rata Shares, a closing fee equal to 5.00% of the Term Loan Commitments as in effect on the Effective Date, payable on the Effective Date in kind (the "Closing Fee"), which fee shall be deemed fully earned and non-refundable when paid.

(b)      Agency Fee.  The Borrower shall pay to the Administrative Agent, in immediately available funds, a non-refundable agency fee (the "Agency Fee") equal to $100,000 in cash on the Effective Date, which fee shall be deemed fully earned when paid.

(c)      Audit and Collateral Monitoring Fees.  The Borrower acknowledges that pursuant to Section 7.01(f), representatives of the Agents may, upon reasonable advance notice, visit any or all of the Loan Parties and/or conduct inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties at any reasonable time and from time to time.  The Borrower agrees to pay (i) $1,500 per day per examiner plus the examiner's out-of-pocket costs and reasonable expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations and (ii) the cost of all visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations conducted by a third party on behalf of the Agents).

Section 2.08      SOFR Option.

(a)      The Borrower may, with the consent of the Required Lenders, at any time and from time to time, and only for so long as no Default or Event of Default has occurred and is continuing, elect to have interest on all or a portion of the Interim Term Loans or Final Term Loans be charged at a rate of interest based upon Adjusted Term SOFR (the "SOFR Option") by notifying the Administrative Agent in writing prior to 11:00 a.m. (New York City time) at least three (3) Business Days prior to (i) the proposed borrowing date of a Term Loan (as provided in Section 2.02), (ii) in the case of the conversion of a Reference Rate Loan to a SOFR Loan, the commencement of the proposed Interest Period or (iii) in the case of the continuation of a SOFR Loan as a SOFR Loan, the last day of the then current Interest Period (the "SOFR Deadline").  Notice of the Borrower's election of the SOFR Option for a permitted portion of the Term Loans pursuant to this Section 2.08(a) shall be made by delivery to the Administrative Agent of (A) a Notice of Borrowing (in the case of the initial making of a Term Loan) in accordance with Section 2.02 or (B) a notice in writing, in substantially the form of Exhibit D hereto (a "SOFR Notice") prior to the SOFR Deadline.  Promptly upon its receipt of each such SOFR Notice, the Administrative Agent shall provide a copy thereof to each of the Lenders.  Each SOFR Notice shall be irrevocable and binding on the Borrower.

(b)        Interest on SOFR Loans shall be payable in accordance with Section 2.04(d). On the last day of each applicable Interest Period, unless the Borrower properly have exercised the SOFR Option with respect thereto, the interest rate applicable to such SOFR Loans automatically shall convert to the rate of interest then applicable to Reference Rate Loans of the same type hereunder.  At any time that a Default or an Event of Default has occurred and is continuing, the Borrower no longer shall have the option to request that any portion of the Term Loans bear interest at Adjusted Term SOFR and the Administrative Agent shall have the right (but not the obligation) to convert the interest rate on all outstanding SOFR Loans to the rate of interest then applicable to Reference Rate Loans of the same type hereunder on the last day of the then current Interest Period.

(c)        Notwithstanding anything to the contrary contained in this Agreement, the Borrower (i) shall have not more than three (3) SOFR Loans in effect at any given time, and (ii) only may exercise the SOFR Option for SOFR Loans of at least $500,000 and integral multiples of $100,000 in excess thereof.

(d)        The Borrower may prepay SOFR Loans at any time; provided, however, that in the event that SOFR Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any mandatory prepayment pursuant to Section 2.06(c) or any application of payments or proceeds of Collateral in accordance with Section 4.03 or Section 4.04 or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrower shall indemnify, defend, and hold the Agents and the Lenders and their participants harmless against any and all Funding Losses in accordance with Section 2.08(e).

(e)        [Reserved].

(f)        Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Required Lenders may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  The parties shall use commercially reasonable efforts to satisfy any applicable IRS guidance, including Treasury Regulation Section 1.1001-6 and any future guidance, to the effect that the implementation of a Benchmark Replacement will not result in a deemed exchange for U.S. federal income tax purposes of any Term Loan under this Agreement for U.S. federal income tax purposes.

(g)        In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(h)        The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. Any determination, decision or election that may be made by the Administrative Agent and the Required Lenders pursuant to this Section 2.08, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document.

(i)        Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(j)        Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for conversion to Reference Rate Loans.

Section 2.09    Funding Losses.  In connection with each SOFR Loan, the Borrower shall indemnify, defend, and hold the Agents and the Lenders harmless against any loss, cost, or expense incurred by any Agent or any Lender as a result of (a) the payment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of a Default or an Event of Default or any mandatory prepayment required pursuant to Section 2.06(c)), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of a Default or an Event of Default), or (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any Notice of Borrowing or SOFR Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "Funding Losses").  Funding Losses shall, with respect to any Agent or any Lender, be deemed to equal the amount reasonably determined by such Agent or such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such SOFR Loan had such event not occurred, at Adjusted Term SOFR that would have been applicable thereto, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period therefor), minus (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate which such Agent or such Lender would be offered were it to be offered, at the commencement of such period, Dollar deposits of a comparable amount and period in the London interbank market.  A certificate of an Agent or a Lender delivered to the Borrower setting forth any amount or amounts that such Agent or such Lender is entitled to receive pursuant to this Section 2.08(e) shall be conclusive absent manifest error.

Section 2.10    Taxes.  (a) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of any Withholding Agent) requires the deduction or withholding of any Taxes from or in respect of any such payment, (i) the applicable Withholding Agent shall make such deduction or withholding, (ii) the applicable Withholding Agent shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount

(an "Additional Amount") necessary such that after making such deduction or withholding (including deductions and withholdings applicable to Additional Amount payable under this Section 2.10) the applicable Recipient receives the amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, each Loan Party shall pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes by any Secured Party.

(c)    The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes (including, without limitation, Indemnified Taxes imposed on any amounts payable under this Section 2.10) paid or payable by such Secured Party or required to be withheld or deducted from a payment to such Secured Party and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefor specifying in reasonable detail the nature and amount of such Indemnified Taxes. A certificate as to the amount of such payment or liability delivered to the Borrower by a Secured Party (with a copy to the Administrative Agent) or on behalf of another Secured Party shall be conclusive absent manifest error.

(d)    (i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.10(d)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Lender that is not a U.S. Person (a "Foreign Lender") shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest

137438523_22

under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI;

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit 2.09(d)-1 hereto to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.09(d)-2 or Exhibit 2.09(d)-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.09(d)-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Agent in writing of its legal inability to do so.

(e)        Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.07(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)        If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.10 (including by the payment of Additional Amounts pursuant to this Section 2.10), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.10 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph (f) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)        The obligations of the Loan Parties under this Section 2.10 shall survive the termination of this Agreement and the payment of the Obligations.

(h)        Promptly after any payment of Taxes by the Loan Parties to a Governmental Authority pursuant to this Section 2.10, the Loan Parties shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

Section 2.11    <u>Increased Costs and Reduced Return</u>.  (a)  If any Secured Party shall have determined that any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any tax, duty or other charge with respect to this Agreement or any Term Loan made by such Agent or such Lender (except for (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes), (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Term Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured

Party any other condition regarding this Agreement or any Term Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Term Loan, or agreeing to make any Term Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrower shall pay to such Secured Party such additional amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b)        If any Secured Party shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Term Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of any Term Loans made or maintained, or any agreement to make Term Loans, or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Secured Party, the Borrower shall pay to such Secured Party from time to time such additional amounts as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c)        All amounts payable under this Section 2.11 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate.  A certificate of such Secured Party claiming compensation under this Section 2.11, specifying the event herein above described and the nature of such event shall be submitted by such Secured Party to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.11, and shall be final and conclusive absent manifest error.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.11 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.11 for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)        The obligations of the Loan Parties under this Section 2.11 shall survive the termination of this Agreement and the payment of the Term Loans and all other amounts payable hereunder.

Section 2.12        Changes in Law; Impracticability or Illegality.

(a)        Adjusted Term SOFR may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except to the extent such changes result in the Lender becoming liable for Indemnified Taxes or Excluded Taxes) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at Adjusted Term SOFR.  In any such event, the affected

Lender shall give the Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Borrower a statement setting forth the basis for adjusting such Adjusted Term SOFR and the method for determining the amount of such adjustment, or (ii) repay the SOFR Loans with respect to which such adjustment is made (together with any amounts due under Section 2.10).

(b)        In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain SOFR Loans or to continue such funding or maintaining, or to determine or charge interest rates at Adjusted Term SOFR, such Lender shall give notice of such changed circumstances to the Borrower and the Administrative Agent, and the Administrative Agent promptly shall transmit the notice to each other Lender and (i) in the case of any SOFR Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such SOFR Loans, and interest upon the SOFR Loans of such Lender thereafter shall accrue interest at the rate then applicable to Reference Rate Loans of the same type hereunder, and (ii) the Borrower shall not be entitled to elect the SOFR Option (including in any borrowing, conversion or continuation then being requested) until such Lender determines that it would no longer be unlawful or impractical to do so.

(c)        The obligations of the Loan Parties under this Section 2.12 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

## ARTICLE III

## [INTENTIONALLY OMITTED]

## ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS

Section 4.01    Payments; Computations and Statements.  (a)  The Borrower will make each payment, or deposit to the Funding Account, under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Accounts or the Funding Account, as may be required.  All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day may, in the Administrative Agent's sole discretion, be credited to the Loan Account on the next succeeding Business Day.  All payments shall be made by the Borrower without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02, after receipt to the Administrative Agent's Accounts, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement.  The Lenders and the Borrower hereby authorize the Administrative Agent to, and the Administrative Agent may in its sole discretion, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any Loan Document.  Notwithstanding anything to the contrary contained in this Agreement, each of the Lenders and the Borrower agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Section 5.02 or Section 5.03 have been satisfied.  Any amount charged to the Loan Account of the Borrower shall be added to the principal amount of the Interim Term Loans or Final Term Loans, as determined by the Administrative Agent, by capitalizing such

47

amount and adding such capitalized amount to the outstanding principal amount of such Term Loans.  The Lenders and the Borrower confirm that any charges which the Administrative Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to the Borrower and solely at the Administrative Agent's discretion, provided that the Administrative Agent shall from time to time upon the request of the Collateral Agent, charge the Loan Account of the Borrower with any amount due and payable under any Loan Document.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days.  Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)  If requested, the Administrative Agent shall provide the Borrower, after the end of a calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrower during such month, the amounts and dates of all Term Loans made to the Borrower during such month, the amounts and dates of all payments on account of the Term Loans to the Borrower during such month and the Term Loans to which such payments were applied, the amount of interest accrued on the Term Loans to the Borrower during such month, and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations.  All entries on any such statement shall be presumed to be correct and, 30 days after the same is sent, shall be final and conclusive absent manifest error.

Section 4.02    Sharing of Payments.  Except as provided in Section 2.02 hereof, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender and any payment of an amendment, consent or waiver fee to consenting Lenders pursuant to an effective amendment, consent or waiver with respect to this Agreement), or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Term Loans, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply).  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

Section 4.03    Apportionment of Payments.  Subject to Section 2.02 hereof:

(a)    All payments of principal and interest in respect of outstanding Term Loans, all payments of fees (other than the fees set forth in Section 2.07 hereof) and all other payments in respect of

48

any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Term Loans, as designated by the Person making payment when the payment is made.

(b)    After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, subject to the provisions of this Agreement, (i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents and Lenders until paid in full; (ii) second, ratably to pay the interest then due and payable in respect of the Roll-Up Loans until paid in full; (iii) third, ratably to pay principal of, and Exit Fee relating to, the Roll-Up Loans until paid in full; (iv) fourth, ratably to pay interest then due and payable in respect of the Interim Term Loans and Final Term Loans until paid in full; (v) fifth, ratably to pay principal of, and Exit Fee relating to, the Interim Term Loans and Final Term Loans until paid in full; and (vi) sixth, ratably to the payment of all other Obligations until paid in full.

(c)    For purposes of Section 4.03(b) "paid in full" means payment in cash of all amounts owing under the Loan Documents (or under the Prepetition 1L Credit Agreement, as applicable) according to the terms thereof, including loan fees, service fees, professional fees, interest, default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d)    In the event of a direct conflict between the priority provisions of this Section 4.03 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of Section 4.03 shall control and govern.

Section 4.04    Defaulting Lenders.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 12.02.

(b)    The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by the Borrower to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Term Loans were funded by the other Lenders) or, if so directed by the Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Term Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrower as if such Defaulting Lender had made such Term Loans to the Borrower.  Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.

(c)    Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Administrative Agent to replace

49

the Defaulting Lender with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 12.07.

(d)     The operation of this Section shall not be construed to increase or otherwise affect the Term Loan Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by the Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(e)     This Section shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Borrower shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Term Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

## ARTICLE V

## CONDITIONS TO TERM LOANS

Section 5.01     Conditions Precedent to Effectiveness and Funding Interim Term Loans. This Agreement and the Lenders' obligation to make the Interim Term Loans shall become effective as of the Business Day (the "Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents (except as otherwise set forth in Schedule 7.01(r)):

(a)     Payment of Fees, Etc. The Borrower shall have paid on or before the Effective Date all fees, costs, expenses and taxes then due and payable pursuant to Section 2.07 and Section 12.04.

(b)     Representations and Warranties; No Event of Default. The following statements shall be true and correct: (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the Effective Date are true and correct on and as of the Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)     Legality.  The making (or deemed making) of the Interim Term Loans on the Effective Date shall not contravene any law, rule or regulation applicable to any Secured Party.

(d)     Delivery of Documents.  The Collateral Agent shall have received on or before the Effective Date the following, each in form and substance satisfactory to the Collateral Agent and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto:

(i)     the Security Agreement;

(ii)     evidence satisfactory to the Collateral Agent that the appropriate financing statements on form UCC-1 have been filed or will be filed contemporaneously with the funding of the Interim Term Loans, in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by the Security Agreement;

(iii)     the results of searches for any effective UCC financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, (x) which results shall not show any such Liens (other than Permitted Liens acceptable to the Collateral Agent) or (y) shall be accompanied by evidence reasonably satisfactory to the Collateral Agent that the Liens indicated in all such financing statements and other filings (or similar document) have been released or will be released on the Effective Date concurrently with the funding of the Loans hereunder;

(iv)     a Perfection Certificate;

(v)     evidence satisfactory to the Collateral Agent that the security interest created under the Mexican Security Agreements has been perfected and is enforceable vis-à-vis third parties in accordance with its terms, through the recordation of the Mexican Security Agreements, as applicable, in the *Registro Único de Garantías Mobiliarias*, or in the partners' or shareholders' registry, along with (y) the delivery to the Collateral Agent of the share titles (when applicable) and (z) a secretarial certificate thereof;

(vi)     [reserved];

(vii)     the Intercompany Subordination Agreement;

(viii)     a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document (or applicable equivalent) of each Loan Party certified as of a recent date not more than 30 days prior to the Effective Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of the Borrower, including, without limitation, Notices of Borrowing, SOFR Notices and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection

51

herewith and therewith, together with evidence of the incumbency of such authorized officers and (D) as to the matters set forth in Section 5.01(b), 5.01(c), 5.01(e), 5.01(f), 5.01(h) and 5.01(i);

(ix)    a certificate of an Authorized Officer of the Borrower certifying that (A) the attached copies of the Material Contracts as in effect on the Effective Date are true, complete and correct copies thereof and (B) such agreements remain in full force and effect and that, except as set forth in Schedule 6.01(w), none of the Loan Parties has breached or defaulted in any of its obligations under such agreements;

(x)    a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent such failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each Loan Party, certifying as of a recent date not more than 30 days prior to the Effective Date as to the subsistence in good standing of, and the payment of Taxes (other than as set forth on Schedule 6.01(j)) by, such Loan Party in such jurisdictions; and

(xi)    evidence of the insurance coverage required by Section 7.01 and the terms of each Security Agreement and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent may reasonably request, together with evidence of the payment of all premiums due in respect thereof for such period as the Collateral Agent may request.

(e)    <u>Material Adverse Effect</u>.  The Collateral Agent shall have determined, in its sole judgment, that no event or development shall have occurred since December 31, 2022 which could reasonably be expected to have a Material Adverse Effect, other than in connection with the Chapter 11 Cases or as disclosed on any Form 10-K, Form 10-Q or Form 8-K filed by Holdings with the SEC since December 31, 2022 and prior to the Petition Date.

(f)    <u>Approvals</u>.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Interim Term Loans on the Effective Date, or the conduct of the Loan Parties' business, or the consummation of any of the underlying transactions (other than, for the avoidance of doubt, the Final Order) shall have been obtained and shall be in full force and effect.

(g)    <u>Proceedings; Receipt of Documents</u>.  All proceedings in connection with the making of the Interim Term Loans and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Collateral Agent and its counsel, and the Collateral Agent and such counsel shall have received all such information and such counterpart originals or certified or other copies of such documents as the Collateral Agent or such counsel may reasonably request.

(h)    <u>Security Interests</u>.  The Loan Documents shall create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest in the Collateral secured thereby (subject only to Permitted Liens).

(i)    <u>Litigation</u>.  Except for the Chapter 11 Cases and the matters set forth on Schedule 6.01(j), there shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation) pending or threatened in any court or before any arbitrator or Governmental Authority which relates to the Term Loans or which, in the opinion of the Collateral Agent, is reasonably likely to be adversely determined, and that, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(j)      Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.02 hereof.

(k)      Patriot Act Compliance.  The Administrative Agent shall have received, at least two (2) Business Days prior to the Effective Date, a duly executed IRS Form W-9 (or other applicable tax form) of Holdings and the Borrower, and all documentation and other information with respect to the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act, that has been reasonably requested in writing by the Administrative Agent at least three (3) Business Days prior to the Effective Date.

(l)      CRO; Bank Accounts. The CRO has been appointed as the duly appointed chief restructuring officer of the Borrower and the other Loan Parties. All deposit and securities accounts owned by the Domestic Loan Parties shall have been updated to provide signing authority for the CRO.

(m)      Chapter 11 Matters.  Each of the following events or conditions shall have occurred or have been completed to the satisfaction of the Agents and Required Lenders:

(i)      The Administrative Agent and the Lenders shall have received the initial 13-Week Cash Flow Forecast for the 13-week period commencing on the Petition Date (such initial forecast attached as Exhibit G-1 hereto) and the Projected Daily Cash Flow Schedule for the two-week period commencing on the Petition Date (such initial schedule attached as Exhibit G-2 hereto), and such forecast and schedule shall be in form and substance satisfactory to the Agents and Required Lenders in their sole discretion;

(ii)      The Chapter 11 Cases shall have been commenced and all of the pleadings related to the requested "first day orders" shall be in form and substance reasonably satisfactory to the Required Lenders;

(iii)      On the Petition Date, the Loan Parties shall have filed motions seeking approval (x) of bid procedures in respect of the sale (the "Sale") of all or substantially all of the assets of the Loan Parties (the "Bid Procedures Motion"), and (y) for the sale of assets and equity of the Loan Parties as set forth in and pursuant to the Asset Purchase Agreement (the "Sale Motion"), all of which foregoing motions, and related relief being sought, to be in form and substance satisfactory to the Required Lenders in their sole discretion;

(iv)      All of the "first day orders" entered by the Bankruptcy Court on or about the Petition Date or the Effective Date (and if any such orders shall have not been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) regarding, relating to or impacting (x) (i) the Loan Parties' cash management systems and arrangements (such order, the "Cash Management Order"), (ii) any rights or remedies of the Agents, the Lenders, the Prepetition 1L Agents, and Prepetition 1L Lenders, (iii) this Agreement and the Prepetition 1L Credit Agreement, (iv) the Collateral, any Liens thereon or any DIP Superpriority Claims, (v) the use of cash collateral, (vi) adequate protection or otherwise relating to the Prepetition Obligations, or (vii) the relief sought in connection with the Bid Procedures Motion and the Sale Motion, shall, in each case, be in form and substance satisfactory to the Agents and the Required Lenders in their sole and absolute discretion, and (y) all other matters, shall, in each case, be in form and substance reasonably satisfactory to the Agents and the Required Lenders;

(v)      The amount of the Interim Term Loans to be made on or about the Effective Date shall not exceed the amount authorized by the Interim Order;

(vi)    The Bankruptcy Court shall have entered the Interim Order, and the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated;

(vii)    The Chapter 11 Cases of any of the Loan Parties shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code;

(viii)    All orders entered by the Bankruptcy Court pertaining to any payment of the Loan Parties' vendors, shippers, or other trade counterparties and all motions and other documents filed, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance reasonably satisfactory to the Required Lenders; and

(ix)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Loan Party shall have applied for, consented to or acquiesced in any such appointment.

Section 5.02    <u>Conditions Precedent to Final Term Loans</u>.  The obligation of the Lenders to make the Final Term Loans hereunder after the Effective Date is subject to satisfaction of the following conditions precedent:

(a)    <u>Payment of Fees, Etc.</u>  The Borrower shall have paid all fees, costs, expenses and material taxes then payable by the Borrower pursuant to this Agreement and the other Loan Documents, including, without limitation, Section 2.07 and Section 12.04 hereof.

(b)    <u>Representations and Warranties; No Event of Default</u>.  The following statements shall be true and correct, and the submission by the Borrower to the Administrative Agent of a Notice of Borrowing with respect to the Final Term Loans, and the Borrower's acceptance of the proceeds of such Term Loans, shall each be deemed to be a representation and warranty by each Loan Party on the date of such Term Loans that:  (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the date of such Term Loan are true and correct on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), (ii) at the time of and after giving effect to the making of such Term Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Term Loan to be made, on such date and (iii) the conditions set forth in this Section 5.02 have been satisfied as of the date of such request.

(c)    <u>Legality</u>.  The making of such Term Loans shall not contravene any law, rule or regulation applicable to any Secured Party.

(d)    <u>Notices</u>.  The Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.02 hereof.

(e)    <u>Proceedings; Receipt of Documents</u>.  All proceedings in connection with the making of such Term Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Agents and their counsel, and the Agents and such counsel shall have received such other agreements, instruments, approvals, opinions and other documents, each in form and substance satisfactory to the Agents, as any Agent may reasonably request.

(f)        Entry of Final Order.  Within 23 days of the Bankruptcy Court's entry of the Interim Order (subject to Bankruptcy Court availability), the Bankruptcy Court shall have entered the Final Order, and the Administrative Agent and the Lenders shall have received a true and complete copy of the Final Order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.

(g)        Compliance with Orders. The Loan Parties shall be in compliance in all material respects with the Bankruptcy Court DIP Orders.

(h)        Compliance with Asset Purchase Agreement. The Loan Parties shall be in compliance in all material respects with the Asset Purchase Agreement.

(i)        Bid Procedures Order.  Within 26 days of the Petition Date (subject to Bankruptcy Court availability), the Bankruptcy Court shall have entered an order approving the Bid Procedures Motion, which order shall be in form and substance acceptable to the Required Lenders in their sole discretion (the "Bid Procedures Order").

Section 5.03        Conditions Precedent to Withdrawals From Funding Account.    The Borrower may request a withdrawal of any amounts on deposit in the Funding Account subject to the fulfillment, in a manner satisfactory to the Administrative Agent in its sole discretion, of each of the following conditions precedent:

(a)        Payment of Fees, Etc.  The Borrower shall have paid (or shall, with the proceeds of such withdrawal, pay) all fees, costs, expenses and material taxes then payable by the Borrower pursuant to this Agreement and the other Loan Documents, including, without limitation, Section 2.07 and Section 12.04 hereof.

(b)        Representations and Warranties; No Event of Default.    The following statements shall be true and correct, and the submission by the Borrower to the Administrative Agent of a request for each withdrawal from the Funding Account, and the Borrower's acceptance of the proceeds of such withdrawal, shall each be deemed to be a representation and warranty by each Loan Party on the date of such withdrawal that:  (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the date of such withdrawal are true and correct on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), (ii) at the time of and after giving effect to the withdrawal and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from such withdrawal or application of the proceeds therefrom on such date and (iii) the conditions set forth in this Section 5.02 have been satisfied as of the date of such request.

(c)        Written Request.  The Collateral Agent shall have received a written request (which may be by electronic mail) for such withdrawal signed by the CRO that includes (i) reasonably detailed information as to the intended use of the proceeds of such withdrawal (which use shall be substantially consistent with the 13-Week Cash Flow Forecast as then in effect), (ii) the amount of the requested withdrawal, and (iii) the date of the requested withdrawal (which shall be no sooner than the two (2) Business Days following the date of such request (or such shorter period as the Administrative Agent may be willing to accommodate from time to time)).

(d)        Maximum Cash.  After giving effect to any such withdrawal, on a *pro forma* basis, the cash on the balance sheet of the Loan Parties (excluding, for the avoidance of doubt, the amount of any funds remaining in the Funding Account) shall not exceed $3,000,000.

(e)        Cash Accounts.  Any account owned by a Loan Party to which the proceeds of a withdrawal shall be wired shall have been updated to provide signing authority for the CRO.

(f)        Bankruptcy Court DIP Orders.  The Bankruptcy Court DIP Orders shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.

(g)        Compliance with Orders. The Loan Parties shall be in compliance in all material respects with the Bankruptcy Court DIP Orders.

Notwithstanding anything herein or in the other Loan Documents to the contrary, at any time following the occurrence of an Event of Default, the Collateral Agent may, and shall upon notice of the Required Lenders, cause all amounts on deposit in the Funding Account to be withdrawn and promptly thereafter applied to repay an equivalent amount of the Term Loans in accordance with the provisions of Section 4.03(b).

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01        Representations and Warranties.  Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a)        Organization, Good Standing, Etc. Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized or incorporated, validly existing and in good standing under the laws of the state or jurisdiction of its organization or incorporation, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrower, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing could not reasonably be expected to have a Material Adverse Effect.

(b)        Authorization, Etc.  Subject to entry of the Interim Order, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable Requirement of Law or (C) any Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties.

(c)        Governmental Approvals.  Except for entry of the Interim Order, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than (x) those which have been provided or obtained on or

prior to the Effective Date or (y) filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, on the Effective Date.

(d)  Enforceability of Loan Documents.  Upon entry of the Interim Order, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms.

(e)  Capitalization.  The authorized Equity Interests of Holdings and each of its Subsidiaries and the issued and outstanding Equity Interests of Holdings and each of its Subsidiaries are as set forth on Schedule 6.01(e).  All of the issued and outstanding shares of Equity Interests of Holdings and each of its Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  All Equity Interests of such Subsidiaries of Holdings are owned by Holdings free and clear of all Liens (other than Permitted Specified Liens).  Except as described on Schedule 6.01(e), there are no outstanding debt or equity securities of Holdings or any of its Subsidiaries and no outstanding obligations of Holdings or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from Holdings or any of its Subsidiaries, or other obligations of Holdings or any of its Subsidiaries to issue, directly or indirectly, any shares of Equity Interests of Holdings or any of its Subsidiaries.

(f)  Litigation.  Except as set forth in Schedule 6.01(f) and except for the Chapter 11 Cases, there is no pending or, to the knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby.

(g)  Financial Statements.

(i)  The Financial Statements, copies of which have been delivered to each Agent and each Lender, fairly present the consolidated financial condition of Holdings and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of Holdings and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with GAAP.  All material indebtedness and other liabilities (including, without limitation, Indebtedness, liabilities for taxes, long-term leases and other unusual forward or long-term commitments), direct or contingent, of Holdings and its Subsidiaries are set forth in the Financial Statements.  Since December 31, 2022, no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect, other than in connection with the Chapter 11 Cases or as disclosed on any Form 10-K, Form 10-Q or Form 8-K filed by Holdings with the SEC since December 31, 2022 and prior to the Petition Date.

(ii)  Holdings has heretofore furnished to each Agent and each Lender (A) projected monthly financial information of Holdings and its Subsidiaries for each fiscal month ending in the 2023 Fiscal Year, and (B) projected annual financial information for the 2023 Fiscal Year, which projected financial statements shall be updated from time to time pursuant to Section 7.01(a)(vii).

(h)  Compliance with Law, Etc.  No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any Requirement of Law, or (iii) any material term of any Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties, and no default or event of default has occurred and is continuing thereunder.

57

(i)      ERISA.  Except as set forth on Schedule 6.01(i), (i) each Loan Party and each Employee Plan and Pension Plan is in compliance with all Requirements of Law in all material respects, including ERISA, the Internal Revenue Code and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, (ii) no ERISA Event has occurred nor is reasonably expected to occur with respect to any Employee Plan, Pension Plan or Multiemployer Plan, (iii) copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan or Pension Plan have been delivered to the Agents, and (iv) each Employee Plan and Pension Plan that is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Internal Revenue Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Internal Revenue Code.  No Loan Party or any of its ERISA Affiliates has incurred any material liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due and which are unpaid with respect to a Pension Plan.  There are no pending or, to the best knowledge of any Loan Party, threatened material claims, actions, proceedings or lawsuits (other than claims for benefits in the ordinary course) asserted or instituted against (A) any Employee Plan, Pension Plan, or their respective assets, (B) any fiduciary with respect to any Employee Plan or Pension Plan, or (C) any Loan Party or any of its ERISA Affiliates with respect to any Employee Plan or Pension Plan.  Except as required by Section 4980B of the Internal Revenue Code, no Loan Party maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or has any obligation to provide any such benefits for any current employee after such employee's termination of employment.

(j)      Taxes, Etc.  (i) All United States federal and other material Tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been timely filed and (ii) all Taxes imposed upon any Loan Party or any property of any Loan Party which have become due and payable on or prior to the date hereof have been paid, except (A) the Unpaid Taxes and other unpaid Taxes in an aggregate amount at any one time outstanding not in excess of the amount for each of Holdings and its Subsidiaries as set forth on Schedule 6.01(j), and (B) Taxes contested in good faith by proper proceedings which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k)      Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Term Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l)      Nature of Business.  No Loan Party is engaged in any business other than as set forth on Schedule 6.01(l) hereto.

(m)     Adverse Agreements, Etc.  No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)      Permits, Etc.  Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations, including Environmental Permits, required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility

58

currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, including any such Environmental Permit, and there is no claim that any of the foregoing is not in full force and effect.

(o)    Properties.  Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except Permitted Liens.  All such properties and assets are in good working order and condition, ordinary wear and tear excepted.

(p)    Employee and Labor Matters.  Except as set forth on Schedule 6.01(p), (i) each Loan Party and its Subsidiaries is in compliance with all Requirements of Law in all material respects pertaining to employment and employment practices, terms and conditions of employment, wages and hours, and occupational safety and health, (ii) no Loan Party or any Subsidiary is party to any collective bargaining agreement, nor has any labor union been recognized as the representative of the employees of any Loan Party of Subsidiary, (iii) there is no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or any Subsidiary which arises out of or under any collective bargaining agreement, (iv) there has been no strike, work stoppage, slowdown, lockout, or other labor dispute pending or threatened against any Loan Party or any Subsidiary, and (v) to the knowledge of each Loan Party, no labor organization or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority. No Loan Party or Subsidiary has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or any similar Requirement of Law, which remains unpaid or unsatisfied.  All material payments due from any Loan Party or Subsidiary on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party or Subsidiary.

(q)    Environmental Matters.  Except as set forth on Schedule 6.01(q) hereto, (i) no Loan Party or any of its Subsidiaries is in violation of any Environmental Law, (ii) each Loan Party and each of its Subsidiaries has, and is in compliance with, all Environmental Permits for its respective operations and businesses, except to the extent any failure to have or be in compliance therewith could not reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (iii)  there has been no Release or threatened Release of Hazardous Materials on, in, at, under or from any properties currently or formerly owned, leased or operated by any Loan Party, its Subsidiaries or a respective predecessor in interest or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party, its Subsidiaries or any respective predecessor in interest, which in any case of the foregoing could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (iv) there are no pending or threatened Environmental Claims against, or Environmental Liability of, any Loan Party, its Subsidiaries or any respective predecessor in interest that could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (v) neither any Loan Party nor any of its Subsidiaries is performing or responsible for any Remedial Action that could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; and (vi) the Loan Parties have made available to the Collateral Agent and Lenders true and complete copies of all material environmental reports, audits and

investigations in the possession or control of any Loan Party or any of its Subsidiaries with respect to the operations and business of the Loan Parties and its Subsidiaries.

(r)    Insurance.  Each Loan Party maintains all insurance required by Section 7.01(h).  Schedule 6.01(r) sets forth a list of all such insurance maintained by or for the benefit of each Loan Party on the Effective Date.

(s)    Use of Proceeds.  The proceeds of the Term Loans will be used in accordance in all material respects with the terms of the Bankruptcy Court DIP Orders and the Loan Documents.  Specifically: (i) the Roll-Up Loans shall be deemed to have converted on a cashless, dollar-for-dollar basis Term Loans (as defined under the Prepetition 1L Credit Agreement) under the Prepetition 1L Credit Agreement on the date of entry of the Final Order; and (ii) the Interim Term Loans and Final Term Loans shall be used initially to fund the Funding Account (less any amounts permitted to be disbursed in accordance with Section 2.02(c)(ii)) and thereafter (x) to pay amounts due to the Lenders and the Agents hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the Lenders and the Agents, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (y) to pay administration costs of the Chapter 11 Cases, fund obligations benefiting from the Carve Out, and pay claims or amounts approved by the Bankruptcy Court, and (z) for working capital and general corporate purposes of the Loan Parties, subject in each case under this clause (ii) to the 13-Week Cash Flow Forecast (subject to Permitted Variances) as then in effect.  No part of the proceeds of any Term Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X, or for any purpose not permitted pursuant to the Bankruptcy Court DIP Orders.

(t)    13-Week Cash Flow Forecast and Projected Cash Flow Schedule.  Each 13-Week Cash Flow Forecast and Projected Daily Cash Flow Schedule was prepared and approved by the Financial Advisor in good faith based on assumptions believed by the Loan Parties to be reasonable at the time made and upon information believed by the Authorized Officers of the Loan Parties to have been reasonable based upon the information available at the time such 13-Week Cash Flow Forecast or Projected Daily Cash Flow Schedule was furnished.  On and after the delivery of any Variance Report in accordance with this Agreement, such Variance Report fairly represents, in all material respects, the information covered thereby.  To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the applicable 13-Week Cash Flow Forecast and Projected Daily Cash Flow Schedule.

(u)    Chapter 11 Matters.

(i)    The Bankruptcy Court DIP Orders are effective to (i) cause the Secured Obligations to be DIP Superpriority Claims, having the status and priority set forth in the Bankruptcy Court DIP Orders, subject to the Carve Out in all respects, and (ii) create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected first priority security interest (in accordance with the priorities set forth in the Bankruptcy Court DIP Orders) in the Collateral without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents.

(ii)    The Bankruptcy Court DIP Orders are in full force and effect, and have not been vacated, reversed, terminated, stayed, modified or amended in any manner.

(iii)    Upon the occurrence of the Final Maturity Date (whether by acceleration or otherwise), the Agents shall, subject to the terms of this Agreement and the applicable provisions of the

Bankruptcy Court DIP Orders, be entitled to immediate payment of the Obligations and to enforce the remedies provided for under this Agreement and the other Loan Documents in accordance with the terms hereof and thereof, in each case without further application to or order by the Bankruptcy Court.

(iv)    If the Bankruptcy Court DIP Orders are the subject of a pending appeal in any respect, none of the Bankruptcy Court DIP Orders, the extension of credit, or the performance by any Loan Party of any of its obligations under this Agreement or any of the other Loan Documents shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Agents and the Lenders shall be entitled to rely in good faith upon the Bankruptcy Court DIP Orders notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties, the Agents and the Lenders shall be permitted and required to perform their respective obligations in compliance with the Loan Documents notwithstanding any such objection or appeal, unless the Bankruptcy Court DIP Orders have been stayed by a court of competent jurisdiction.

(v)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Loan Party shall have applied for, consented to or acquiesced in any such appointment. No order has been entered in any of the Chapter 11 Cases to convert any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or to dismiss any of the Chapter 11 Cases.

(v)    <u>Intellectual Property</u>. Except as set forth on Schedule 6.01(u), each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Set forth on Schedule 6.01(u) is a complete and accurate list as of the Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party; (ii) each material work of authorship owned by each Loan party and which is not Registered Intellectual Property, and (iii) each Intellectual Property Contract to which each Loan Party is bound. No trademark or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened. To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed.

(w)    <u>Material Contracts</u>. Set forth on Schedule 6.01(w) is a complete and accurate list as of the Effective Date of all Material Contracts of each Loan Party, showing the parties and subject matter thereof and amendments and modifications thereto. Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Loan Party that is a party thereto and all other parties thereto in accordance with its terms, (ii) has not been otherwise amended or modified, and (iii) except as set forth in Schedule 6.01(w), is not in default due to the action of any Loan Party or, to the knowledge of any Loan Party, any other party thereto.

(x)    <u>Investment Company Act</u>. None of the Loan Parties is (i) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(y)    <u>Customers and Suppliers</u>. There exists no actual or threatened termination, cancellation or limitation of, or modification to or change in the business relationship between (i) any Loan

Party, on the one hand, and any material customer or any group thereof, on the other hand, or (ii) any Loan Party, on the one hand, and any material supplier or any group thereof, on the other hand, and there exists no present state of facts or circumstances that could reasonably be expected to give rise to or result in any such termination, cancellation, limitation, modification or change.

(z) <u>Security Interest in Collateral</u>. The provisions of the Bankruptcy Court DIP Orders create legal and valid Liens on all the Collateral in favor of the Collateral Agent, for its benefit and the benefit of the other Secured Parties. The Collateral Documents further evidence the legal and valid Liens on all the Collateral in favor of the Collateral Agent, for its benefit and the benefit of the other Secured Parties. Such Liens, upon (i) the entry by the Bankruptcy Court of the Interim Order, (ii) the filing of financing statements in appropriate form describing the Collateral as "all assets" or using language of similar import or otherwise containing a reasonable description of the Collateral in the offices specified in the Security Agreement, with respect to Collateral that may be perfected by the filing of a financing statement in such office and (iii) any other filings contemplated hereby and by the Collateral Documents, in each case, as applicable, constitute further evidence that such Liens are perfected and continuing Liens on the Collateral securing the Obligations, enforceable against the applicable Loan Party and all third parties, and having priority over all other Liens on the Collateral except Permitted Liens, to the extent any such Liens would have priority over the Liens in favor of the Collateral Agent pursuant to the Bankruptcy Court DIP Orders.

(aa) <u>Sanctions; Anti-Corruption and Anti-Money Laundering Laws</u>. None of any Loan Party, any Subsidiary thereof, any of their respective directors, officers, or employees, shareholders or owners, nor any of their respective agents or Affiliates, (i) is a Sanctioned Person or currently the subject or target of any Sanctions, (ii) has assets located in a Sanctioned Country, (iii) conducts any business with or for the benefit of any Sanctioned Person, (iv) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons, (v) is a "Foreign Shell Bank" within the meaning of the USA Patriot Act, i.e., a foreign bank that does not have a physical presence in any country and that is not affiliated with a bank that has a physical presence and an acceptable level of regulation and supervision, or (vi) is a Person that resides in or is organized under the laws of a jurisdiction designated by the United States Secretary of the Treasury under Section 311 or 312 of the USA Patriot Act as warranting special measures due to money laundering concerns. Each Loan Party and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by each Loan Party and its Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Anti-Corruption Laws and Anti-Money Laundering Law. Each Loan Party and each Subsidiary is in compliance with all Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws. Each Loan Party and each Affiliate, officer, employee or director acting on behalf of any Loan Party is (and is taking no action that would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA Patriot Act. In addition, no Loan Party or any Subsidiary is engaged in any kind of activities or business of or with any Person or in any country or territory that is subject to any sanctions administered by OFAC, the United Kingdom, the European Union, Germany, Canada, Australia or the United Nations.

(bb) <u>Anti-Bribery and Corruption</u>.

(i) Neither any Loan Party nor any Subsidiary thereof, nor, to the knowledge of any Loan Party, any director, officer, employee, or any other Person acting on behalf of any Loan Party, has offered, promised, paid, given or authorized the payment or giving of any money or other thing of value, directly or indirectly, to or for the benefit of any Person, including without limitation, any employee, official

or other Person acting on behalf of any Governmental Authority, or otherwise engaged in any activity that may violate any Anti-Corruption Law.

(ii)    Neither any Loan Party nor any Subsidiary thereof, nor, to the knowledge of any Loan Party, any director, officer, employee, or any other Person acting on behalf of any Loan Party, has engaged in any activity that would breach any Anti-Corruption Laws.

(iii)    To each Loan Party's knowledge and belief, there is no pending or threatened action, suit, proceeding or investigation before any court or other Governmental Authority against any Loan Party or any Subsidiary thereof or any of their directors, officers, employees or other Person acting on their behalf that relates to a potential violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions.

(iv)    The Loan Parties will not directly or indirectly use, lend or contribute the proceeds of the Advances for any purpose that would breach the Anti-Bribery and Corruption Laws.

(cc)    <u>Full Disclosure</u>.

(i)    Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrower's industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

(ii)    Projections have been prepared on a reasonable basis and in good faith based on assumptions, estimates, methods and tests that are believed by the Loan Parties to be reasonable at the time such Projections were prepared and information believed by the Loan Parties to have been accurate based upon the information available to the Loan Parties at the time such Projections were furnished to the Lenders, and Holdings is not be aware of any facts or information that would lead it to believe that such Projections are incorrect or misleading in any material respect; it being understood that (A) Projections are by their nature subject to significant uncertainties and contingencies, many of which are beyond the Loan Parties' control, (B) actual results may differ materially from the Projections and such variations may be material and (C) the Projections are not a guarantee of performance.

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS

Section 7.01    <u>Affirmative Covenants</u>. So long as any principal of or interest on any Term Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Term Loan Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)    <u>Reporting Requirements</u>. Furnish to each Agent and each Lender (and, in the case of clause (xx) below, also to FTI):

137438523_22

(i)        as soon as available, and in any event within thirty (30) days after the end of each fiscal month of Holdings and its Subsidiaries commencing with the fiscal month of Holdings and its Subsidiaries ending August 31, 2023, (x) internally prepared consolidated balance sheets, statements of operations and retained earnings and statements of cash flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year, and (B) the Projections, all in reasonable detail and certified by an Authorized Officer of Holdings as fairly presenting, in all material respects, the financial position of Holdings and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of Holdings and its Subsidiaries for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments, (y) a report of key performance indicators during such fiscal month with respect to the top 25 customers, headcount and billable utilization, as reasonably identified by Holdings, for the business of Holdings and its Subsidiaries, and any additional financial information as may be reasonably requested by the Administrative Agent, and (z) a Compliance Certificate;

(ii)        the following:

(A)        as soon as available and in any event within forty five (45) days after the end of each fiscal quarter of Holdings and its Subsidiaries commencing with the fiscal quarter of Holdings and its Subsidiaries ending September 30, 2023, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of Holdings and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of Holdings as fairly presenting, in all material respects, the financial position of Holdings and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of Holdings and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of Holdings and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments, and

(B)        no later than two (2) Business Days after the delivery of the financial information described in clause (ii)(A) above, a comparison of the financial information described in clause (ii)(A) to that in the Projections, and a report of key performance indicators during such fiscal quarter with respect to the top 25 customers, headcount and billable utilization, as reasonably identified by Holdings, for the business of Holdings and its Subsidiaries, and any additional financial information as may be reasonably requested by the Administrative Agent;

(iii)        the following

(A)        as soon as available, and in any event within ninety (90) days after the end of each Fiscal Year of Holdings and its Subsidiaries, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of Holdings and its Subsidiaries as at the end of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of a "Big Four" firm or another independent certified public accountant of recognized standing selected by Holdings and satisfactory to the

Agents (which report and opinion shall not include any qualification, exception or explanatory paragraph expressing substantial doubt about the ability of Holdings or any of its Subsidiaries to continue as a going concern or any qualification or exception as to the scope of such audit , and

(B)     no later than two (2) Business Days after the delivery of the financial information described in clause (iii)(A) above, a comparison of the financial information described in clause (iii)(A) to that in the Projections;

(iv)     no later than two (2) Business Days after the delivery of the financial statements of Holdings and its Subsidiaries required by clauses (ii) and (iii) of this Section 7.01(a), a Compliance Certificate:

(A)     stating that an Authorized Officer of the Borrower has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of Holdings and its Subsidiaries during the period covered by such financial statements with a view to determining whether Holdings and its Subsidiaries were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which Holdings and its Subsidiaries propose to take or have taken with respect thereto,

(B)     [reserved], and

(C)     in the case of the delivery of the financial statements of Holdings and its Subsidiaries required by (x) clause (iii) of this Section 7.01(a), attaching confirmation that there have been no changes to the information contained in each of the Perfection Certificates delivered on the Effective Date or the date of the most recently updated Perfection Certificate delivered pursuant to this Agreement, and/or attaching an updated Perfection Certificate identifying any such changes to the information contained therein, and (y) clause (ii) of this Section 7.01(a), attaching a summary of all material insurance coverage maintained as of the date thereof by any Loan Party or any of its Subsidiaries and evidence that such insurance meets the requirements set forth in Section 7.01(h), each Security Agreement and each Mortgage (or stating that there has been no change in the information most recently provided pursuant to this clause (C)(y)), together with such other related documents and information as the Administrative Agent may reasonably require;

(v)     as soon as available and in any event within 10 days after the end of each fiscal month of Holdings and its Subsidiaries commencing with the fiscal month of Holdings and its Subsidiaries ending August 31, 2023, reports in form and detail satisfactory to the Agents and certified by an Authorized Officer of the Borrower as being accurate and complete (but subject to final balance sheet adjustments) (A) listing all Accounts of the Loan Parties as of such day, which shall include the amount and age of each such Account, showing separately those which are more than 30, 60, 90 and 120 days old and a description of all Liens, set-offs, defenses and counterclaims with respect thereto, together with a reconciliation of such schedule with the schedule delivered to the Agents pursuant to this clause (v)(A) for the immediately preceding fiscal month, the name and mailing address of each Account Debtor with respect to each such Account and such other information as any Agent may request, (B) listing all Inventory of the Loan Parties as of each such day, and containing a breakdown of such Inventory by type and amount, the cost and the current market value thereof (by location), the date of acquisition, the warehouse and production facility location and such other information as any Agent may request, all in detail and in form

satisfactory to the Agents and (C) listing the cash balance in each deposit account of the Loan Parties as of the last day of such fiscal month;

(vi)     promptly following receipt from any Governmental Authority, any documents, notices, letters, or other correspondence of any kind relating to Unpaid Taxes or any other Tax liabilities of Holdings or any of its Subsidiaries in excess of $100,000 (or its equivalent in another currency or currencies);

(vii)     as soon as available and in any event not later than 60 days prior to the end of each Fiscal Year, a certificate of an Authorized Officer of Holdings (A) attaching Projections for Holdings and its Subsidiaries, supplementing and superseding the Projections previously required to be delivered pursuant to this Agreement, prepared on a monthly basis and otherwise in form and substance satisfactory to the Agents, for the immediately succeeding Fiscal Year for Holdings and its Subsidiaries and (B) certifying that the representations and warranties set forth in Section 6.01(bb)(ii) are true and correct with respect to the Projections;

(viii)     promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any Tax matters or investigation of any Loan Party other than (A) routine inquiries by such Governmental Authority and (B) inquiries and submissions made in the normal course of business;

(ix)     as soon as possible, and in any event within three (3) Business Days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(x)     as soon as possible and in any event: (A) within five (5) Business Days after a Loan Party has knowledge of the occurrence (or future occurrence) of any ERISA Event, notice of such ERISA Event (in reasonable detail), and (B) within 10 Business Days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to any Pension Plan, and (C) within 10 Business Days after any Loan Party sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party;

(xi)     promptly after the commencement thereof but in any event not later than five (5) days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator, in which the amount claimed therein is $500,000 (or its equivalent in another currency or currencies) or more in the aggregate for all such actions, suits or proceedings;

(xii)     as soon as possible and in any event within five (5) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with any Material Contract;

(xiii)     as soon as possible and in any event within five (5) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

137438523_22

(xiv)    as soon as possible and in any event within five (5) days after the delivery thereof to Holdings' Board of Directors, copies of all reports or other information so delivered in connection with a meeting of such Board of Directors (other than any such reports or other information that are subject to attorney-client or other legal privilege); provided, that, it is agreed that all such reports and other information are subject to Section 12.20;

(xv)    promptly after (A) the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange (including, without limitation, any statements, reports, filings, agreements, or other information that relate to any Equity Issuance) and (B) the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

(xvi)    promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xvii)    promptly upon request, any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming the Borrower's compliance with Section 7.02(r);

(xviii)    simultaneously with the delivery of the financial statements of Holdings and its Subsidiaries required by clauses (i), (ii) and (iii) of this Section 7.01(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.02(q), the consolidated financial statements of Holdings and its Subsidiaries delivered pursuant to clauses (i), (ii) and (iii) of this Section 7.01(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Agents;

(xix)    (A) (i) by 5:00 p.m. (New York City Time) on the Monday of each week (or, if such Monday is not a Business Day, the immediately succeeding Business Day), (I) a 13-week cash flow forecast of Holdings and its Subsidiaries (each, a "13-Week Cash Flow Forecast"), prepared by the Loan Parties' Financial Advisor, setting forth in reasonable detail all sources and uses of the Loan Parties' cash for the succeeding 13-week period and (II) a listing of all accounts payable balances of the Loan Parties as of one (1) Business Day immediately prior to the applicable reporting date, which shall include the amount and age of each such account payable and the name and mailing address of each account creditor, which deliverables, in each case of clauses (i)(I) and (II) above, shall be in form and substance satisfactory to the Required Lenders; and (ii) by 5:00 p.m. (New York City Time) on the Monday of each week (or, if such Monday is not a Business Day, the immediately succeeding Business Day), (I) a projected daily cash flow schedule of Holdings and its Subsidiaries (each, a "Projected Daily Cash Flow Schedule"), prepared by the Loan Parties' Financial Advisor, setting forth in reasonable detail all sources and uses of the Loan Parties' cash for the succeeding two-week period and (II) a calculation of the Qualified Cash of Holdings and its Subsidiaries as of such Monday, which deliverables, in each case of clauses (ii)(I) and (II) above, shall be in form and substance satisfactory to the Required Lenders; and (B) by 7:00 p.m. (New York City Time) on the third (3rd) Business Day after the end of each Testing Period, commencing with the Testing Period that ends on the last day of the third (3rd) Weekly Period after the Petition Date and weekly thereafter, a report (each, a "Variance Report") describing in reasonable detail the Loan Parties' actual aggregate cash receipts and actual aggregate cash disbursements during such Testing Period as compared to the projected aggregate cash receipts and projected aggregate cash disbursements set forth in the 13-Week Cash Flow Forecast as then applicable for such Testing Period (such comparison, the "Variance");

(xx)    as soon as possible and in any event within one (1) day after receipt thereof by any Loan Party, copies of any reports or other work product prepared by the Financial Advisor or the Investment Banker;

(xxi)    (A) promptly upon receipt or delivery thereof, copies of all material correspondence and notices submitted to or by any Loan Party or its advisors in respect of any potential financing or investment in the Loan Parties, (B) copies of all proposals for any such financings or investments in the Loan Parties, and (C) promptly upon request, any other information concerning such financings or investments as any Agent may from time to time reasonably request; and

(xxii)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party (including, without limitation, any Environmental, Social, and Corporate Governance information) as any Agent may from time to time may reasonably request.

(b)    <u>Additional Borrowers, Guarantors and Collateral Security</u>.  Cause:

(i)    each Subsidiary of any Loan Party not in existence on the Effective Date, or in existence on the Effective Date and not a debtor and debtor-in-possession in the Chapter 11 Cases on the Effective Date, to execute and deliver to the Collateral Agent promptly and in any event within 30 days after the formation, acquisition or change in status thereof, or within two (2) Business Days of becoming a debtor and debtor-in-possession in the Chapter 11 Cases (or such later date when the Bankruptcy Court approves such Subsidiary becoming a Borrower or Guarantor hereunder to the extent necessary), (A) a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Borrower or Guarantor, (B) a supplement to each relevant Security Agreement, together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of such Security Agreement, (2) undated stock powers for such Equity Interests executed in blank with signature guaranteed, and (3) such opinions of counsel as the Collateral Agent may reasonably request, (C) to the extent required under the terms of this Agreement, one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to Permitted Liens) on such real property and such other Real Property Deliverables as may be required by the Collateral Agent with respect to each such real property, (D) if such Subsidiary is organized under the laws of the United Mexican States, an amendment to the relevant Mexican Security Agreement, whereby the shareholders or partners of such Subsidiary pledge their shares or equity interest in such Subsidiary in the same terms as the applicable Mexican Security Agreement, (E) if such Subsidiary is organized under the laws of the United Mexican States, an additional Mexican Security Agreement, whereby such Subsidiary pledges its assets in the same terms as the applicable Mexican Security Agreement, and (F) such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreements or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations; and

(ii)    each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within 30 days after the formation or acquisition of such Subsidiary a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such Equity Interests executed in blank, (C) such opinions of counsel as the Collateral Agent may reasonably request and (D) such other agreements, instruments, approvals or other documents requested by the Collateral Agent.

(c)    <u>Compliance with Laws; Payment of Taxes</u>.

(i)    Comply, and cause each of its Subsidiaries to comply, with all Requirements of Law, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing); and

(ii)    Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all Taxes imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries, except (i) unpaid Taxes in an aggregate amount at any one time not in excess of $50,000 or such other amount for the applicable Loan Party as set forth on Schedule 6.01(j), and (ii) Taxes contested in good faith by proper proceedings which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(d)    <u>Preservation of Existence, Etc.</u>  Except to the extent necessary to comply with the terms of the Asset Purchase Agreement, maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (i) to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect or (ii) as otherwise permitted pursuant to Schedule 7.01(d).

(e)    <u>Keeping of Records and Books of Account</u>.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)    <u>Inspection Rights</u>.  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal business hours and with reasonable notice to the Borrower, at the expense of the Borrower, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants and advisors, and the independent accountants and advisors of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this Section 7.01(f).

(g)    <u>Maintenance of Properties, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except (i) to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect or (ii) as otherwise permitted pursuant to Schedule 7.01(d).

(h)    <u>Maintenance of Insurance</u>.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, cyber, hazard, flood, rent, worker's compensation and business interruption insurance) with respect to the Collateral and its other properties (including all real property

leased or owned by it) and business, in such amounts and covering such risks as is (i) carried generally in accordance with sound business practice by companies in similar businesses similarly situated, (ii) required by any Requirement of Law, (iii) required by any Material Contract and (iv) in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent. All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as their interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent for the benefit of the Agents and the Lenders, as their respective interests may appear, and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

        (i)      <u>Obtaining of Permits, Etc.</u> Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, in each case, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect.

        (j)      <u>Environmental</u>.

        (i)      Keep the Collateral free of any Environmental Lien;

        (ii)      Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all Environmental Permits that are necessary or useful in the proper conduct of its business, and comply, and cause each of its Subsidiaries to comply, with all Environmental Laws and Environmental Permits;

        (iii)      Take all commercially reasonable steps to prevent any Release or threatened Release of Hazardous Materials in violation of any Environmental Law or Environmental Permit at, in, on, under or from any property owned, leased or operated by any Loan Party or its Subsidiaries;

        (iv)      Provide the Collateral Agent with written notice within 10 days of any of the following: (A) discovery of any Release of a Hazardous Material or environmental condition at, in, on, under or from any property currently or formerly owned, leased or operated by any Loan Party, Subsidiary or predecessor in interest or any violation of Environmental Law or Environmental Permit that in any case could reasonably be expected to result in any material Environmental Claim or Environmental Liability; (B) notice that an Environmental Lien has been filed against any Collateral; or (C) an Environmental Claim or Environmental Liabilities; and provide such reports, documents and information as the Collateral Agent may reasonably request from time to time with respect to any of the foregoing.

70

(k)      Fiscal Year.  Cause the Fiscal Year of Holdings and its Subsidiaries to end on December 31 of each calendar year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)      Landlord Waivers; Collateral Access Agreements.  At any time any Collateral with a book value in excess of $50,000 (when aggregated with all other Collateral at the same location) is located on any real property of a Loan Party located in the United States (whether such real property is now existing or acquired after the Effective Date) which is not owned by a Loan Party, or is stored on the premises of a bailee, warehouseman, or similar party, upon the written request of the Collateral Agent, use its commercially reasonable efforts to obtain written subordinations or waivers or collateral access agreements, as the case may be, in form and substance satisfactory to the Collateral Agent.

(m)      After Acquired Real Property.  Upon the acquisition by it or any of its Subsidiaries after the date hereof of any interest (whether fee or leasehold) in any real property (wherever located) (each such interest being a "New Facility") with a Current Value (as defined below) in excess of $100,000 in the case of a fee interest immediately so notify the Collateral Agent, setting forth with specificity a description of the interest acquired, the location of the real property, any structures or improvements thereon and either an appraisal or such Loan Party's good-faith estimate of the current value of such real property (for purposes of this Section, the "Current Value").  The Collateral Agent shall notify such Loan Party whether it intends to require a Mortgage (and any other Real Property Deliverables or landlord's waiver (pursuant to Section 7.01(l) hereof) with respect to such New Facility.  Upon receipt of such notice requesting a Mortgage (and any other Real Property Deliverables) or landlord's waiver, the Person that has acquired such New Facility shall promptly furnish the same to the Collateral Agent.  The Borrower shall pay all fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Loan Party's obligations under this Section 7.01(m).

(n)      Anti-Corruption Laws; Anti-Money Laundering Laws; Sanctions.

(i)      Maintain, and cause each of its Subsidiaries to maintain, policies and procedures designed to promote compliance by each Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii)      Comply, and cause each of its Subsidiaries to comply, with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)      Neither Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee or any Person acting on behalf of any Loan Party will engage in any activity that would breach any Anti-Corruption Law.

(iv)      Promptly notify the Administrative Agent of any action, suit or investigations by any court or Governmental Authority in relation to an alleged breach of the Anti-Corruption Law.

(v)      Not directly or indirectly use, lend or contribute the proceeds of any Term Loan for any purpose that would breach any Anti-Corruption Law.

(vi)      Each Loan Party and Affiliate, officer, employee or  director, acting on behalf of the Loan Party is (and will take no action which would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other

71

reasonable internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA Patriot Act. In addition, none of the activities or business of any Loan Party includes any kind of activities or business of or with any Person or in any country or territory that is subject to any Sanctions.

(vii)    In order to comply with the "know your customer/borrower" requirements of the Anti-Money Laundering Laws, promptly provide to the Administrative Agent upon its reasonable request from time to time (A) information relating to individuals and entities affiliated with any Loan Party that maintain a business relationship with the Administrative Agent, and (B) such identifying information and documentation as may be available for such Loan Party in order to enable the Administrative Agent or any Lender to comply with Anti-Money Laundering Laws.

(o)    <u>Lender Meetings</u>.

(i)    Upon the request of any Agent or the Required Lenders, participate in a meeting with the Agents and the Lenders at Holdings' corporate offices (or at such other location as may be agreed to by the Borrower and such Agent or the Required Lenders) at such time as may be agreed to by the Borrower and such Agent or the Required Lenders to discuss the financial condition and results of operation of Holdings and its Subsidiaries.

(ii)    Notwithstanding the foregoing, each Tuesday (commencing on the Tuesday immediately succeeding the Petition Date) or, if such Tuesday is not a Business Day, then the next succeeding Business Day (or more frequently upon the reasonable request of any Agent or the Required Lenders), the Borrower shall, and shall cause each of (i) Holdings and senior management of Holdings and its Subsidiaries, (ii) the Investment Banker, (iii) the Approved Independent Director, (iv) the Financial Advisor, and (v) any other third party advisor retained to pursue financing alternatives, to participate in a meeting with the Agents and the Lenders at such time as may be agreed to by the Borrower and such Agent or the Required Lenders, to discuss Holdings' and its Subsidiaries' operations, financial position, the status of the Investment Banker's undertakings with respect to the IB Engagement, and compliance with the other terms of this Agreement

(p)    <u>Board Information Rights</u>. The Administrative Agent shall be timely notified of the time and place of any regular or special meetings (regular meetings shall be held no less than once per quarter) and will be given written notice of all proposed actions to be taken by the Board of Directors (or any relevant committee thereof) of Holdings (or its direct or indirect parent holding company) and any of its Subsidiaries at such meeting as if the Administrative Agent were a member thereof. Such notice shall describe in reasonable detail the nature and substance of the matters to be discussed and/or voted upon at such meeting (or the proposed actions to be taken by written consent without a meeting). The Administrative Agent shall have the right to, and shall, receive all information provided to the members of the Board of Directors or any similar group performing an executive oversight or similar function (or any relevant committee thereof) of Holdings (or its direct or indirect parent holding company) and any of its Subsidiaries in anticipation of or at such meeting (regular or special and whether telephonic or otherwise), in addition to copies of the records of the proceedings or minutes of such meeting, when provided to the members other than such information subject to attorney-client or other legal privilege; provided that, the Administrative Agent shall keep such materials and information confidential in accordance with Section 12.20 of this Agreement.

(q)    <u>Further Assurances</u>. Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents,

72

(ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Loan Party (i) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

(r)      <u>Post-Closing Matters</u>. Execute and deliver the documents and comply with the requirements set forth on Schedule 7.01(r), in each case within the time limits specified on such schedule.

(s)      <u>Financial Advisor; Investment Banker; Independent Director</u>.

(i)      The Loan Parties shall seek to retain (and, upon retention, continue to retain) a financial advisor reasonably acceptable to the Administrative Agent and Required Lenders (the "<u>Financial Advisor</u>") (it being understand that Teneo is acceptable to the Agents and Required Lenders).

(ii)      (A) Holdings shall continue to have on its board of directors at least one independent director acceptable to the Agents and Required Lenders (it being understood that Patrick Bartels is acceptable to the Agents and Required Lenders, the "<u>Approved Independent Director</u>")); (B) other than as set forth in clause (D) below, each other Loan Party that is a limited liability company shall continue to have as its sole manager (directly or, in the case of a member managed company, indirectly) the Approved Independent Director; (C) other than as set forth in clause (D) below, each other Loan Party that is a corporation shall continue to have as its sole director the Approved Independent Director; and (D) as to any Loan Party organized and existing under the laws of the United Mexican States, the Loan Parties shall cause the appointment thereto of the Approved Independent Director as the sole director (or sole manager, as applicable) upon the written demand of the Administrative Agent. Holdings shall not, and shall not permit any other Loan Party to, take any action or fail to take any action that would as a result thereby modify any Approved Independent Director's powers at any of the Loan Parties from such powers as existed on the Effective Date (other than in compliance with the foregoing clause (D)).

(iii)      The Loan Parties shall seek to retain (and, upon retention, continue to retain) an investment banker (the "<u>Investment Banker</u>") reasonably acceptable to the Agents and Required Lenders and on terms acceptable to the Agents and Required Lenders. Such Investment Banker shall be retained for the purposes set forth in its retention agreement (in form and substance acceptable to the Agents and Required Lenders), which shall include undertaking the preparation for a potential transaction involving Holdings and its Subsidiaries (the "<u>IB Engagement</u>"). In furtherance of the purposes of the retention of the Investment Banker, the Loan Parties shall (A) promptly following requests therefor, furnish to the Investment Banker all information and documentation (financial and otherwise) relating to Holdings and its Subsidiaries reasonably requested by the Investment Banker, and (B) from time to time make available to the Investment Banker, upon reasonable advance notice and at reasonable times, members of senior management of Holdings and its Subsidiaries as requested by the Investment Banker for a reasonable number of meetings and conferences calls, which members of senior management shall engage in such meetings and calls in good faith to assist the Investment Banker in respect of the IB Engagement

(t)        [Reserved].

(u)        <u>Financial Advisor</u>.  The Loan Parties shall (i) promptly following requests therefor, furnish to the Financial Advisor all information and documentation relating to management (which, for the avoidance of doubt, will not be limited to senior management) of Holdings and its Subsidiaries, and (ii) from time to time make available to the Financial Advisor, upon reasonable advance notice and at reasonable times, all members of management (senior or otherwise) of Holdings and its Subsidiaries as requested by the Financial Advisor or any Agent for a reasonable number of meetings and conference calls, which members of management shall engage in such meetings and calls in good faith.

(v)        <u>Access for FTI</u>. The Loan Parties shall provide FTI Consulting ("<u>FTI</u>"), as financial advisor to counsel to the Agents and Lenders, all reasonably requested financial, operating, and other information relating to the Loan Parties and their businesses, and shall cause the Loan Parties' management, the Approved Independent Director, and the Financial Advisor to be available to FTI in connection with FTI's review and assessment of the Loan Parties' financial position, operations, forecasts, and businesses.

(w)        <u>Certain Bankruptcy Matters.</u>

(i)        use its reasonable best efforts to cause all proposed (A) "first day" orders and "second day" orders, (B) orders relating to or affecting the Term Loans and other Obligations and the Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (C) orders concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Bankruptcy Rules, and (D) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Loan Parties, in each case to be in accordance with and permitted by the terms of this Agreement and in form and substance reasonably satisfactory to the Required Lenders;

(ii)        comply in all material respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases;

(iii)        comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court;

(iv)        other than in connection with exigent circumstances whereby the Loan Parties have less than three (3) Business Days' knowledge of a filing due, at least three (3) Business Days prior to the filing thereof, provide copies to the Administrative Agent of all motions, pleadings, applications, judicial information, financial information and any other documents contemplated to be filed by the Loans Parties with the Bankruptcy Court, and receive and accept (to the extent reasonable) all comments thereto provided by the Administrative Agent; and

(v)        promptly provide the Administrative Agent with updates of any material developments in connection with the Chapter 11 Cases, whether in connection with the marketing of the Loan Parties' assets, the formulation of bidding procedures, an auction plan, and documents related thereto, or otherwise. Without limiting the foregoing, promptly upon any such information becoming available to the Loan Parties, each Loan Party shall provide the Administrative Agent with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports and

updated information relating to the sale of assets, and copies of all drafts of proposed sale documentation, any such bids and any updates, modifications or supplements to such information and materials. Notwithstanding the foregoing, to the extent the Administrative Agent or an affiliate thereof submits a bid for substantially all of the Loan Parties' assets, the Loan Parties shall only provide information regarding the sale process that would not be deemed to provide preferential treatment to such bidder; provided that, for the avoidance of doubt, information regarding the number and identity of the parties contacted and the overview of the marketing efforts undertaken in connection with the sale process shall not be deemed to provide preferential treatment and shall be disclosed, and provided further that, if at any time, the Administrative Agent is not part of the sale process, then the Loan Parties shall provide full and complete information regarding the sale process to the Administrative Agent.

(x)     Milestones.  By the times specified on Schedule 7.01(x) hereto, pursue and comply with each of the milestones set forth on Schedule 7.01(x) hereto (each a "Milestone" and, collectively, the "Milestones").

(y)     Excess Cash Balances.  If, during any period of two (2) consecutive Business Days, Holdings and its Subsidiaries, taken together, have more than $3,000,000 of cash on their balance sheet, repay to the Funding Account an amount equal to such excess.

Section 7.02     Negative Covenants.  So long as any principal of or interest on any Term Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Term Loan Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)     Liens, Etc.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any Requirement of Law of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof) other than, as to all of the above, Permitted Liens.

(b)     Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c)     Fundamental Changes; Dispositions.

(i)     Other than as may be permitted pursuant to Schedule 7.02(c), wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, including by means of a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, or permit any of its Subsidiaries to do (or agree to do) any of the foregoing;

(ii)     Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions;

(iii)     Form or create any Subsidiary unless (A) the Consenting Group has consented to such formation or creation and (B) such Subsidiary is (i) a Domestic Subsidiary or (ii) a

75

Foreign Subsidiary formed under the laws of the United Mexican States and owned by two or more Domestic Subsidiaries (other than AN USA) that are either the Borrower or a Guarantor, and in each case such Subsidiary becomes a Guarantor and the Borrower complies with the requirements of Section 7.01(b) at the time of formation or creation of such Subsidiary; and

(iv)    Retain new employees, or terminate any existing employees, unless with the prior consent of the Consenting Group.

(d)    <u>Change in Nature of Business.</u>  Other than as may be permitted pursuant to Schedule 7.02(d), make or permit any of its Subsidiaries to make, any change in the nature of its business as described in **Error! Reference source not found.**.

(e)    <u>Term Loans, Advances, Investments, Etc.</u>  Make or commit or agree to make, or permit any of its Subsidiaries make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f)    <u>Sale and Leaseback Transactions</u>.  Enter into, or permit any of its Subsidiaries to enter into, any Sale and Leaseback Transaction.

(g)    [Reserved].

(h)    <u>Restricted Payments</u>.  Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i)    <u>Federal Reserve Regulations</u>.  Permit any Term Loan or the proceeds of any Term Loan under this Agreement to be used for any purpose that would cause such Term Loan to be a margin loan under the provisions of Regulation T, U or X of the Board.

(j)    <u>Transactions with Affiliates</u>.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) transactions (other than any transactions between Holdings and its Subsidiaries, on the one hand, and any of the Mexican Loan Parties or AN USA, on the other hand) consummated in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and that are fully disclosed to the Agents prior to the consummation thereof, if they involve one or more payments by Holdings or any of its Subsidiaries in excess of $100,000 for any single transaction or series of related transactions, (ii) transactions with another Loan Party (other than any of the Mexican Loan Parties and AN USA); (iii)  transactions permitted by Section 7.02(b), Section 7.02(e) and Section 7.02(h), (iv) sales of Qualified Equity Interests of Holdings to Affiliates of Holdings not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith, (v) transactions by any Mexican Loan Party with another Mexican Loan Party or AN USA, and (vi) reasonable and customary director and officer compensation (including bonuses and stock option programs), benefits and indemnification arrangements, in each case approved by the Board of Directors (or a committee thereof) of such Loan Party or such Subsidiary.  Notwithstanding anything herein to the contrary, no entry into, renewal, or extension of any transaction or series of related transaction (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) shall be permitted among any of Holdings or its Subsidiaries (other than the Mexican Loan Parties

and AN USA), on the one hand, and the Mexican Loan Parties or AN USA, on the other hand, other than as may be expressly required by the Asset Purchase Agreement and Permitted Intercompany Investments.

(k)     <u>Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries</u>.  Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; <u>provided</u>, <u>however</u>, that nothing in any of clauses (i) through (iv) of this Section 7.02(k) shall prohibit or restrict compliance with:

(A)     this Agreement and the other Loan Documents;

(B)     any agreement in effect on the date of this Agreement and described on Schedule 7.02(k), or any extension, replacement or continuation of any such agreement; <u>provided</u>, that, any such encumbrance or restriction contained in such extended, replaced or continued agreement is no less favorable to the Agents and the Lenders than the encumbrance or restriction under or pursuant to the agreement so extended, replaced or continued;

(C)     any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

(D)     in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset sale agreement or similar contract for the conveyance of such property or asset and (2) instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto;

(E)     customary restrictions on dispositions of real property interests in reciprocal easement agreements;

(F)     customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets; or

(G)     customary restrictions in contracts that prohibit the assignment of such contract.

(l)     <u>Limitations on Negative Pledges</u>.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement and the other Loan Documents, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(b) of this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such

sale or other disposition; <u>provided</u> that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, and (iv) customary provisions in leases restricting the assignment or sublet thereof.

      (m)      <u>Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.</u>

      (i)      Amend, modify, grant any waiver or release under or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification, waiver, release or change would shorten the final maturity or average life to maturity of, or require any payment to be made (other than any payment to be made in Equity Interests consisting of common stock) earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would add any covenant or event of default, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any material respect;

      (ii)      except for payments approved by the Bankruptcy Court DIP Orders,

      (A)      make any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Prepetition Indebtedness,

      (B)      refund, refinance, replace or exchange any other Indebtedness for any such Prepetition Indebtedness,

      (C)      make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Existing Warrants, the Exitus Indebtedness or the AGS Indebtedness, or

      (D)      make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing;

      (iii)      amend, modify or otherwise change any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity Interests (including any shareholders' agreement), or enter into any new agreement with respect to any of its Equity Interests, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iii) that either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, <u>provided</u> that no such amendment, modification or change or new agreement or arrangement shall provide for any plan of division pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any similar statute or provision under applicable law); or

      (iv)      agree to any amendment, modification or other change to or waiver of any of its rights under any Material Contract if such amendment, modification, change or waiver would be materially adverse to any Loan Party or any of its Subsidiaries or the Agents and the Lenders.

(n)      Investment Company Act of 1940.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o)      ERISA.  (i) Cause or fail to prevent, or permit any of its ERISA Affiliates to cause or fail to prevent, an ERISA Event that individually or in the aggregate has, or could reasonably be expected to have a Material Adverse Effect, or (ii) adopt any employee welfare benefit plan within the meaning of Section 3(1) of ERISA that provides retiree medical benefits to employees after termination of employment other than as required by Section 601 of ERISA or other Requirements of Law.

(p)      Environmental.  Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials on, in, at, under or from any property owned, leased or operated by it or any of its Subsidiaries, except in compliance with Environmental Laws .

(q)      Accounting Methods.  Modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r)      Sanctioned Persons; Anti-Corruption Laws; Anti-Money Laundering Laws.

(i)      Conduct, nor permit any of its Subsidiaries to conduct, any business or engage in any transaction or deal with or for the benefit of any Sanctioned Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Sanctioned Person; or

(ii)      Use, nor permit any of its Subsidiaries to use, directly or indirectly, any of the proceeds of any Term Loan, (A) to fund any activities or business of or with any Sanctioned Person or in any other manner that would result in a violation of any Sanctions by any Person (including by any Person participating in any Term Loan, whether as underwriter, advisor, investor or otherwise), or (B) for the purpose of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law.

Section 7.03      Permitted Variances. So long as any principal of or interest on any Term Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Term Loan Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing: permit a Variance during any Testing Period (i) in respect of the total aggregate amount of Operating Disbursements to be more than 10% in excess of the amount of Operating Disbursements forecasted in the 13-Week Cash Flow Forecast applicable during such Testing Period or (ii) in respect of the aggregate cash receipts to be less than 90% of the aggregate cash receipts forecasted in the 13-Week Cash Flow Forecast applicable during such Testing Period. Any Variance that does not exceed the Variance permitted pursuant to the foregoing clauses (i) and (ii) shall be referred to herein as a "Permitted Variance".

Section 7.04      Additional Bankruptcy Matters. So long as any principal of or interest on any Term Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Term Loan Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

79

(a) Use any portion or proceeds of the Term Loans or the Collateral, or disbursements set forth in the 13-Week Cash Flow Forecast, for payments or purposes that would violate the terms of the Interim Order or the Final Order.

(b) Incur, create, assume, suffer to exist or permit (or file an application for approval of) any other superpriority administrative claim which is pari passu with or senior to the claim of the Secured Parties against any Loan Party, except for the Carve Out or as otherwise expressly permitted by the Bankruptcy Court Orders.

(c) Subject to the Bankruptcy Court DIP Orders, assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties.

(d) Seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents.

(e) Subject to the terms of the Bankruptcy Court DIP Orders, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent, or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (provided that any Loan Party may raise any issue permitted under the terms of the Bankruptcy Court DIP Orders).

(f) Except (i) as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement) or (ii) with the prior consent of the Administrative Agent, make any payment or distribution to any non-Loan Party Affiliate, Mexican Loan Party or insider of any Loan Party unless otherwise contemplated in the 13-Week Cash Flow Forecast.

(g) Make or permit to be made any change to the Bankruptcy Court DIP Orders without the consent of the Administrative Agent.

(h) File or pursue or support any other Person in filing or pursuing any Plan of Reorganization or other chapter 11 plan or disclosure statement in respect of any Loan Party that does not provide for the repayment of the Prepetition 1L Obligations and the Obligations in full and in cash on the effective date of such Plan of Reorganization.

(i) Without the consent of the Administrative Agent, move to assume or reject any material lease, material license or other material contract of any Loan Party pursuant to Section 365 of the Bankruptcy Code;

(j) Except where not reasonably practicable, fail to provide prior notice and copies to the Administrative Agent of any material motions or other material documents to be filed with the Bankruptcy Court.

## ARTICLE VIII

## CASH MANAGEMENT ARRANGEMENTS
## AND OTHER COLLATERAL MATTERS

Section 8.01    Cash Management Arrangements.  (a)  The Loan Parties shall (i) establish and maintain cash management services of a type and on terms reasonably satisfactory to the Agents at one or more of the banks set forth on Schedule 8.01 (each a "Cash Management Bank") and (ii) except as otherwise provided under **Error! Reference source not found.**, deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral, all Collections (of a nature susceptible to a deposit in a bank account) and all other amounts received by any Loan Party (including payments made by Account Debtors directly to any Loan Party) into a Cash Management Account.

(b)    The Domestic Loan Parties shall not maintain, and shall not permit any of their Domestic Subsidiaries to maintain, cash, Cash Equivalents or other amounts in any deposit account or securities account (other than Excluded Accounts and the Funding Account), other than deposit accounts and securities accounts (i) that are subject to the Lien of the Secured Parties, (ii) that are identified on Schedule 8.01 (as amended from time to time pursuant to Section 8.01(d)) and (iii) over which the CRO has signing authority.

(c)    Upon the terms and subject to the conditions set forth in a Control Agreement with respect to a Cash Management Account (other than Petty Cash Accounts), all amounts received in such Cash Management Account shall at the Administrative Agent's direction be wired each Business Day into the Administrative Agent's Accounts, except that, so long as no Event of Default has occurred and is continuing, the Administrative Agent will not direct the applicable Cash Management Bank to transfer funds in such Cash Management Account to the Administrative Agent's Accounts.

(d)    So long as no Default or Event of Default has occurred and is continuing, the Borrower may amend Schedule 8.01 to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, each Loan Party and such prospective Cash Management Bank shall have executed and delivered to the Collateral Agent a Control Agreement with respect to such Cash Management Account (other than a Petty Cash Account).  Each Loan Party shall close any of its Cash Management Accounts (and establish replacement cash management accounts in accordance with the foregoing sentence) promptly and in any event within 30 days of notice from the Collateral Agent that the creditworthiness of any Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment, or that the operating performance, funds transfer, or availability procedures or performance of such Cash Management Bank with respect to Cash Management Accounts or the Collateral Agent's liability under any Control Agreement with such Cash Management Bank is no longer acceptable in the Collateral Agent's reasonable judgment.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01    Events of Default.  Each of the following events shall constitute an event of default (each, an "Event of Default"):

(a)        the Borrower shall fail to pay, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (i) any interest on any Term Loan, or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Term Loans) or any other Loan Document, and such failure continues for a period of three (3) Business Days or (ii) all or any portion of the principal of the Term Loans;

(b)        any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)        any Loan Party shall fail to perform or comply with any covenant or agreement contained in (i) Sections 7.01(a) - Section 7.01(d), Section 7.01(f), Section 7.01(h), Section 7.01(k) - Section 7.01(m), Section 7.01(o), (r), (s), or (u) - (y), Section 7.02, Section 7.03 or Article VIII, or (ii) any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party or any Mortgage to which it is a party and such failure, in the case of this clause (c)(ii) shall remain unremedied for two (2) Business Days;

(d)        any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 9.01, such failure, if capable of being remedied, shall remain unremedied for fifteen (15) days after the earlier of the date a senior officer of any Loan Party has knowledge of such failure and the date written notice of such default shall have been given by any Agent to such Loan Party;

(e)        Holdings or any of its Subsidiaries shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of Indebtedness (excluding Indebtedness evidenced by this Agreement and excluding Indebtedness under which the payment or remedies are subject to the automatic stay under Section 362 of the Bankruptcy Code and are stayed (but only for so long as such stay is in effect)), which Indebtedness is in an aggregate amount at least $100,000, and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)        except the Chapter 11 Cases, any of Holdings' Foreign Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any non-United States Debtor Relief Laws, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall make a general assignment for the benefit of creditors, or (iii) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

137438523_22

(g)        except the Chapter 11 Cases, any proceeding shall be instituted against any of Holdings' Foreign Subsidiaries seeking to adjudicate it under non-United States Debtor Relief Laws a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of fifteen (15) days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h)        any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any Loan Party that is party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)        the Bankruptcy Court DIP Orders, any Security Agreement, any Mortgage or any other Collateral Document, after entry or delivery thereof, shall for any reason, on and after the entry of the Interim Order, fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, senior-most Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(j)        one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $100,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against Holdings or any of its Subsidiaries and remain unsatisfied (unless such judgment, order, or award is subject to the automatic stay under Section 362 of the Bankruptcy Code and only for so long such stay remains in effect) and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of ten (10) consecutive days (or, in the  case of a Foreign Subsidiary, a period of ten (10) consecutive Business Days) after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;

(k)        Holdings or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for more than ten (10) days;

(l)        any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than ten (10) consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(m)        the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by Holdings or any of its Subsidiaries, if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(n)        the indictment, or the threatened indictment of Holdings or any of its Subsidiaries or any senior officer thereof under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against Holdings or any of its Subsidiaries or any senior officer thereof, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of Holdings or any such Subsidiary or any property that such senior officer holds in his or her capacity as an officer;

(o)        (i) there shall occur one or more ERISA Events that individually or in the aggregate results in, or could reasonably be expected to result in liability of any Loan Party or any of its ERISA Affiliates in excess of $500,000, or (ii) there exists any fact or circumstance that could reasonably be expected to result in the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA upon the property or rights to property of any Loan Party or any of its ERISA Affiliates;

(p)        any Variance shall exceed the Permitted Variance; or

(q)        any Loan Party shall file a motion in the Chapter 11 Cases to obtain additional financing from a party other than the Lenders under Section 364(c) or (d) of the Bankruptcy Code that (i) is not permitted under Section 7.02(b) and (ii) does not commit to provide for the payment of the Obligations and the Prepetition 1L Obligations in full and in cash upon the incurrence of such additional financing; or

(r)        any Loan Party shall file a motion seeking an order (i) approving payment of any claim that arose prior to the Petition Date other than (x) as provided for in the "first day" or "second day" orders approved by the Required Lenders, (y) as contemplated by the 13-Week Cash Flow Forecast (including Permitted Variances) as then in effect, or (z) to the extent otherwise consented to by the Required Lenders in writing, (ii) granting relief from the automatic stay under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets, or (iii) except with respect to the Prepetition 1L Obligations as provided in the Bankruptcy Court DIP Orders, approving any settlement or other stipulation not approved by the Required Lenders and not included in the 13-Week Cash Flow Forecast as then in effect with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor; or

(s)        an order is entered in any of the Chapter 11 Cases appointing, or any Loan Party, or any Subsidiary of a Loan Party shall file an application for an order seeking the appointment of, (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(t)        an order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the Term Loan Commitments, and payment in full in cash of all Obligations (other than contingent indemnification obligations as to which no claim has been asserted) of the Loan Parties hereunder and under the other Loan Documents upon entry thereof; or

(u)        an order is entered by the Bankruptcy Court in any of the Chapter 11 Cases (i) to revoke, reverse, stay, modify, supplement or amend the Bankruptcy Court DIP Orders, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever), in each case other than the Carve Out, to have administrative priority as to the Loan Parties equal or superior to the priority of the DIP Superpriority Claim shall be entered by the Bankruptcy Court, or (iii) dismissing

84

any of the Chapter 11 Cases which does not contain a provision for termination of all Term Loan Commitments, and payment in cash in full of all Obligations (other than contingent indemnification obligations as to which no claim has been asserted) of the Loan Parties hereunder and under the other Loan Documents upon entry thereof; or

    (v)  any Loan Party violates any term, provision or condition in the Bankruptcy Court DIP Orders; or

    (w)  the entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or

    (x)  an application for any of the orders described in Sections 8.01(s) - (w) shall be made by a Person (including, for the avoidance of doubt, the Loan Parties) and such application is not contested by the Loan Parties in good faith or such Person actually obtains entry of an order of the Bankruptcy Court; or

    (y)  any Loan Party shall pay any claim that arose prior to the Petition Date other than (i) as permitted by any "first day" or "second day" order entered by the Bankruptcy Court on or prior to the Effective Date or (ii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Required Lenders, in each case consistent with the 13-Week Cash Flow Forecast; or

    (z)  the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole); or

    (aa)  (i) any Loan Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests relating to the Prepetition 1L Obligations or of the Collateral Agent, the Administrative Agent, and/or the Lenders, or the claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code or (ii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Collateral Agent, the Administrative Agent and/or the Lenders created by any of the Bankruptcy Court DIP Orders, this Agreement, or any Collateral Document, or created in connection with the Prepetition 1L Obligations; or

    (bb)  any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party) any other Person's motion to, (i) disallow in whole or in part, the Agents' and Lenders' claim in respect of the Obligations or contest any material provision of any Loan Document, or (ii) disallow in whole or in part, any claims in respect of the Prepetition 1L Obligations or contest any material provision of any "Loan Documents" (as defined in the Prepetition 1L Credit Agreement); or

    (cc)  the failure of the Borrower to timely satisfy any of the Milestones; or

    (dd)  any Loan Party or any of its Subsidiaries seeks entry of an order approving or attempts to consummate a sale of substantially all of its assets, or a material portion thereof, via a Plan of Reorganization or a section 363 sale without the prior written consent of the Required Lenders (which may be given or withheld in such Lenders' sole discretion); or

(ee)        there shall be any Plan of Reorganization confirmed in the Chapter 11 Cases that does not provide for the repayment of the Prepetition 1L Obligations and the Obligations in full and in cash on the effective date of such Plan of Reorganization; or

(ff)        any Loan Party, or any Person claiming by or through the Loan Parties or any of their Subsidiaries, shall (x) obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Administrative Agent or any Lender (in any of their respective capacities as such) relating to the Term Loans or the Loan Documents, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against such Agent or such Lender, in their capacities as such or (y) file, assist or otherwise participate in any pleading that, if the relief requested therein were granted, would result in an Event of Default; or

(gg)        the Bankruptcy Court shall enter any order to materially limit, restrict, curtail, reduce, suspend, stay or enjoin the right of the Buyer (as defined in the Asset Purchase Agreement) to credit bid the Obligations or Prepetition 1L Obligations; or

(hh)        the Lenders or Prepetition 1L Lenders are not permitted to credit bid at any auction in the Chapter 11 Cases; or

(ii)        any of the Loan Parties shall (i) fail to comply with the Asset Purchase Agreement in any material respect or (ii) amend the Asset Purchase Agreement in a manner that is adverse to the interests of the Lenders without prior written consent of the Administrative Agent; or

(jj)        the Roll-Up Loans shall not be approved upon entry of the Final Order; or

(kk)        any Mexican Governmental Authority shall file a Lien against any Mexican Loan Party or any of its property or assets; or

(ll)        any termination of the Asset Purchase Agreement (unless such termination results from the approval by the Bankruptcy Court in its Sale Order (as defined in Schedule 7.01(x)) of an asset purchase agreement or other acquisition agreement with a winning bidder other than the Buyer (as defined in the Asset Purchase Agreement));

then, and in any such event, the Collateral Agent may, and shall at the request of the Required Lenders, by notice to the Borrower, (i) terminate the Term Loan Commitments, whereupon all Term Loan Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Term Loans then outstanding to be accelerated and due and payable, whereupon all or such portion of the aggregate principal of all Term Loans, all accrued and unpaid interest thereon and all fees and other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 9.01 with respect to any Foreign Subsidiary of Holdings, without any notice to any Loan Party or any other Person or any act by any Agent or any Lender, all Commitments shall automatically terminate and all Term Loans then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents shall be accelerated and become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Loan Party.

## ARTICLE X

## AGENTS

Section 10.01    Appointment.    Each Lender (and each subsequent maker of any Term Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including:  (i) to receive on behalf of each Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Term Loans on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Term Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Term Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) shall be binding upon all Lenders and all makers of Term Loans; provided, however, the Agents shall not be required to take any action which, in the reasonable opinion of any Agent, exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 10.02    Nature of Duties; Delegation.    (a)  The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the

87

financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Term Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral without reliance upon the Administrative Agent or any other Lender or any of their Related Parties, and neither the Agents nor any of their Related Parties shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Term Loan hereunder or at any time or times thereafter, <u>provided</u> that, upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document.  If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender.  Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) have instructed such Agent to act or refrain from acting pursuant hereto.

(b)     Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any of its Related Parties or any other trustee, co-agent or other Person (including any Lender).  Any such Related Party, trustee, co-agent or other Person shall benefit from this Article X to the extent provided by the applicable Agent.

Section 10.03   <u>Rights, Exculpation, Etc.</u>  The Agents and their Related Parties shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Term Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.  The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled.  The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are

88

137438523_22

promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

Section 10.04    Reliance.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05    Indemnification.  To the extent that any Agent or any Related Party of the foregoing is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five (5) days of written demand by such Agent, reimburse such Agent and such Related Parties for and indemnify such Agent and such Related Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent and such Related Parties), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent and the Related Parties in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent and such Related Parties under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted from such Agent's or such Related Party's gross negligence or willful misconduct.  The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Term Loans and the termination of this Agreement.

Section 10.06    Agents Individually.  With respect to its Pro Rata Share of the Term Loan Commitments hereunder and the Term Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Term Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07    Successor Agent.  (a)    Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)      With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.  Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 12.04 and Section 12.16 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08    Collateral Matters.

(a)      The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Term Loan Commitments and payment and satisfaction of all Term Loans and all other Obligations (other than Contingent Indemnity Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section 12.02.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(a).

(b)      Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(a)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(a).  Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(c)      Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may

90

be the purchaser of any or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code), (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(d)     The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09     Agency for Perfection. Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions. In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10     No Reliance on any Agent's Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Money Laundering Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act.

137438523_22

Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11    No Third Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12    No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 10.13    Reports; Confidentiality; Disclaimers.    By becoming a party to this Agreement, each Lender:

(a)        is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to Holdings or any of its Subsidiaries (each, a "Report") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)        expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)        expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding Holdings and its Subsidiaries and will rely significantly upon Holdings' and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)        agrees to keep all Reports and other material, non-public information regarding Holdings and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 12.20, and

(e)        without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrower, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14    Collateral Custodian. Upon the occurrence and during the continuance of any Default or Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests.  Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such

custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral. All costs and expenses incurred by the Collateral Agent or its designee by reason of the employment of the custodian shall be the responsibility of the Borrower and charged to the Loan Account.

Section 10.15    Collateral Agent May File Proofs of Claim.

(a)    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(b)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(c)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Collateral Agent and, in the event that the Collateral Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent and its agents and counsel, and any other amounts due the Collateral Agent hereunder and under the other Loan Documents.

Section 10.16    Erroneous Distribution.    If all or any part of any payment or other distribution by or on behalf of the Administrative Agent to the Borrower, any Lender, or any other Person is determined by the Administrative Agent in its sole discretion to have been made in error as determined by the Administrative Agent (any such distribution, an "Erroneous Distribution"), then the Borrower, such Lender, or such other Person shall forthwith on written demand (accompanied by a reasonably detailed calculation of such Erroneous Distribution) repay to the Administrative Agent the amount of such Erroneous Distribution received by such Person. Any determination by the Administrative Agent, in its sole discretion, that all or a portion of any distribution to the Borrower, a Lender, or any other Person was an Erroneous Distribution shall be conclusive absent manifest error. The Borrower, each Lender, and any other potential recipient of an Erroneous Distribution hereunder waives any claim of discharge for value and any other claim of entitlement to, or in respect of, any Erroneous Distribution.

## ARTICLE XI

## GUARANTY

Section 11.01    Guaranty.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding (or any other matter under any Debtor Relief Law), other than the Chapter 11 Cases, of the Borrower, whether or not a claim for post-filing interest is allowed in

93

such Insolvency Proceeding) fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the "Guaranteed Obligations"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this Article XI. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding (or other matter under any Debtor Relief Law), other than the Chapter 11 Cases, involving the Borrower. Notwithstanding any of the foregoing, Guaranteed Obligations shall not include any Excluded Swap Obligations. In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law. The guarantee, indemnity and other obligations of Tarnow Investment, S.L. under this Article XI shall not guarantee any obligation or Collateral incurred for the purpose of, directly or indirectly, financing or securing the acquisition of, or the subscription for the shares of, its parent company (*sociedad dominante*), to the extent it would result in or constitute unlawful financial assistance within the meaning of Articles 143 of the Royal Decree 1/2010, July 2nd, Spanish Companies Act (*Real Decreto Legislativo 1/2010, de 2 de julio, por el que se aprueba el texto refundido de la Ley de Sociedades de Capital*).

Section 11.02    Guaranty Absolute. Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto. Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral. The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions. The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)        any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

Section 11.03    Waiver.  Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor.  Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits.  Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04    Continuing Guaranty; Assignments.    This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, its Term Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05    Subrogation.  No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the Final Maturity Date shall have occurred.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited

and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06    Contribution.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Article XI.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Article XI such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Article XI in respect of the Guaranteed Obligations.  "Fair Share Contribution Amount" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Article XI that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor.  "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Article XI(including, without limitation, in respect of this Section 11.06), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor.  The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01    Notices, Etc.

(a)    Notices Generally.  All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or telecopier.  In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

AgileThought, Inc.
222 Urban Towers
Suite 1650 E
Irving, TX 75039
Attention:  Chief Financial Officer
Telephone:  (877) 514-9180
Email: Carolyne.Cesar@agilethought.com

with a copy to:

AgileThought, Inc.
222 Urban Towers
Suite 1650 E
Irving, TX 75039
Attention:  Chief Legal Officer
Telephone:  (877) 514-9180
Email: diana.abril@agilethought.com

and (which shall not constitute notice) to:

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004 1482
Attention: Katie Coleman
Telephone: (212) 837-6447
Email:  katie.coleman@hugheshubbard.com

if to the Administrative Agent or the Collateral Agent, to it at the following
address:

Blue Torch Finance LLC
c/o Blue Torch Capital LP
150 East 58th Street, 39th Floor
New York, New York 10155
Email: BlueTorchAgency@alterdomus.com
with a copy to:

SEI – Blue Torch Capital Loan Ops
1 Freedom Valley Drive
Oaks, Pennsylvania 19456
Telecopier: (469) 709-1839
Email:  bluetorch.loanops@seic.com

in each case, with a copy (which shall not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention: Leonard Klingbaum and Nell Ethridge
Telecopier:  646-728-2694
Email: leonard.klingbaum@ropesgray.com; nell.ethridge@ropesgray.com

137438523_22

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided, that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided, further that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

(b)    Electronic Communications.

(i)    Each Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

(ii)    Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

Section 12.02    Amendments, Etc.    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (a) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Agents and the Lenders or extending an existing Lien over additional property, by the Agents and the Borrower, (b) in the case of any other waiver or consent, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and (c) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(i)    increase the Term Loan Commitment of any Lender, reduce the principal of, or interest on, the Term Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees on, the Term Loans payable to any Lender, in each case, without the written consent of such Lender;

(ii)    change the percentage of the Term Loan Commitments or of the aggregate unpaid principal amount of the Term Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender;

(iii)    amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender;

(iv)    release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Agents and the Lenders, or release the Borrower or any Guarantor (except in connection with a Disposition of the Equity Interests thereof permitted by Section 7.02(c)(ii)), in each case, without the written consent of each Lender; provided, that the Required Lenders may elect to release all or a substantial portion of the Collateral without the requirement to obtain the written consent of each Lender if such release is in connection with (x) an exercise of remedies by the Collateral Agent at the direction of the Required Lenders pursuant to Section 9.01 or (y) any Disposition of all or a substantial portion of the Collateral by one or more of the Loan Parties with the consent of the Required Lenders after the occurrence and during the continuance of an Event of Default so long as such Disposition is conducted in a commercially reasonable manner as if such Disposition were a disposition of collateral by a secured creditor in accordance with Article 9 of the UCC; or

(v)    amend, modify or waive Section 4.02, Section 4.03 or this Section 12.02 of this Agreement without the written consent of each Lender.

(b)    Notwithstanding anything to the contrary in **Error! Reference source not found.**:

(i)    no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents;

(ii)    any amendment, waiver or consent to any provision of this Agreement (including Sections 4.01 and 4.02) that permits any Loan Party, any Permitted Holder (or other equity holder of Holdings) or any of their respective Affiliates to purchase Term Loans on a non-pro rata basis, become an eligible assignee pursuant to Section 12.07 and/or make offers to make optional prepayments on a non-pro rata basis shall require the prior written consent of the Required Lenders rather than the prior written consent of each Lender directly affected thereby;

(iii)    any Control Agreement, Guaranty, Mortgage, Security Agreement, collateral access agreement, landlord waiver or other agreement or document, in each case, purporting to create or perfect a security interest in any of the Collateral (each, a "<u>Collateral Document</u>") may be amended, waived or otherwise modified with the consent of the applicable Agent and the applicable Loan Party without the need to obtain the consent of any Lender or any other Person if such amendment, modification, supplement or waiver is delivered in order (A) to comply with local Requirements of Law (including foreign law or regulatory requirements) or advice of local counsel, (B) to cure any ambiguity, inconsistency, omission, mistake or defect or (C) to cause such Collateral Document to be consistent with this Agreement and the other Loan Documents, and if the Administrative Agent and the Borrower shall have jointly identified an ambiguity, inconsistency, omission, mistake or defect, in each case, in any provision of any Loan Document (other than a Collateral Document), then the Administrative Agent and the Borrower shall be permitted to amend such provision; any amendment, waiver or modification pursuant to this paragraph shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof;

(iv)    no consent of any Loan Party shall be required to change any order of priority set forth in Section 2.06(c)(iv) and Section 4.03;

(v)    the Administrative Agent and the Borrower may enter into an amendment to this Agreement pursuant to Section 2.08(g) to reflect an alternate service or index rate and such other related changes to this Agreement as may be applicable; and

(vi)    no Defaulting Lender, Loan Party, Permitted Holder (or other equity holder of Holdings) or any of their respective Affiliates that is a Lender shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents and any Term Loans held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Term Loans of all other Lenders in the aggregate (other than such Defaulting Lender, Loan Party, Permitted Holder (or other equity holder of Holdings) or Affiliate).

(c)    If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender other than the Collateral Agent and the Administrative Agent and their respective Affiliates and Related Funds (the "Holdout Lender") fails to give its consent, authorization, or agreement, then the Collateral Agent, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "Replacement Lender"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 12.07. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Term Loans.

Section 12.03    No Waiver; Remedies, Etc. No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04    Expenses; Taxes; Attorneys' Fees. The Borrower will pay on demand, all reasonable out-of-pocket costs and expenses incurred by or on behalf of each Agent and each Lender, regardless of whether the transactions contemplated hereby are consummated (including, without limitation, (i) the reasonable fees, costs, client charges and expenses of FTI, (ii) the reasonable fees, charges and disbursements of one counsel to the Agents and the Lenders taken as a whole, any special or regulatory counsel and one local counsel for the Agents and the Lenders taken as a whole in each relevant jurisdiction that is material to the interests of the Agents and the Lenders, and solely in the case of an actual or perceived conflict of interest, where the party affected by such conflict informs the Borrower of such conflict and thereafter retains its own counsel one additional counsel in each relevant jurisdiction to each group of similarly situated affected parties, and (iii) reasonable costs and expenses for accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets,

100

appraisals of Collateral, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 7.01(b) or the review of any of the agreements, instruments and documents referred to in Section 7.01(f)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) any Environmental Claim, Environmental Liability or Remedial Action arising from or in connection with the past, present or future operations of, or any property currently, formerly or in the future owned, leased or operated by, any Loan Party, any of its Subsidiaries or any predecessor in interest, (k) any Environmental Lien, or (l) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing. Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrower agrees to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents and (y) if the Borrower fails to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrower. The obligations of the Borrower under this Section 12.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.05    Right of Set-off. Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.04 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agents and the Lenders under this Section 12.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 12.06    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07    <u>Assignments and Participations</u>.

(a)    This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; <u>provided</u>, <u>however</u>, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Subject to the conditions set forth in clause (c) below, each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to:

(i)    all or a portion of its Term Loan Commitment and any Term Loan made by it with the written consent of each Agent, and

(ii)    [reserved];

<u>provided</u>, <u>however</u>, that no written consent of the Collateral Agent or the Administrative Agent shall be required (A) in connection with any assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender.

(c)    Assignments shall be subject to the following additional conditions:

(i)    Each such assignment shall be in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Term Loan Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $5,000,000 or a multiple of $1,000,000 in excess thereof);

(ii)    The parties to each such assignment shall execute and deliver to the Administrative Agent, for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Collateral Agent, for the benefit of the Administrative Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender) and all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering or terrorist financing rules and regulations, including the USA PATRIOT Act; and

(iii)    No such assignment shall be made to (A) any Loan Party, any Permitted Holder (or other equity holder of Holdings) or any of their respective Affiliates or (B) any Defaulting Lender or any of its Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B).

(d)     Upon such execution, delivery and acceptance, from and after the recordation date of each Assignment and Acceptance on the Register, (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)     By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(f)     The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at one of its offices, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Term Loans (and stated interest thereon)owing to each Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior written notice.

(g)     Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Borrower, Administrative Agent or the Collateral Agent pursuant to Section 12.07(b) (which consent of the applicable Agent and Borrower must be evidenced by such Agent's or Borrower's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Term Loans and/or Term Loan Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in

conjunction with delivery of the assignment to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h)        A Term Loan (and the note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each note shall expressly so provide).  Any assignment or sale of all or part of a Term Loan (and the note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register or the Register, together with the surrender of the note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).

(i)        If any Lender sells participations in a Term Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Term Loans held by it and the principal amount (and stated interest thereon) of the portion of the Term Loan that is the subject of the participation (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under the Code or Treasury Regulations, including without limitation, Section 5f.103-1(c) of the United States Treasury Regulations. A Term Loan (and the note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each note shall expressly so provide). Any participation of such Term Loan (and the note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(j)        Any Person who purchases or is assigned or participates in any portion of such Term Loan shall comply with Section 2.10(d).

(k)        Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Term Loan Commitments and the Term Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Term Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Term Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 of this Agreement or any other Loan Document). The Loan Parties agree that each participant shall be entitled to the benefit of Section 2.10 and Section 2.11 of this Agreement (subject to the requirements and limitations therein, including the requirements under Section 2.10(d) (it being understood that the documentation required under Section 2.10(d) shall be delivered to the participating Lender)) with respect to its participation in any portion of the Term Loan Commitments and the Term Loans as if it were a Lender; provided that a participant shall not be entitled to receive any greater payment under Section 2.10

or Section 2.11 with respect to its participation than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participant acquired the applicable participation.

(l)       Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to, or other indebtedness issued by, such Lender pursuant to a securitization transaction (including any structured warehouse credit facility, collateralized loan obligation transaction or similar facility or transaction, and including any further securitization of the indebtedness or equity issued under such a transaction) (a "Securitization"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  The Loan Parties shall cooperate with such Lender and its Affiliates to effect a Securitization, including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its Term Loans or any Securitization.

Section 12.08   Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by telecopier or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telecopier or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

Section 12.09   GOVERNING LAW. EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN SUCH OTHER LOAN DOCUMENTS) AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

Section 12.10   Submission to Jurisdiction. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT IF OTHERWISE EXPRESSLY SET FORTH IN SUCH OTHER LOAN DOCUMENTS), OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT ANY AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

Section 12.11    <u>Waiver of Venue</u>.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SECTION 12.10.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

Section 12.12    <u>Service of Process</u>.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 12.13    <u>Consent by the Agents and Lenders</u>.  Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "<u>Action</u>") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.14    <u>No Party Deemed Drafter</u>.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.15    <u>Reinstatement; Certain Payments</u>.  If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to each other Agent and Lender and the Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.16    <u>Indemnification; Limitation of Liability for Certain Damages</u>.

(a)    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Related Parties (collectively called the "<u>Indemnitees</u>") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document, of any Environmental Claim or any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrower under this Agreement

or the other Loan Documents, including, without limitation, the management of any such Term Loans or the Borrower's use of the proceeds thereof, (iii) the Agents and the Lenders relying on any instructions of the Borrower or the handling of the Loan Account and Collateral of the Borrower as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (v) any claim, including any Environmental litigation, investigation or proceeding relating to or arising out of any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)      The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.16 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.16 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)      No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)      The indemnities and waivers set forth in this Section 12.16 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

(e)      This Section 12.16 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

Section 12.17    Records.  The unpaid principal of and interest on the Term Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.07 hereof, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.18    Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.19    Highest Lawful Rate.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender

under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrower); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section 12.19, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrower).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Term Loans until payment in full so that the rate or amount of interest on account of any Term Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 12.19 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 12.19.

For purposes of this Section 12.19, the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.20    Confidentiality.  Each Agent and each Lender agrees (on behalf of itself and its Related Parties) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time

is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates, its Related Parties or the Related Parties of any Person described in clause (ii) or (iii) below) (it being understood that the Persons to whom such disclosure is made either will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.20 or is subject to other customary confidentiality obligations); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization, so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization agrees, in writing, to be bound by or is otherwise subject to customary confidentiality obligations (including, without limitation, confidentiality provisions similar in substance to this Section 12.20); (iv) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority; (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency; (vi) in connection with any litigation to which any Agent or any Lender is a party; (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (viii) to any other Person if such information is general portfolio information that does not identity the Loan Parties, or (ix) with the consent of the Borrower. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to any Agent or any Lender in connection with the administration of this Agreement, the other Loan Documents and the Term Loan Commitments.

Section 12.21   <u>Public Disclosure</u>.   Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure).   Each Loan Party hereby authorizes each Agent and each Lender, after consultation with the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.22   <u>Integration</u>.   This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.23   <u>USA PATRIOT Act</u>.   Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrower, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrower in accordance with the USA PATRIOT Act.   Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered as of the date set forth on the first page hereof.

BORROWER:

**AN GLOBAL LLC**

By: _____
Name:
Title:

GUARANTORS:

**AGILETHOUGHT, INC.**

By:_____
Name:
Title:

**AGILETHOUGHT, LLC**

By:_____
Name:
Title:

**4TH SOURCE, LLC**

By:_____
Name:
Title:

**IT GLOBAL HOLDINGS LLC**

By:_____
Name:
Title:

**4TH SOURCE HOLDING CORP.**

By:_____
Name:
Title:

**QMX INVESTMENT HOLDINGS USA, INC.**

By:_____
Name:
Title:

**AGS ALPAMA GLOBAL SERVICES USA, LLC**

By:_____
Name:
Title:

**ENTREPIDS TECHNOLOGY INC.**

By:_____
Name:
Title:

**4TH SOURCE MEXICO, LLC**

By:_____
Name:
Title:

**AN USA**

By:_____
Name:
Title:

**AGILETHOUGHT DIGITAL SOLUTIONS, S.A.P.I. DE C.V.**

By:_____
Name:
Title:

[Signature Page to DIP Financing Agreement]

**FAKTOS INC., S.A.P.I DE C.V.**

By:_____
Name:
Title:

**AGILETHOUGHT MEXICO, S.A. DE C.V.**

By:_____
Name:
Title:

**AGILETHOUGHT    BRASIL-CONSULTORIA    EM
TECNOLOGIA LTDA**

By:_____
Name:
Title:

**AGILETHOUGHT    BRASIL    SERVICOS    DE
CONSULTORIA EM SOFTWARE LTDA**

By:_____
Name:
Title:

**AGILETHOUGHT COSTA RICA, S.A.**

By:_____
Name:
Title:

**AGILETHOUGHT SERVICIOS
ADMINISTRATIVOS, S.A. DE C.V.**

By:_____
Name:
Title:

[Signature Page to Financing Agreement]

**AGILETHOUGHT SERVICIOS MÉXICO, S.A. DE C.V.**

By:_____
Name:
Title:


**AN DATA INTELLIGENCE, S.A. DE C.V.**

By:_____
Name:
Title:


**AN EXTEND, S.A. DE C.V.**

By:_____
Name:
Title:


**AN EVOLUTION, S. DE R.L. DE C.V.**

By:_____
Name:
Title:


**AN UX, S.A. DE C.V.**

By:_____
Name:
Title:


**CUARTO ORIGEN, S. DE R.L. DE C.V.**

By:_____
Name:
Title:


[Signature Page to Financing Agreement]

**ENTREPIDS MÉXICO, S.A. DE C.V.**


By:_____
Name:
Title:

**FACULTAS ANALYTICS, S.A.P.I. DE C.V.**


By:_____
Name:
Title:


**AGILETHOUGHT, S.A.P.I. DE C.V.**


By:_____
Name:
Title:

[Signature Page to Financing Agreement]

<u>COLLATERAL AGENT AND</u>
<u>ADMINISTRATIVE AGENT:</u>

**BLUE TORCH FINANCE LLC**, as Collateral Agent
and Administrative Agent
By: Blue Torch Capital LP, its managing member


By: _____
       Name: Kevin Genda
       Title:  CEO

[Signature Page to DIP Financing Agreement]

LENDERS:

[TBD]


By: _____
       Name:
       Title: