## **EXHIBIT B**

**Reply**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| AN GLOBAL, LLC, et al.,[1] | Case No. 23-11294 (JKS) |
| Debtors. | (Jointly Administered) |

### CREDIT SUISSE MEXICO CREDIT OPPORTUNITIES FUND'S REPLY IN SUPPORT OF RESERVATION OF RIGHTS WITH RESPECT TO ENTRY OF FINAL DIP ORDER

Credit Suisse Mexico Credit Opportunities Fund ("Credit Suisse Mexico")[2], by and through their undersigned counsel, hereby submit this Reply (this "Reply") in support of the reservation of rights ("Reservation of Rights") to the *Credit Suisse Mexico Credit Opportunities Fund's Reservation of Rights with Respect to Entry of Final DIP Order* [Docket No. 103] (the "Reservation of Rights")[3] and in response to the *Response of Debtors to Credit Suisse Mexico Credit Opportunities Fund's Reservation of Rights with Respect to Entry of Final DIP Order* [Docket No. 163] (the "Debtor Response") and the related joinders filed by Blue Torch [Docket No. 164] (the "Blue Torch Joinder") and the Creditors' Committee [Docket No. 179] (the "Committee Joinder" and, collectively with the Debtor Response and the Blue Torch Joinder, the "Responses"). In support of this Reply, Credit Suisse Mexico respectfully states as follows:

---

[1] A complete list of the Reorganized Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://kroll.com/AgileThought. The Debtors' address is 222 W. Las Colinas Boulevard, Suite 1650E, Irving, TX 75039.

[2] "Credit Suisse Mexico Credit Opportunities Fund" is the commercial name of the trust established pursuant to that certain Irrevocable Trust Agreement F/179122 entered into among, *inter alia*, Banco Credit Suisse (México), S.A., Institución de Banca Múltiple, Grupo Financiero Credit Suisse (México) as Settlor, Manager and Second Place Beneficiary and Banco Nacional de México, S.A. integrante del Grupo Financiero Banamex, División Fiduciaria as trustee. Credit Suisse Mexico Credit Opportunities Fund is the beneficiary of the two trusts that are the record holders of the Prepetition 2L Loans and signatories to the Prepetition 2L Credit Agreement.

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Reservation of Rights or in the Motion (as defined in the Reservation of Rights), as applicable.

**REPLY**

1.  This Court's Interim DIP Order is neutral in respect of the Intercreditor Agreement, as it contains language expressly reserving the rights of all parties under the Intercreditor Agreement. See, Interim DIP Order at ¶ 4 ("Nothing in this Interim Order shall modify the terms of the Intercreditor Agreement, and the rights, priorities, and obligations set forth therein."). Prior to the hearing on the Interim DIP Order, Credit Suisse Mexico discussed its view that the DIP Obligations would be captured by the First Lien Cap with counsel to Blue Torch and the counsel to the Debtors. Based on the inclusion of the intercreditor-neutrality language in the Interim Order, and in the absence of any other intercreditor-related findings, Credit Suisse took no issue with the Interim Order and communicated as much to Blue Torch's counsel prior to and at the First Day Hearing.

2.  On September 15, Credit Suisse Mexico filed a three-page reservation of rights, restating its position with respect to the First Lien Cap, supporting the Debtors' DIP process, and asking that a Final Order be entered approving the DIP Facility and containing the same intercreditor neutrality language reflected in the Interim DIP Order. Eighteen days later, the Debtors — joined by Blue Torch and the Committee — responded to this Reservation of Rights by asserting that Credit Suisse Mexico does not have standing to file a Reservation of Rights and has violated the Intercreditor Agreement. Additionally, these Parties have now disclosed to the Court that Blue Torch is unwilling to allow any further funding under the DIP Facility without a series of findings that abrogate the rights of all Prepetition 2L Lenders and the Prepetition 2L Agent under the Intercreditor Agreement.

3.  The Responses should be set aside. For the avoidance of doubt, as clearly stated in the Reservation of Rights, and notwithstanding any assertions to the contrary, Credit Suisse

Mexico **does not** object to the Debtors' entry into the DIP Facility, nor does Credit Suisse object to any feature of the DIP or any provision of the DIP Order that does not relate to the Intercreditor Agreement. Instead, Credit Suisse submits that the Final DIP Order should be entered on terms consistent with the Interim DIP Order, with rights under the Intercreditor Agreement intact.

4. There are three central issues in the Responses. **First**, the Debtor Response treats Credit Suisse Mexico as a stranger to these Chapter 11 Cases and the Intercreditor Agreement. This is disingenuous. As the Debtors know well, for months leading up to the Petition Date, both the Company and Blue Torch have consistently worked directly with Credit Suisse Mexico and its legal advisors on matters closely related to the Intercreditor Agreement. This included the negotiation of three separate amendments to the Intercreditor Agreement to permit increases to the First Lien Cap. Indeed, the Company's own First Day Declaration describes the Prepetition 2L Credit Agreement as a "second lien credit facility . . . with Nexxus Capital and Credit Suisse."[4] See Declaration of James S. Feltman, Chief Restructuring Officer of the Debtors, in Support of First Day Relief, [Docket No. 13] ¶ 32.

5. The Intercreditor Agreement identifies each Second Lien Creditor as an express beneficiary of the Intercreditor Agreement. See Intercreditor Agreement § 9.14[5] ("This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the

---

[4] As the First Day Declaration goes on to note, the Nexxus portion of the Prepetition 2L Credit Facility converted into equity of the Company on June 15, 2023, leaving only Credit Suisse as a major holder of obligations under the Prepetition 2L Credit Agreement. Credit Suisse is mentioned seven times throughout this Declaration.

[5] A copy of the Intercreditor Agreement can be found at Exhibit 33 of the Supplemental Declaration of James S. Feltman in Support of the Debtors' DIP Financing Motion [Docket No. 163] (the "Supplemental Feltman Declaration"). While the Supplemental Feltman Declaration also includes subsequent amendments to the Intercreditor Agreement, none of those Amendments altered the language cited in this Reply.

Agents, the First Lien Creditors **and the Second Lien Creditors**.") (emphasis added). The Debtor Response seeks to enforce the Intercreditor Agreement against Credit Suisse Mexico (based on a misreading of it) and determine certain critical items under the Intercreditor Agreement. The Debtors and Blue Torch cannot, at the same time, seek to allege that Credit Suisse Mexico lacks the most basic standing, to resist such enforcement and to request that this Court reserve its rights under the Intercreditor Agreement.

6.   Most importantly, the Debtor Response and the related joinders inaccurately depict the filing of a simple Reservation of Rights as an attempt to enforce rights and remedies against the Debtors or Blue Torch. This is clearest in the Debtors' citation to Section 14.12 of the Prepetition 2L Credit Agreement. This Section prohibits individual lenders from exercising enforcement actions (such as set-off and foreclosure) without the prior consent of the Prepetition 2L Agent.[6] However, by no means is Credit Suisse Mexico seeking to take any enforcement or collection actions or, for that matter, to take any action at all under the Prepetition 2L Credit Agreement or the Prepetition Intercreditor Agreement.[7] Credit Suisse Mexico is simply

---

[6] See, Supplemental Feltman Declaration, at Ex. 22, § 14.12 ("All enforcement actions under this Agreement and the other Loan Documents (other than the Mexican Collateral Agreements or the Mexican Collateral Amendment and Reaffirmation Agreements) against the Loan Parties or any third party with respect to the Obligations or the Collateral may be taken by only Administrative Agent or Collateral Agent (at the direction of the Required Lenders or as otherwise permitted in this Agreement) or by their respective agents at the direction of such Agent.").

[7] In any case, the Prepetition 2L Credit Agreement cited by the Debtors makes clear that the role of the Prepetition 2L Agent is purely administrative and mechanical, and that the authority and responsibility to make determinations set forth in the Prepetition 2L Credit Agreement ultimately rests with the Prepetition 2L Lenders. See, Id. at 14.4 ("The duties of each of the Administrative Agent and the Collateral Agent under the Loan Documents are solely mechanical and administrative in nature. The Administrative Agent and the Collateral Agent shall be entitled to request written instructions, or clarification of any instruction, from the Required Lenders (or, if the relevant Loan Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Administrative Agent and the Collateral Agent may refrain from acting unless and until it receives those written instructions or that clarification.")

requesting that this Court's Final DIP Order clarify that it works in concert with the Intercreditor Agreement (by using the same language included in the Interim DIP Order).

7. **Second**, the Responses wrongly assert that Credit Suisse Mexico has objected to the Motion. As stated clearly in the Reservation of Rights, and as reiterated herein, "Credit Suisse Mexico does not object to either the entry of the Final Order approving the Motion or the Debtors' entry into the DIP Facility on a final basis." Reservation of Rights at ¶ 5.[8] Credit Suisse Mexico merely seeks that this Court hold the Debtor and Blue Torch to the Court's Interim DIP Order, namely, that the DIP Order is to be entered without prejudice to the parties' rights under the Intercreditor Agreement. To attempt to transform this action into a breach of the Intercreditor Agreement — the very Intercreditor Agreement that Credit Suisse Mexico is seeking to preserve — proves too much.

8. **Third**, in the event that the Court were to elect to decide the issue of whether the DIP Obligations constitute First Lien Obligations (and, consequently, Excess First Lien Obligations), the Debtors' position is incorrect. The Debtor Response glosses over key provisions of the Intercreditor Agreement as they relate to the First Lien Cap and provides an insufficient basis for the key findings included in the Proposed Final Order. Most notably, the definition of First Lien Obligations set out in the Debtor Response omits critical language supporting Credit Suisse Mexico's position that the DIP Obligations are, in fact, First Lien Obligations under the Intercreditor Agreement. The Debtor Response states as follows:

> 17. More importantly, perhaps, the Intercreditor Agreement defines "*First Lien Obligations*" as follows: "First Lien Obligations" shall mean all "Obligations", *as defined in the First Lien Loan Agreement . . . pursuant to the terms of the First Lien Documents. First Lien Obligations shall continue to constitute First Lien Obligations, notwithstanding the fact that such First Lien Obligations or*

---

[8] Credit Suisse Mexico did, however, reserve its rights with respect to the Final Order, to provide protection for this exact scenario.

> ***any claim for such First Lien Obligations is subordinated,*** avoided or disallowed under the Bankruptcy Code, Debtor Relief Law or other applicable law.  First Lien Obligations shall also include any Debt of the First Lien Borrowers and each other Credit Party incurred in connection with a Refinancing of the First Lien Obligations under the First Lien Documents to the extent permitted by Section 5.3.
>
> 18. The Intercreditor Agreement thus defines First Lien Obligations solely as those Obligations defined ***in the First Lien Credit Agreement.***

Debtor Reservation of Rights ¶ 17–18 (emphasis in original).

       9.       However, the actual definition of First Lien Obligations in the Intercreditor Agreement is broader than as set forth in the Debtor Response.  The definition is as follows — the bracketed language having been omitted from the Debtor Response:

> "First Lien Obligations" shall mean all "Obligations", as defined in the First Lien Loan Agreement [, including all principal, interest, charges, expenses, fees, attorneys' fees and other sums (including all interest, charges, expenses, fees, attorneys' fees and other sums that would accrue but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code or any other provision of the Bankruptcy Code) chargeable to the First Lien Borrowers or any other Credit Party by the First Lien Agent and/or any First Lien Creditor**, and reimbursement, indemnity or other obligations due and payable to the First Lien Agent and/or any First Lien Creditor] pursuant to the terms of the First Lien Documents**.  First Lien Obligations shall continue to constitute First Lien Obligations, notwithstanding the fact that such First Lien Obligations or any claim for such First Lien Obligations is subordinated, avoided or disallowed under the Bankruptcy Code, Debtor Relief Law or other applicable law.  First Lien Obligations shall also include any Debt of the First Lien Borrowers and each other Credit Party incurred in connection with a Refinancing of the First Lien Obligations under the First Lien Documents to the extent permitted by Section 5.3.

Intercreditor Agreement § 1.1 (emphasis and brackets added).

       10.      The Debtor Response wrongly states that the "First Lien Obligations" are limited solely to the obligations defined in the First Lien Credit Agreement.  This is directly contrary to the plain language of the definition of First Lien Obligations, which is expansive, and includes "any reimbursement, indemnity, or other obligations due and payable to the First Lien Agent and/or any First Lien Creditor pursuant to the terms of the First Lien Documents." Id.  In turn,

the First Lien Documents are defined as "(a) the First Lien Loan Agreement, **and (b) all other documents** pursuant to which any Credit Party or any other Person grants to the First Lien Agent or any First Lien Creditor a Lien on any Collateral, including, without limitation, all "Loan Documents" (as defined in the First Lien Loan Agreement) . . ." Id. (emphasis added). A plain reading of the definition of First Lien Obligations makes clear that it captures all obligations under any First Lien Documents, which includes, **but is expressly not limited to** the First Lien Credit Agreement and the other Loan Documents defined in the First Lien Credit Agreement.

11. The DIP Documents are First Lien Documents, as they are documents pursuant to which the Credit Parties (namely, certain Debtors) grant the First Lien Agent or any First Lien Creditor (namely, Blue Torch) a lien on Collateral (the Collateral securing the Prepetition 1L Credit Agreement also secured the DIP Facility). As such, the DIP Obligations are amounts due under First Lien Documents and are thus First Lien Obligations under the Intercreditor Agreement. To the extent those First Lien Obligations exceed the First Lien Cap, (as the Debtor acknowledges they would), they are Excess First Lien Obligations.

12. The Debtor Response goes to great lengths to explain that the DIP Facility and related Roll-Up are new obligations, which are not governed by First Lien Documents or governed by the Intercreditor Agreement.[9] However, even if this is the case, then the DIP Facility would constitute a "Refinancing"[10] of the First Lien Obligations, because the DIP

---

[9] See Debtor Reply at ¶ 19 ("[R]egardless of the amount of the final DIP Facility, whether it is just the new money ($22.7 million) or the aggregate amount of the new money and the full roll-up of the outstanding Prepetition 1L Obligations (not less than $119,882,093.79), the DIP Obligations are all incurred under the DIP Loan Documents, not the prepetition loan documents, and therefore are not subject to the First Lien Cap in the Intercreditor Agreement.").

[10] The Intercreditor Agreement provides that to "Refinance" is "in respect of any Debt, to refinance, extend, renew, defease, restructure, replace, refund or repay, or to issue other Debt, in exchange or replacement for, such Debt, in any case in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings." Intercreditor Agreement § 1.1.

Facility will refinance and replace the First Lien Obligations in full[11], and would thus be governed by Section 5.3 of the Intercreditor Agreement. Section 5.3 of the Intercreditor Agreement provides that if a Refinancing of the First Lien Obligations has the effect of "increasing the aggregate principal amount of loans, letters of creditor, bankers acceptances, bonds, debentures, notes, or similar instruments or other similar extensions of credit or commitments therefor beyond the First Lien Cap", then such amendment must be consented to by the Prepetition 2L Agent.[12] The Debtors concede that the amount of DIP Obligations (which they argue are new, non-First Lien Obligations, but which will refinance and replace the existing First Lien Obligations) exceed the First Lien Cap. For this reason, if the DIP Obligations are not, as the Responses contend, First Lien Obligations under the Intercreditor Agreement, then the Refinancing of the Prepetition 1L Credit Agreement that will be accomplished through the DIP Facility and the related Roll-Up requires the consent of the Prepetition 2L Agent.

13. For the avoidance of doubt, Credit Suisse Mexico is not currently seeking and has not sought to litigate (before this Court or any other) whether the DIP Obligations are First Lien Obligations under the Intercreditor Agreement, or whether there was any other breach of the Intercreditor Agreement resulting from the DIP Facility. Credit Suisse Mexico has not sought and is not currently seeking any subordination of any portion of the DIP Facility. Whether and when such issues are ultimately appropriate for litigation will depend on a number of factors, including, ultimately, the value realized the Debtors in their ongoing sale process. Credit Suisse

---

[11] See Motion at pg. 23 ("Proceeds of the Roll-Up Loans will be used solely to refinance (through a cashless conversion) the same amount of Prepetition 1L Obligations under the Prepetition 1L Credit Agreement").

[12] See Intercreditor Agreement § 5.3(c) ("Without the consent of the Second Lien Agents, the First Lien Agent and the First Lien Creditors will not amend . . . (or Refinance) the terms of the First Lien Documents if the effect of such amendment . . . (or Refinancing) is to . . . (iv) increase[] the aggregate principal amount of loans, letters of credit, bankers acceptances, bonds, debentures, notes, or similar instruments or other similar extensions of credit or commitments therefor beyond the First Lien Cap.")

has simply requested that the Final DIP Order not be used as a tool to litigate complex intercreditor issues.

14.  Lastly, Blue Torch's decision to withhold DIP funding from the Debtors cannot serve as an avenue to convert the Final DIP Hearing into an Intercreditor trial. The DIP Motion did not seek any relief or finding in respect of the Intercreditor Agreement (other than by stating that all parties' rights are expressly preserved). In turn, notwithstanding the fact that the Reservation of Rights was filed nearly three weeks ago, the Debtors and Blue Torch elected to disclose at 11:00 PM less than three days before the Final DIP Hearing that Blue Torch had been withholding funding from the Debtors under the DIP Credit Agreement as a result of the Reservation of Rights.[13] As the three separate amendments to the Intercreditor Agreement clearly show, the First Lien Cap has been top of mind for each of the Debtors, Blue Torch, and Credit Suisse Mexico since at least April of 2023.[14] Moreover, the Debtors and Blue Torch have been aware of Credit Suisse Mexico's position with respect to the DIP Obligations and the First Lien Cap since prior to the Petition Date. If Blue Torch has decided to withhold funding from the Debtors (and the Debtors have consented to this) is has done so on its own accord, and this cannot form the basis to drag any Intercreditor issues before this Court.

15.  In summary, Credit Suisse Mexico respectfully requests that the Court enter the Final DIP Order, substantially in the form proposed by the Debtors, subject to removal of the requested intercreditor-related findings and clarification that the Final DIP Order is without

---

[13] Instead of seeking relief to require Blue Torch to fund these amounts or reaching out to Credit Suisse Mexico to resolve any issues raised in the Reservation of Rights, the Debtors simply filed their replies, stated that Blue Torch is entitled to withhold funding and asked this Court to determine Intercreditor issues at the Final DIP Hearing.

[14] See, Supplemental Feltman Declaration, at Exs. 34–36 (each providing for an increase in the then-existing First Lien Cap)

prejudice to any other rights of the parties to the Intercreditor Agreement in respect of the DIP Facility.

Dated: Wilmington, Delaware
October 4, 2023

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Joseph O. Larkin*
Joseph O. Larkin (I.D. No. 4883)
Stephen J. Della Penna (ID No. 6103)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone: (302) 651-3000
Fax: (302) 651-3001
joseph.larkin@skadden.com
stephen.dellapenna@skadden.com

- and -

James J. Mazza, Jr. (admitted *pro hac vice*)
Robert E. Fitzgerald (admitted *pro hac vice*)
155 North Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0549
Fax: (312) 407-8641
james.mazza@skadden.com
robert.fitzgerald@skadden.com

*Counsel to Credit Suisse Mexico Credit Opportunities Fund*